IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LAKESHORE FARMS, INC., | ) | Case No 18-50077-btf11 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**EMERGENCY MOTION
FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN
POST PETITION FINANCING PURSUANT TO 11 U.S.C §§ 105,
363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING
A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014**

Lakeshore Farms, Inc., Debtor and Debtor-in-Possession ("**Debtor**"), by and through

counsel, Joanne B. Stutz of Evans & Mullinix, P.A., submits this emergency motion ("**the**

**Motion**") for entry of interim ("**the Interim Order**") and final ("**the Final Order**") orders

Authorizing Debtor to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 363,

364(c)(1), 364(c)(2), 364(d)(1), and 503(b)(1), and Scheduling a Final Hearing Pursuant to Fed.

R. Bankr. P 2002, 4001 and 9014.  In support of this Motion, Debtor represents as follows:

**BACKGROUND**

1.      On the 28th day of February, 2018, Lakeshore Farms, Inc. (hereinafter "**Debtor**")

filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the

Bankruptcy Code).  Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, Debtor remains as

Debtor-in-Possession.

2.      No trustee or examiner has been appointed in Debtor's Chapter 11 case, and no

committees have been appointed or designated.

3.      Debtor is a farming operation, owned by Jonathan Russell and formed on January

26, 2001, with its principal place of business located at 24806 Highway 69, Forest City, Missouri

64551.

00775204

In the United States Bankruptcy Court
For the Western District of Missouri, Kansas City Division
In re LAKESHORE FARMS, INC.
Case No 18-50077-btf11
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105,  363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING A
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).

5.      Debtor has experienced financial difficulties, which resulted in the filing of this

Chapter 11 case.  However, those difficulties are not sufficient to force the cessation of Debtor's

operations.  Rather, Debtor has the ability to reorganize and desires to do so.

## RELIEF REQUESTED

6.      Debtor seeks approval of an Interim Order and a Final Order authorizing Debtor

to obtain Debtor in Possession (**DIP**) financing, secured by Debtor's 2018 crops.

**The Interim Financing Order**

7.      Debtor proposes entry of the Interim Order, in substantially the same form as the

order attached hereto, that provides, among other things, this Court's authorization under

sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy

Code, for Debtor:

a.      to obtain secured postpetition financing ("**the Postpetition Financing**") in

the aggregate principal amount of up to $2,900,323.00 ("**the Commitment**")

from Agrifund, LLC and its participating distributor, Agri-Next 3F Farms

(collectively "**ARM**") pursuant to a *Demand Promissory Note* in the amount of

$2,373,879.00 between Debtor and Agrifund("**the Agrifund Note**") and an *Ag-

Input Inter-Creditor Agreement*  ("**the Inter-Creditor Agreement**") between

2

In the United States Bankruptcy Court
For the Western District of Missouri, Kansas City Division
In re LAKESHORE FARMS, INC.
Case No 18-50077-btf11
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105,  363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING A
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014

Debtor and ARM in the amount of $526,444.00 (the Agrifund Note and the Inter-

Creditor Agreement shall collective be referred to as "**the DIP Loan**") ;

b.       to grant ARM, as security for Debtor's obligations under the DIP Loan:

    i.       priority in payment from the 2018 crop proceeds and crop insurance,
pursuant to section 364(c)(1) of the Bankruptcy Code, with respect to
such obligations over any and all administrative expenses of the kinds
specified in Bankruptcy Code sections 503(b) and 507(b) (to the
extent permitted by law);

    ii.      first priority, senior priming liens, pursuant to section 364(d)(1) of the
Bankruptcy Code, in the 2018 crop proceeds and crop insurance of
Jonathan Russell or Debtor, whichever is the owner and beneficiary of
said crop insurance, related to Debtor's farming operations;

c.       to borrow up to $2,900,323.00 under the DIP Loan on an interim basis

pending a final hearing on this Motion; and

d.       to schedule a final hearing on this Motion ("**the Final Hearing**") pursuant

to Bankruptcy Rule 4001, to consider entry of a final Order authorizing the

Postpetition Financing; and

e.       to establish notice procedures regarding the Final Hearing.

8.       Debtor further requests that the Interim Financing Order require ARM to, in

accordance with the terms of the DIP Credit Agreement, as defined herein, immediately pay the

lease payments due for the crop land Debtor requires in order to operate its farming operation.

**BASIS FOR RELIEF**

9.       Debtor has determined that the DIP Loan is necessary to enable Debtor to fulfill

its Chapter 11 obligations and successfully reorganize.  Because Debtor lacks the financial

wherewithal to fund its farming operation in 2018, Debtor concluded that obtaining a firm

In the United States Bankruptcy Court
For the Western District of Missouri, Kansas City Division
In re LAKESHORE FARMS, INC.
Case No 18-50077-btf11
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105,  363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING A
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014

commitment for postpetition financing at the outset of this case is both necessary and in the best

interest of its creditors.

10.     Before the Petition Date, Debtor approached ARM for the purpose of obtaining

postpetition financing.  As ARM is familiar with Debtor's business, having made at least one

prior loan to Debtor, and provided an indication of its intent and willingness to serve as Debtor's

DIP Lender, Debtor determined in its sound business judgment that ARM's proposal for the

Postpetition Financing was the most favorable under the circumstances and addressed Debtor's

capital needs.

11.     The DIP Loan and other documents to be executed in connection therewith

(collectively, "**the Documents**") are the result of arm's length negotiations between Debtor and

ARM.  A representative copy of the proposed DIP Loan and the Documents, which are subject to

revision, is attached hereto as Exhibit A and made a part hereof for all purposes.

12.     As is more fully set forth in the proposed Interim Financing Order, any

stipulations, admissions, agreements and assertions contained in the Interim Order are only

binding on third parties if such party in interest, including Debtor or a committee appointed in

this case, fails to challenge such stipulations, admissions, agreements and assertions within thirty

(30) days after the initial selection of counsel for such committee (unless a further time is agreed

to by ARM or the Court orders a longer period on a showing by a party in interest that ARM did

not cooperate with the reasonable requests of such party).

## THE POSTPETITION FINANCING SHOULD BE APPROVED

13.     Sections 364(c) and (d) of the Bankruptcy Code provide:

In the United States Bankruptcy Court
For the Western District of Missouri, Kansas City Division
In re LAKESHORE FARMS, INC.
Case No 18-50077-btf11
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105,  363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING A
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

(1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)  secured by a junior lien on property of the estate that is subject to a lien

(d) (1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if -

(A)  the trustee is unable to obtain such credit otherwise; and

(B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)  In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

14.    Debtor negotiated the DIP Loan at arm's length and pursuant to its business judgment.  Courts have generally given deference to Debtor's exercise of its business judgment, so long as that exercise is in compliance with the underlying provisions and policies of the Bankruptcy Code.

15.    The DIP Loan is for the benefit of Debtor's estate and its creditors.  Such financing is the sole means of preserving and enhancing Debtor's going concern value. With the credit provided by the DIP Loan, Debtor will be able to operate its business and reorganize.  In the absence of the DIP Loan Debtor will be unable to meet its operating expenses, causing irreparable harm to its reorganization efforts.

16.    Thus, this Court should authorize Debtor to enter into the DIP Loan.

In the United States Bankruptcy Court
For the Western District of Missouri, Kansas City Division
In re LAKESHORE FARMS, INC.
Case No 18-50077-btf11
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105,  363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING A
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014

17.    The terms and conditions of the DIP Loan are fair and reasonable and were

negotiated by the parties in good faith and at arms' length.  Thus, ARM should be accorded the

benefits of section 364(e) of the Bankruptcy Code.

## INTERIM APPROVAL SHOULD BE GRANTED

18.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit

pursuant to section 364 may not be commenced earlier than fourteen (14) days after the service

of such motion.  However, the Court may conduct a preliminary expedited hearing on the motion

and authorize Debtor to obtain credit to the extent necessary to avoid immediate and irreparable

harm to the debtor's estate, pending a final hearing.

19.    Debtor requests that the Court conduct an expedited preliminary hearing on the

Motion and enter an Interim Financing Order which authorizes Debtor, pending a Final Hearing,

to obtain the credit contemplated by the DIP Credit Agreement in the amount of not more than

$2,900,323.00.  This will enable Debtor to operate while it pursues reorganization and avoid

immediate and irreparable harm and prejudice to its creditors and all parties in interest pending

the Final Hearing.

## NOTICE OF THIS MOTION

20.    Notice of the hearing on this Motion, with a copy of the Motion, will be served on

the following entities and/or their counsel: (1) the Office of the United States Trustee; (2) ARM;

(3) Debtor's creditors, both secured and unsecured, and Lessors, as reflected on the Court's

mailing matrix by facsimile, if known, otherwise by overnight mail.

In the United States Bankruptcy Court
For the Western District of Missouri, Kansas City Division
In re LAKESHORE FARMS, INC.
Case No 18-50077-btf11
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105,  363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING A
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014

## NOTICE OF INTERIM FINANCING ORDER
## AND HEARING ON FINAL ORDER

21.     Debtor respectfully requests that the Court set a final hearing date on the Motion

as soon as practicable and permitted by applicable law and an objection deadline on or before

5:00 p.m. (Prevailing Central Time) five (5) business days prior to the date of the final hearing,

and authorize Debtor to serve a copy of the signed Interim Financing Order, which shall fix the

time and date for the filing of objections, if any, by ECF or, if such party will not receive notice

by ECF, by first class mail upon (1) counsel to any official committee of unsecured creditors

appointed in this case; (2) the Office of the United States Trustee; (3) all parties who have filed

requests for notice under Bankruptcy Rule 2002 as of the date of service of the Interim Financing

Order but do not receive notice through ECF; (4) counsel for ARM; and (5) Debtor's creditors,

both secured and unsecured, and Lessors, as reflected on the Court's mailing matrix at their last

known addresses.  Debtor requests that the Court consider such notice of the Interim Financing

Order to be sufficient notice under Bankruptcy Rule 4001.

22.     Debtor further requests that the Court order that any party in interest objecting to

the relief sought at the final hearing on the Interim Financing Order shall serve and file written

objections, which objections shall be served upon: (1) Joanne B. Stutz, Evans & Mullinix, P.A.,

7225 Renner Road, Suite 200, Shawnee, KS  66217, counsel to Debtor; and (2) Eric W. Collins,

Collins & Jones, P.C., 1010 W. Foxwood Drive, Raymore, Missouri  64083, counsel for ARM,

and shall be filed with the Clerk of the United States Bankruptcy Court for the Western District

of Missouri, Kansas City Division.

In the United States Bankruptcy Court
For the Western District of Missouri, Kansas City Division
In re LAKESHORE FARMS, INC.
Case No 18-50077-btf11
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105,  363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1 AND SCHEDULING A
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014

WHEREFORE, Debtor respectfully requests this Court's order granting (i) the relief

requested herein and (ii) such other and further relief as the Court deems just and equitable.


Respectfully Submitted:

EVANS & MULLINIX, P.A.

*/s/ Joanne B. Stutz*
Joanne B. Stutz, KS #12365; MO #30820
7225 Renner Road, Suite 200
Shawnee, KS  66217
(913) 962-8700; (913) 962-8701 (Fax)
jstutz@emlawkc.com
*Attorneys for Lakeshore Farms, Inc.*



**2018 Crop Operating Loan Term Sheet**

| | |
|---|---|
| **Borrower:** | **Lakeshore Farms, Inc. (Jonathan Lee Russell)** |
| **Lender:** | Ag Resource Management / Agrifund, LLC |
| **Participating Distributor:** | Agri-Next 3F Farms |
| | |
| **Total Commitment Amount:** | $ 2,900,323 |
| **ARM Portion of Commitment:** | $ 2,373,879 |
| **Distributor Portion of Commitment:** | $ 526,444 |
| | |
| **Interest Rate:** | 12.0% |
| **Loan Origination Fee:** | $ 28,158 |
| **Loan Service Fee:** | $ 56,317 |
| | |
| **Collateral:** | Crop, Crop Insurance, and Government Payments |

Conditions:
Promissory Note
Security Agreement
UCC
Acknowledgment of Credit Limit
Acknowledgment of Cash Advance Policy
Guaranty Agreement
Notice to Buyer of Security Interest: Cargill
CCC-36 Assignment of FSA Payment for MO | Andrew
CCC-36 Assignment of FSA Payment for MO | Atchison
CCC-36 Assignment of FSA Payment for MO | Holt
CCC-36 Assignment of FSA Payment for MO | Nodaway
CCC-36 Assignment of FSA Payment for MO | Buchanan
Crop Insurance Assignment of Indemnity from: Rain and Hail
Distributor Inter Creditor Agreement
Distributor Guaranty Agreement
Approved motion to incur debt by the court protecting ARM and Agri-Next 3F Farms (Distributor)
Harvest agreement between Lakeshore Farms Inc and Olsen Custom Farms, LLC
Equipment agreement between Lakeshore Farms Inc and Olsen Custom Farms, LLC
Verification that Lakeshore Farms Inc is not on RMA ITS database
Signed Rent Waiver from Bob Hall for including but not limited to FSN 61 and FSN 3493

Client Acknowledgement:

**EXHIBIT**

A

X_____     _____
Signature                                    Date

Note: This is a term sheet and not a commitment to lend. These terms and conditions are subject to change. The anticipated commitments are based upon the intended acres, crop mix, and crop insurance type and levels that were communicated to ARM. If intended planted acres, crop mix, and/or crop insurance type and levels change, I agree to promptly notify ARM. Please note that this outline does not contain all of the terms, conditions, and other provisions involved in this transaction that would be more fully described in the definitive legal document(s) for the proposed transaction.

**ARM Crop Loan Documents**
Borrower's exact full legal name, if organization, include organizations legal representative full legal name

**Borrower**                                                    SSN/TID
Entity Name              Lakeshore Farms, Inc
Borrower Name            Jonathan Lee Russell       30-0029011
Address                  24806 Hwy 159
City ST Zip              Forest City, MO 64451

Entity Name
Co-Borrower Name
Address
City ST Zip

Entity Name
Co-Borrower Name
Address
City ST Zip

Entity Name
Co-Borrower Name
Address
City ST Zip

**Terms**
Loan Origination Date    3/1/2018
Total Loan Commitment     $2,900,323.00
ARM Commitment            $2,373,879.00
Loan Due Date             2/15/2019
Loan Rate                 12.00%

**Collateral**
Crop Year                2018
Crop State               MO
Insured Crops            Soybeans

**Guarantor(s)**
Guarantor                Jonathan Lee Russell
Guarantor
Guarantor
Guarantor

**Buyers(s)**
Buyer                    Cargill
Buyer
Buyer
Buyer

**Cross-Collateral**
Related Borrower / Amount
Related Borrower / Amount
Related Borrower / Amount
Related Borrower / Amount

**Distributor Participation**
Distributor              Agri-Next 3F Farms
Address, City, ST Zip    28706 S. State Route 7 S.
                         Garden City, MO 64747
Distributor Commitment   $526,444.00

1

## Corporate Resolution

BE IT KNOWN AND REMEMBERED that at a special meeting of the Board of Directors of Lakeshore Farms, Inc., a MO corporation, held at the office of Ag Resource Management on this date, March 1, 2018, with a quorum of the directors being present (in person or by teleconference), the following resolution was offered, duly seconded, and upon being put to a vote, was unanimously adopted:

IT IS RESOLVED THAT Jonathan Lee Russell be authorized to execute any and all documents necessary to enable Lakeshore Farms, Inc, a corporation organized under the laws of the State of MO, to borrow funds from any lending institution, to incur debt, and execute promissory notes and to encumber, hypothecate or mortgage all or any part or parts of the property belonging to said corporation.

ATTEST:                                          APPROVED:

_____          _____
SECRETARY                                        Jonathan Lee Russell, President


### CERTIFICATE

I, Jonathan Lee Russell, Secretary/Treasurer of Lakeshore Farms, Inc, hereby certify that the above and foregoing correct copy of the resolution adopted by the Board of Directors of said Corporation, with a quorum of the directors present and on the date above shown.

_____
SECRETARY

3

**Demand Promissory Note**                                    **Negotiable Paper**

$2,373,879.00 **ON DEMAND** on or before 2/15/2019, we the makers, endorsers, guarantors, sureties and all of us, **IN SOLIDO**, promise to pay and guarantee payment to Agrifund, LLC ("ARM") the above sum for value received with interest at the rate of 12.00% per year. In the event of Borrower's default under the terms and conditions of the attached ARM security agreement, ARM shall have the right, at ARM's sole option, to increase the interest rate under this Note to a default rate increase (the "Default Rate Increase") equal to six (6.00%) percent per annum over the original rate listed on the Note and to further declare this Note to be in default and to accelerate the maturity and insist upon immediate payment in full of the unpaid principal balance then outstanding under this Note, plus accrued interest at the Default Rate. ARM shall further be entitled upon Borrower's failure to pay this Note when due to prospectively increase the interest rate to the Default Rate provided hereinabove.

Should this Note be placed in the hands of an attorney for collection, then Borrower agrees to pay reasonable attorney's fees in the amount of twenty-five (25%) of the principal and interest due together with all court costs incurred in the collection of this Note.

This note contemplates multiple advances up to the face amount herein.

The makers, endorsers, guarantors, sureties and all of us hereby severally waive presentment for payment, demand, notice of non-payment, protest, notice of protest, all pleas of division, and discussion, and all pleas of compensation and offset of the indebtedness represented by this instrument; consent to one or more extensions of payment for such periods and amounts as may be granted, all without notice; and agree that any security for the payment of same may be from time to time changed, surrendered, or otherwise dealt with as the holder of said note may determine and without notice.

Upon the death, suspension, failure in business, or insolvency of any party hereto, or upon the filing of any bankruptcy proceeding under any chapter of the Federal Bankruptcy Laws, or any notice of any tax lien or writ of seizure, or upon the appointment of a receiver, for or against any party hereto, the makers hereof, and each of them, to said ARM, shall at the option of the holder, immediately mature and become due and eligible.

All parties hereto agree that ARM may in its sole discretion, release, substitute, or otherwise deal with or dispose of, and collateral pledged to secure the payment of this note, all without notice to or affecting the liability of any party hereunder, No delay on the part of any holder hereof in exercising any power or right hereunder shall operate as a waiver of any power or right, nor shall any single or partial exercise of any power or right hereunder preclude another or further exercise thereof, or the exercise of any other power or right.

If this demand promissory note is being executed in conjunction with an Agricultural Security Agreement, all terms and conditions of said Agricultural Security Agreement are incorporated herein as fully as if completely being reproduced herein..

THIS NOTE OR INSTRUMENT IS SUBJECT TO (A) A SECURITY INTEREST GRANTED BY AGRIFUND, LLC (THE "BORROWER"), IN FAVOR OF CAPITAL ONE, NATIONAL ASSOCIATION, IN ITS CAPACITY AS ADMINISTRATIVE AGENT (TOGETHER WITH ITS SUCCESSORS AND ASSIGNS, THE "ADMINISTRATIVE AGENT"), PURSUANT TO THAT CERTAIN AMENDED AND RESTATED SECURITY AGREEMENT DATED AS OF NOVEMBER 22, 2016, EXECUTED AND DELIVERED BY THE BORROWER IN FAVOR OF THE ADMINISTRATIVE AGENT (AS THE SAME MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME), WHICH SECURITY AGREEMENT IS REQUIRED UNDER THE TERMS AND CONDITIONS OF THAT CERTAIN AMENDED AND RESTATED CREDIT AGREEMENT DATED AS OF NOVEMBER 22, 2016, BY AND AMONG THE BORROWER, CERTAIN SUBSIDIARIES AND AFFILIATES OF THE BORROWER, AS GUARANTORS, THE ADMINISTRATIVE AGENT, AND THE LENDERS FROM TIME TO TIME PARTY THERETO (AS THE SAME MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME). EACH HOLDER HEREOF ACQUIRING THIS NOTE OR INSTRUMENT BY TRANSFER FROM A PREVIOUS HOLDER TAKES THIS NOTE OR INSTRUMENT SUBJECT TO SUCH SECURITY INTEREST."

**Interest is payable on demand.**
"NE VARIETUR" for identification with an act of Agriculture Security Agreement passed before me this 3/1/2018

Lakeshore Farms, Inc

_____            _____

Jonathan Lee Russell

_____            _____

5

## Agricultural Security Agreement



| GRANTOR(S): | LENDER: |
|---|---|
| Lakeshore Farms, Inc. | AgriFund, LLC (AARM) |
| Jonathan Lee Russell | 1401 Hudson Lane, STE 300, Monroe, LA 71201 |
| 24803 Hwy 159 | 474749327 |
| Forest City, MO 64451 | |
| 301002901| | |

BORROWER(S) NAME:
Lakeshore Farms, Inc.                    Jonathan Lee Russell

TERMS AND CONDITIONS

DEFINITIONS: The following terms shall have the following meanings when used in this agreement:

Agreement: The term "Agreement" refers to this Security Agreement as this Agreement may be modified or amended in writing from time to time, and to any exhibits or attachments to this Agreement which are incorporated herein by reference.

Borrower: The term "Borrower" refers individually, collectively and interchangeably to the above named Borrower(s) to the extent that this is a third party security agreement.

Collateral: The term "Collateral" refers individually, collectively and interchangeably to the Collateral as more fully described in the Collateral Description section of this Agreement.

Grantor: The term "Grantor" refers individually, collectively and interchangeably to the above named Grantor(s), and all other parties signing this Agreement as a grantor.

Indebtedness: The term "Indebtedness" refers to Grantor's (and/or Borrower's) Indebtedness and obligations under a certain promissory note dated 3/1/2018, in the amount of U.S. $2,373,879.00, as well as any substitute, replacement or refinancing note or notes for the above described promissory note.

The term "Indebtedness" also refers individually, collectively and interchangeably to any and all present and future loans, loan advances, extensions of credit and/or other financial accommodations obtained and/or to be obtained by Grantor (and/or Borrower) from Lender, as well as from Lender's successors and assigns, from time to time, one or more times, now or in the future, and any and all promissory notes and other instruments or agreements evidencing such present and future loans, loan advances, extensions of credit, and/or other financial accommodations, as well as any and

6

all other obligations and liabilities that Grantor (and/or borrower) may now and/or in the future owe to or incur in favor of Lender, as well as Lender's successors and assigns, whether directly or indirectly, or by way of assignment or purchase of participation interest, and whether absolute or contingent, liquidated, voluntary or involuntary, determined or undetermined, due or to become due, and whether otherwise secured or unsecured, and whether Grantor (and/or Borrower) is obligated alone or with others on a joint, several or solidary basis, as a principal obligator or as a surety, of every nature and kind whatsoever, in principal, interest, costs, expenses, attorney's fees and other fees and charges, whether such additional indebtedness or obligations are in any way related to the loan evidenced by the promissory note described in the immediately preceding paragraph, and whether any such indebtedness or obligations may be barred under any statute of limitations or prescriptive period, or may be or become otherwise unenforceable or voidable for any reason whatsoever. Unless otherwise agreed by Lender in writing, the maximum amount of indebtedness secured by this Agreement shall be limited to $50,000,000.00.

Lender: The term "Lender" refers to the Lender named above, its successors and assigns, and any subsequent holder or holders of the indebtedness or any interest therein.

GRANT OF SECURITY INTEREST: In order to secure the prompt and punctual payment and satisfaction of the indebtedness as defined above, Grantor does by these presents hereby grant a continuing security interest in favor of Lender as affecting the Collateral described in the Collateral Description section of this Agreement.

COLLATERAL DESCRIPTION: (Check as Applicable)
1.  ☒  CROPS: Any and all of Grantor's present and future rights, title and interest in and to the following described crops:
    a.  ☒  ALL CROPS: Any and all of Grantor's crops of every type and description
    b.  ☒  Specific Crops: See Exhibit A attached.

growing or to be planted, cultivated, grown, raised and/or harvested on the property more fully described herein or on any exhibit attached hereto, together with any and all agricultural and farm products produced or derived therefrom, of every nature and kind whatsoever, and all present and future inventory of Grantor and the products thereof, of every type and description derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and all of Grantor's related equipment, and any and all additions thereto and substitutions or replacements therefor, and all accessories, attachments, and accessions thereto, and all proceeds derived or to be derived therefrom, whether in the form of cash, farm product, or otherwise, and whether from or through any federal or state government agency or program or otherwise, including without limitation all easements, profits, rights of storage, trailing and grazing, irrigation, water rights, all rights of payment by or through the Commodity Credit Corporation or the ASCS, all rights to payments for participation in the Agricultural Conservation Program, the Cropland Conversion Program, the National Wool Act of 1954, the Wheat, Feed Grain, and Cotton Programs of the Agricultural Adjustment Act of 1938, and any other programs of the United States Department of Agriculture, and all payments in kind, including without limitation PIK certificates and commodities redeemed or acquired by PIK certificates, warehouse receipts, chemicals and fertilizers, documents, letters of entitlement, and deficiency, conservation reserve, and diversion and storage payments, and seed payments or rebates, gin rebates, elevator rebates, and warehouse rebates, and all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts and contract rights of Grantor to collect and enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way relating or pertaining to any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Unless otherwise agreed or specified by Lender in writing, this Security Agreement will affect Grantor's crops for the crop year in which this Agreement is executed as well as for all subsequent crop years thereafter until such time as this Agreement is canceled or terminated by Lender in writing.

2.  ☒  FARM PRODUCTS: Any and all of Grantor's present and future rights, title and interest in and to
    a.  ☒  ALL FARM PRODUCTS: Any and all of Grantor's now owned and after acquired farm products of every type and description
    b.  ☐  SPECIFIC FARM PRODUCTS: See Exhibit      attached.

together with all replacements and substitutions therefore and additions thereto, and all offspring and products previously, contemporaneously and/or in the future acquired by Grantor whether by purchase, exchange, accretion otherwise, and any and all of Grantor's present and future inventory in any way derived or to be derived therefrom,

7

whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and all of Grantor's equipment in any way related thereto, and any and all additions thereto and substitutions and replacements therefore, and all accessories, attachments, and accessions thereto, whether added now or later, and any and all other products and proceeds derived or to be derived therefrom, whether in cash, farm products, or otherwise, and whether for or through any federal or state government agency or program or otherwise, including without limitation all easements, profits, rights of storage, trailing and grazing and irrigation, water rights, and all rights to payments by or through the Commodity Credit Corporation or the ASCS, all right to payment for participation in the Agricultural Conservation Program, the Cropland Conversion Program, the National Wool Act of 1954, the Wheat, Feed Grain and Cotton programs of the Agricultural Adjustment Act of 1938, and any other programs of the United States Department of Agriculture, and all payments in kind, including without limitation PIK certificates and commodities redeemed or acquired by PIK certificates, warehouse receipts, chemicals and fertilizers, documents, letters of entitlement, and deficiency, conversation reserve, and storage payments, and all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale or other disposition of any of the foregoing, and any rights of Grantor to collect or to enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and any and all rights that Grantor may have with regard thereto,

3.  ☒  EQUIPMENT:  Any and all of Grantor's present and future rights, title and interest in and to
    a.  ☒  ALL EQUIPMENT:  Any and all of Grantor's now owned and after acquired machinery, equipment, furniture, furnishings and fixtures, of every type and description
    b.  ☐  SPECIFIC EQUIPMENT:  See Exhibit    attached.

together with all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation, any equipment purchased with proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, chattel paper, instruments, note and monies that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation , or use of the foregoing, and all rights of Grantor with regard thereto.

4.  ☒  INVENTORY:  Any and all of Grantor's present and future rights, title and interest in and to
    a.  ☒  ALL INVENTORY:  Any and all of Grantor's present and future inventory (including consigned inventory) of every type and description
    b.  ☐  SPECIFIC INVENTORY:  See Exhibit    attached.

and related equipment wherever located, and any and all additions thereto and substitutions and replacements therefore, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and all other documents of every type covering all or any part of the foregoing, any and all accessories, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation, all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to ownership, operation, use or collection of any of the foregoing, including without limitation, Grantor's books, records, files, computer discs and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on account.

5.  ☐  LIVESTOCK:
    a.  ☐  MARKET LIVESTOCK:  See Exhibit    attached.
    b.  ☐  BREEDING LIVESTOCK:  See Exhibit    attached.

8

LOCATION OF COLLATERAL: Lender's security interest will affect the Collateral wherever located. Grantor agrees not to remove or relocate, or to permit the removal or relocation of any of the Collateral from the State of Louisiana for a period in excess of sixty (60) consecutive days without first obtaining Lender's prior written consent.

Some or all of the Collateral consisting of Grantor's crops and farm products may be located on the following described property; See Exhibit A attached.

CONTINUING SECURITY INTEREST TO SECURE PRESENT AND FUTURE INDEBTEDNESS: Grantor affirms that Grantor is granted a continuing security interest in the Collateral in favor of Lender to secure any and all present and future indebtedness as may be outstanding from time to time, one or more times, in principal, interest, costs, expenses, attorney's fees and charges, with the continuing preferences and priorities provided under applicable law.

DURATION OF AGREEMENT: This Agreement shall remain in full force and effect until such time that this Agreement and the security interest created hereby are terminated and canceled by Lender under a written cancellation instrument in favor of Grantor.

PERFECTION OF SECURITY INTEREST: Grantor agrees to take whatever actions are required by Lender to perfect and continue Lender's security interest in the Collateral. Contemporaneous with the execution of this Agreement, Grantor will execute appropriate forms of financing statements and any similar statements as required by law to perfect Lender's security interest in the Collateral. Grantor hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to effect or to continue the security interest granted by this Agreement. Upon request of Lender, Grantor will deliver to Lender any and all documents evidencing or constituting the Collateral, and Grantor will note Lender's interest on any documents and chattel paper if not delivered to Lender for possession by Lender.

GRANTOR'S REPRESENTATION AND WARRANTIES: Except as previously disclosed to Lender in writing, Grantor hereby represents and warrants to Lender that: (A) Grantor is and will continue to be the lawful owner of the Collateral; (B) Grantor has the right to grant a security interest in the Collateral in favor of Lender: (C) as of the time this Agreement is executed or at the time each financing statement is filled with regard to the Collateral, there are and will be no liens, encumbrances, or other security interests affecting the Collateral; (D) the security rights and interest granted under this Agreement will at no time become subordinate or junior to any security rights, interest, liens or claims of any person, firm, or corporation; and (E) this Agreement is binding upon Grantor as well as Grantor's successors, representatives and assigns, and is legally enforceable in accordance with its terms. The above representations and warranties and all other representations and warranties contained in this Agreement are and will be continuing in nature and will remain in full force and effect until such time as this Agreement is canceled in the manner provided above.

PROHIBITIONS REGARDING THE COLLATERAL: So long as this Agreement remains in effect, and to the extent applicable, Grantor agrees not to, without Lender's prior written consent: (A) sell, assign, transfer, convey, option, mortgage, or lease the Collateral; (B) permit any lien, encumbrance or other security interest to be placed on or attach to the collateral; (C) permit any of the Collateral to be attached to real (immovable) property so as to become a "fixture" under state law; (D) do anything or permit anything to be done that may in any way impair Lender's security interest and rights in and to the Collateral; (E) modify, adjust, compromise, settle, waive or forego any rights that Grantor may have with regard to the Collateral. Notwithstanding and other provision of this Agreement to the contrary, to the extent that the Collateral consists of Grantor's inventory, Grantor shall have the right to sell or lease individual items of inventory in the ordinary course of Grantor's business at ordinary prices and under such terms and conditions as Lender may have previously agreed to in writing. Any and all proceeds accruing from the sale, lease or other disposition of the inventory shall be fully, faithfully and promptly accounted for by Grantor, and shall be received by Grantor in trust for Lender, separate and apart from Grantor's other funds, and shall be promptly remitted to Lender to be applied against the secured indebtedness.

AFFIRMATIVE COVENANTS: So long as this Agreement remains in effect, and to the extent applicable, Grantor agrees as follows:

To the extent that the Collateral consists of the Grantor's farm products or inventory, Grantor shall store and exhibit such Collateral for the purpose of processing, sale or lease in the ordinary course of business. Grantor will not, without having first obtained Lender's prior written consent, use any items of Grantor's farm products or inventory for Grantor's own purpose, or relinquish possession of any such farm products or inventory to third parties.

9

Grantor will not, and will not permit others to, abandon, waste or destroy the Collateral. Grantor will observe and abide by and cause others to observe and abide by all laws, rules, regulations and ordinances, as well as all policies of insurance, affecting the Collateral or its use. Grantor will promptly pay when due all taxes, local and special assessments and governmental charges of every type and description that may from time to time be imposed assessed or levied against the collateral and the property on which Grantor conducts farming, agricultural or other business operations. Grantor will additionally provide Lender with evidence that such taxes, assessments and governmental charges have been paid in full and in a timely manner. Grantor will further pay when due all claims for work done, services rendered, materials furnished in connection with any of the Collateral so no lien or encumbrance may ever attach to or be filed against the Collateral.

Grantor will not make or permit any alterations to any of the Collateral consisting of equipment that may reduce or impair the Collateral's use or value. Grantor will keep, maintain and cause others to keep and maintain any such equipment in good working order, repair or condition at all times while this Agreement remains in effect. Lender or Lender's agents may periodically inspect the Collateral at all reasonable times. Lender or Lender's agents shall have the further right to inspect and copy Grantor's books and records and to discuss Grantor's affairs and finances with Grantor.

Should Grantor for any reason fail to pay taxes, assessments and other governmental charges when due, or should Grantor fail to repair and maintain the Collateral as required under this Agreement, then Lender shall have the right, at Lender's sole option and without responsibility to do so, to make advances on Grantor's behalf to pay such taxes, assessments and governmental charges, and to make necessary repairs to the Collateral. Further, Lender may from time to time make additional advances in order to obtain current appraisals of the Collateral. Should Grantor (and/or Borrower) default under any other loan or extension of credit secured by the Collateral, or should the collateral become subject to or threatened with seizure and /or sale, then Lender shall have the additional right, again at Lender's sole option and discretion and without any responsibility or liability to do so, to cure such defaults or to cause such defaults to be cured, whether by making payments on Grantor's (and/or Borrowers) behalf or by taking such other actions as lender may deem to be necessary and proper within its sole discretion. All such additional sums that Lender may advance for such purposes, as well as Lender's additional expenses as provided under this Agreement shall be considered a part of the indebtedness secured by this Agreement. Grantor will reimburse Lender immediately for all such sums together with interest thereon at the rate of 15 percent per annum from the date of each advance until Lender is repaid in full.

Grantor shall faithfully perform any and all of its obligations under any contracts or agreements that may give rise to Grantor's accounts, chattel paper and/or contract rights on which Lender has been granted a security interest. Grantor agrees not to do, neglect to do, or permit to be done, anything that might cause a modification or termination of any such contract or agreement or the obligations of any obligor or other person thereunder, which may diminish or impair the value of the Collateral or the security rights and interests of Lender therein and hereunder. Grantor further agrees to immediately notify Lender in writing if any default, cancellation or notice of cancellation of any such contract or agreement. Should Grantor for any reason fail to comply with its obligations under any of the above referenced contracts or agreements, Lender may make additional advances on Grantor's behalf and/or take such other action or actions as Lender may deem proper, within its sole judgment, to perform such obligations on Grantor's behalf and to cure and to rectify any such default or defaults. All additional sums that may be advanced by Lender for such purposes, together with interest thereon at the above rate, shall constitute additional indebtedness secured by this Agreement. Upon request by Lender, Grantor agrees to notify individual obligors under Grantor's accounts, chattel paper, contracts and other agreements on which Lender has been granted a security interest, advising such obligors of the fact that their obligations have been collaterally assigned and pledged to Lender. Should Grantor fail to provide such notices for any reason upon request by Lender, Grantor may forward appropriate notices to such obligors, either in Grantor's name or in Lender's name. Grantor further agrees that Lender or Lender's agents may periodically contact individual obligors to verify their respective obligations, to determine whether such obligors have any offsets or counterclaims against Grantor, and with regard to such other matters about which Lender may inquire. Lender shall have the right, at any time and for any reason, whether or not an event of default exists under the indebtedness or under this Agreement, to directly collect and receive all monies, proceeds and/or payments of Grantor's accounts, chattel paper, contracts and agreements subject hereto, as such amounts become due and payable. Lender shall have the further right to notify individual obligors under such accounts, chattel paper, contracts or agreements to pay such proceeds and payments directly to Lender at an address to be designated by Lender, and to do any and all other things as Lender may deem to be necessary and proper, within its sole discretion. Lender shall have the additional right, when appropriate and within Lender's sole discretion, to file suit, either in its own name or in the name of Grantor, to collect any and all such sums that may be due and owing under such accounts, chattel paper, contracts or agreements, and to enforce any guaranties and security therefor. Lender may also take such other actions either in Grantor's name or in the name of Lender, and Lender may deem appropriate within its sole judgment, with regard to collection and payment of the same, including without

limitation, making any compromise or settlement, or releasing any parties or collateral security, without affecting the liability of Grantor under this Agreement or under the indebtedness secured hereby.

SPECIAL COVENANTS FOR CROPS AND FARM PRODUCTS:  Grantor further agrees and covenants as follows:

As applies to the current 2018 year crops unless otherwise approved, to the extent applicable, Grantor agrees to use the proceeds of agricultural purpose loans extended by Lender solely for the purpose of planting, producing and harvesting Grantor's crops, and/or for the care, feeding, raising, production and processing of Grantor's farm products or for such additional purpose or purposes as Lender may agree to in writing. Grantor agrees not to use such loan proceeds for any purpose not otherwise agreed to by lender, with Lender having the right while this agreement remains in effect to demand evidence from Grantor that Grantor has in fact used, and will continue to use, the proceeds of such loans for such purposes as approved by Lender.

Grantor agrees to actively pursue and conduct its farming, agricultural and other business operations for as long as this Agreement remains in effect. Grantor further agrees that Lender may from time to time enter upon Grantor's premises for the purpose of ascertaining whether Grantor is properly and prudently conducting its farming, agricultural and business activities.

Grantor agrees promptly to pay when due all costs and expenses associated with the preparation for planting, planting cultivation, irrigation, fertilization, spraying and harvesting of Grantor's crops, as well as to promptly pay when due all costs and expenses related to the care, feeding, raising, rearing, production, storage and processing of Grantor's farm products. Grantor additionally agrees to promptly pay when due all expenses and wages of laborers, overseers and harvesters.

Grantor agrees to furnish Lender with a current and accurate list of any and all potential or intended purchasers, commission merchants, selling agents, brokers, dealers and any other person or persons or entities to or through whom Grantor may sell or otherwise dispose of all or any part of the Collateral, including, the full name, current mailing and business address and telephone numbers of such persons or entities. Grantor further covenants and agrees to provide such lists to Lender by certified mail, to be received by Lender at least five (5) business days after the execution of the Agreement, or 180 calendar days before any such sale or other disposition of the Collateral is contemplated to take place, whichever is earlier. Should any of Lender's crops or farm products or other collateral subject to this Agreement be placed in a warehouse or other facility. Grantor unconditionally agrees to immediately deliver to Lender any and all warehouse receipts and other documents evidencing ownership of such Collateral whether the same may be issued in negotiable or non-negotiable form acceptable to Lender. No purchaser of the Collateral or any cooperative marketing association, warehouseman or purchaser of warehouse receipts will ever be deemed to be the agent of Lender. No payment made to Grantor by any purchaser, cooperative marketing association or purchaser of warehouse receipts will ever be construed to be payment to Lender or to operate as a release of Lender's security interest under this Agreement.

Grantor shall comply promptly, and shall cause others to comply, with all laws, ordinances and regulations of all governmental authorities applicable to the cultivation, production and harvesting of Grantor's crops and to the care, feeding, rearing, production and processing of Grantor's farm products, as well as any way relating to the property on which such crops and farm products are located or to the production, disposition, or use of any other Collateral. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's security interest in the collateral, in Lender's opinion, is not jeopardized. Grantor shall not use the Collateral, and shall not permit others to use the Collateral, for any purpose other than those previously agreed to by Lender in writing; but in no event shall any of the Collateral be used in any manner that would damage, depreciate or diminish its value or that may result in cancellation or termination of insurance coverage. Grantor additionally agrees not to do or permit to be done anything that may increase the risk of fire or other hazards to any of Collateral.

Grantor represents and warrants that the Collateral and the property described above never has been and never will be so long as this Agreement remains in effect, used for the generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance, as such terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1930, as amended 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1966, Pub. L. No. 99-499 ("SARA"). the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules and regulations adopted pursuant to any of the foregoing. The representations and warranties contained herein are based upon Grantor's due diligence in investigating the Collateral and the property for hazardous waste. Grantor hereby (a) releases and waives any claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a

11

breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the indebtedness and the cancellation of this Agreement.

REQUIRED INSURANCE:  So long as this Agreement remains in effect, Grantor shall, at its sole cost, keep and/or cause others at their expense, to keep the Collateral and the above described property and improvements located thereon constantly insured against loss by fire, by hazards included within the term "extended coverage" and by such other hazards (including flood insurance where applicable) as may be required by Lender. Insurance on the Grantor's crops and farm products (and inventor to the extent applicable) shall be in an amount not less than the anticipated market value of such commodities or such other amount or amounts as Lender may approve in writing. Insurance on other Collateral shall be in an amount not less than the full replacement value of the Collateral, or such other amount or amounts as Lender may require or approve in writing. Grantor shall further provide and maintain, at its sole cost and expense, comprehensive public liability insurance, naming both Grantor and Lender as parties insured, protecting against claims for bodily injury, death and/or property damage arising out of the use, ownership, possession, operation and condition of the Collateral and the property on which the Collateral is located, and further containing a broad form contractual liability endorsement covering Grantor's obligations to indemnify Lender as provided hereunder. In addition, Grantor shall obtain at its expense such federal or state crop insurance as may be required by Lender.

Grantor may purchase such insurance from any insurance company or broker that is acceptable to Lender, provided that such approval may not be unreasonably withheld. All insurance policies, including renewals and replacements, must also be in form and substance acceptable to Lender, and must additionally contain a lender's loss payable or other endorsement in favor of Lender, providing in part that (a) all proceeds and returned premiums under such policies of insurance will be paid directly to Lender and (b) no act or omission on the part of Grantor, or any of its officers, agents employees or representatives, nor breach of any warranty contained in such policies, shall affect the obligations of the insurer to pay the full amount of any loss to Lender. Such policies of insurance must also contain a provision prohibiting cancellation or the alteration of such insurance without at least thirty (30) day's prior written notice to Lender of such intended cancellation or alteration.

Grantor agrees to provide Lender with originals or certified copies of such policies of Insurance. Grantor further agrees to promptly furnish Lender with copies of all renewal notices and, if requested by Lender, with copies of receipts for paid premiums. Grantor shall provide Lender with originals or certified copies of all renewal or replacement policies of insurance no later than fifteen (15) days before any such existing policy or policies should expire. If Grantor's insurance policies and renewals are held by another person, Grantor agrees to supply original or certified copies of the same to Lender within the time periods required above.

Grantor agrees to immediately notify Lender in writing of any material casualty to or accident involving the Collateral, whether or not such casualty or loss is covered by insurance. Grantor further agrees to promptly notify Grantor's insurance company and to submit an appropriate claim and proof of loss to the insurance company in the event that any collateral is lost, damaged, or destroyed as a result of an insured hazard. Lender may submit such a claim and proof of claim to the insurance company on Grantor's behalf, should Grantor fail to do so promptly for any reason. Grantor hereby irrevocably appoints Lender as its agent and attorney-in-fact, such agency being coupled with an interest, to make, settle and adjust claims under such policy or policies of insurance  and to endorse the name of Grantor on any check or other item of payment for the proceeds thereof; it being understood, however, that unless one or more events of default exist under this Agreement, Lender will not settle or adjust any such claim without the prior approval of Grantor (which approval shall not be unreasonably withheld).

Lender shall have the right to directly receive the proceeds of all insurance protecting the Collateral. In the event that Grantor should receive any such insurance proceeds, Grantor agrees to immediately hold such insurance proceeds in trust and to immediately turn over and to pay such proceeds directly to Lender. All such insurance process may be applied, at Lender's sole option and discretion, in such manner as Lender determine (after payment of all reasonable costs, expenses and attorney's fees necessarily paid or fees necessarily paid or incurred by Lender in this connection) for the purpose of (i) repairing or restoring the lost, damaged or destroyed Collateral; or (ii) reducing the then outstanding balance of the indebtedness.

Lender's receipt of such insurance proceeds and the applications of such proceeds as provided herein shall not, however, affect Lender's security interest under this Agreement. Nothing under this section shall be deemed to excuse Grantor from its obligations to promptly repair, replace or restore any lost or damaged Collateral, whether or not the same may be covered by insurance, whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Lender. Furthermore, unless otherwise confirmed by Lender in writing, the application or release of any insurance proceeds by Lender shall not be deemed to cure or waive any event of default under this Agreement. Any proceeds which have not been

12

disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of Collateral shall be used to repay the indebtedness.

Any and all awards or damages received by Grantor from any governmental authority covering any of the Collateral shall further be paid to Lender and credited to the unpaid balance of the indebtedness.

Any and all awards or damages received by grantor from any governmental authority covering any of the Collateral shall further be paid to Lender and credited to the unpaid balance of the indebtedness.

Should Grantor for any reason fail to maintain insurance on the Collateral as required under this Agreement, then Lender shall have the right again at Lender's sole option and discretion and without any responsibility or liability to do so, to purchase such insurance on Grantor's behalf, including without limitation, the right to purchase insurance protecting only lender's rights and interests in the Collateral. All additional sums that may be advanced by Lender for such purposes, together with interest thereon at the above rate, shall constitute additional indebtedness secured by this Agreement.

EVENTS OF DEFAULT:  The following additions or inaction's or both shall constitute events of default under this Agreement.

1.  Any failure to pay principal and/or interest under any indebtedness secured by this Agreement when the same shall be due.
2.  Any failure to comply with the terms and conditions and representations and warranties set forth in this Agreement.
3.  A default under any loan, security agreement or other agreement in favor of Grantor's other creditors that may have a material effect on Grantor's ability to perform under this Agreement or in any way related to the indebtedness.
4.  Should Grantor (or Borrower) or any guarantor of the indebtedness be declared to be insolvent or should Grantor cease to conduct its farming, agricultural or business operations as presently conducted, or should a proceeding for readjustment of indebtedness, reorganization, composition or extension under any insolvency or bankruptcy law be brought by or against Grantor (or Borrower) or any guarantor, or should Grantor (or Borrower) or any guarantor file proceedings for a respite or make a general assignment for the benefit of creditors, or should a receiver for all or any part of Grantor's ( or Borrower's) or any guarantor's property be applied for or appointed.
5.  Should any representation or warranty made in connection with the indebtedness prove to be incorrect or misleading in any respect.
6.  Should Lender reasonably deem itself to be insecure with regard to repayment of the indebtedness.

RIGHTS AND REMEDIES ON DEFAULT:  Should one or more events of default occur or exist under this Agreement and at any time thereafter, Lender shall have all the rights and remedies of a secured party under applicable law. In addition and without limitation, Lender may exercise one or more of the following rights and remedies:

Lender may declare the entire indebtedness to be immediately due and payable, without further notice or demand for payment.

Lender shall have the further right(s), if it chooses to do so, to: (a) refuse to make additional lien advances to Grantor, or to reduce the amount of further loan advances; (b) demand that Grantor provide Lender with such additional collateral security as may then be acceptable to Lender; (c) to commence appropriate seizure, attachment or foreclosure proceedings against the Collateral, where under Lender may cause the Collateral or any parts or parts thereof, to be immediately seized where ever found, and sold in accordance with applicable state law, and(d) subject to requirements of then applicable Louisiana law, Lender may enter upon the property on which the crops and farm products, or any part or parts thereof, may then be located, with Lender thereafter having the right to carry on Grantor's farming, agricultural and other business operations to conclusion, in which event Lender shall have the free use of Grantor's equipment, tools, implements and supplies. Grantor unconditionally agrees to assist Lender in such efforts and not to in any way impair such ongoing operations on the part of Lender. All additional sums that Lender may expand for such purposes shall constitute additional indebtedness secured under this Agreement and shall bear interest from date of advance until reimbursed in full at the above interest rate.

13

Should any of the Collateral for any reason be located in a state other than Louisiana or following any default under the indebtedness or under this Agreement, or should there be a subsequent change in Louisiana law permitting self-help remedies with regard to non-possessory collateral, Grantor agrees that Lender may take possession of the collateral in any manner then permitted under the laws of the state in which the collateral is then located or under the laws of Louisiana as then applicable, at Lender's sole option. However, use of a state's laws, other than Louisiana, shall in no way b considered a waiver of the application of Louisiana law as the governing law of this contract. Should Lender for any reason have or acquire possession of the collateral at or following default, Lender may sell the Collateral at public or private sale as authorized by Louisiana law or by the applicable provisions of the Uniform Commercial code in effect in the state where the collateral is then located. If Lender is required by law to give grantor notice of the public or private sale of the Collateral, and Grantor agrees that the requirements of reasonable notice shall be met if Lender mails such notice to Grantor at grantor's last address appearing in Lender's records at least ten (10) days before the time of any public sale or, if disposition is by private sale, at least ten (10) days before the time after which private sale may occur. If public sale is held, there will be sufficient compliance with all requirements of notice to the public by a single publication in a newspaper of general circulation in the parish or county where the Collateral is then located. This notice shall include the time and place of sale, and a brief description of the property to be sold, Grantor further agrees that any such sale shall be conclusively deemed to be conducted in a commercially reasonable manner if made consistent with the standards of similar sales of collateral by commercial banks in the same community in which Lender has its main office.

Grantor recognizes that Lender may not be able to effect the public sale of all or any part of the Collateral and Lender may be compelled or deem it best to resort to one or more private sales to a restricted group of purchasers, at Lendor's sole option. However, use of state's laws, other than Louisiana, shall in no way be considered as a waiver of the application of Louisiana law as the governing law of this contract. Grantor further acknowledges that any private sale of the collateral may be at prices and on terms less favorable to Grantor than those of public sales and Grantor unconditionally agrees that such private sales shall be deemed to have been made in a commercially reasonably manner.

Lender shall have the further right, if it chooses to do so, to commence appropriate seizure, attachment or foreclosure proceedings against the Collateral, whereunder Lender may cause the Collateral or any part or parts thereof, to be immediately seized wherever found, and sold whether in term of court or on vacation, under ordinary or executory process, in accordance with applicable state law, to the highest bidder for cash, with or without appraisement, without the necessity of making additional demand upon or notifying Grantor (or Borrower) in default, all of which are expressly waived. For purposes of foreclosure under the Louisiana executory process procedures, Grantor confesses judgment and acknowledges to be indebted unto and in favor of Lender up to the full amount of the indebtedness, in principal, interest, costs, expenses, attorneys' fees and other fees and charges. To the extent permitted under applicable Louisiana law, Grantor additionally waives: (A) the benefit of appraisal as provided in Articles 2332,2336,2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (B) the demand and three (3) days' delay provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (C) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (D) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (E) all of the benefits provided under Articles 2331, 2722, and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above.

Should any other Collateral be seized as an incident to an action for the recognition or enforcement of this Agreement, by seizure, by executory process, sequestration, attachment, writ of fieri facias, foreclosure proceedings or otherwise, Grantor hereby agrees that the court issuing any such order shall, if requested by Lender, or its agent, or any person or persons named by Lender at a time that the seizure, attachment or foreclosure is requested, or at any time thereafter, should be appointed as the keeper of the Collateral as provided under state law. Such keeper shall be entitled to reasonable compensation. Grantor agrees to pay the reasonable fees of such keeper, which are hereby fixed at $50.00 per hour, which compensation of the keeper shall also be secured by the Agreement.

Should it be necessary for Lender to foreclose under this Agreement, all declarations of fact, which are made under an authentic act before Notary Public, in the presence of two witnesses, by a person declaring such facts to be within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of La. R.S. 9:3509.1, La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, as applicable. Lender may, in addition to the foregoing remedies, or in lieu thereof, in Lender's sole discretion commence an appropriate action against Grantor seeking specific performance of any covenant contained herein. All expenses relating to the sale or other disposition of Collateral, including without limitation, Lender's reasonable attorney's fees and expenses of retaking, holding, insuring, preparing for sale and selling the Collateral shall become part of the indebtedness secured by this Agreement, and shall be payable on demand, with interest at the above rate, from the date of expenditure until Lender is repaid in full.

14

Grantor agrees that all of the remedies provided under this Agreement shall be cumulative in nature and nothing under this Agreement shall limit or restrict the remedies available to Lender following any event of default.

APPLICATION OF PROCEEDS:  Lender may apply any proceeds derived or to be derived from the sale, collection or other disposition of the Collateral first to the reimbursement of any expenses incurred by Lender in connection therewith, including the fees of Lender's attorney and court costs; and then to the payment of any additional sums that Lender may advance on Grantor's behalf under this Agreement, together with interest thereon; and then to the payment of the indebtedness in such order and with such priority as Lender may determine within its sole discretion.

PROTECTION OF LENDER'S SECURITY RIGHTS:  Grantor agrees to be fully responsible for any losses that Lender may suffer as a result of anyone other than Lender asserting any rights or interest in the Collateral. Grantor further agrees to appear in and defend all actions and proceedings purporting to affect Lender's security rights and interest. Should Grantor fail to do what is required of it under this Agreement, or if any action or proceeding is commenced naming Lender as a party, or affecting Lender's security interest, or the rights and powers granted under this Agreement, then Lender may, without releasing Grantor from any of its obligations, do whatever Lender believes is necessary and proper within its sole discretion, including advancing additional sums on Grantor's behalf as provided herein, to protect Lender's security rights and interests.

INDEMNIFICATION OF LENDER:  Grantor further agrees to indemnify, to defend and to hold Lender harmless from any and all claims, suits, obligations, damages, loss, cost, and expenses (including the fees of Lender's attorney), demand, liabilities, penalties, fines and forfeitures of any nature and kind whatsoever, that may be asserted against or incurred by Lender, arising out of or in any way occasioned by this Agreement or the rights and remedies granted to or in favor of Lender hereunder.

MISCELLANEOUS PROVISIONS:  In entering into this Agreement, Grantor is, to the extent applicable, waiving any exemption from seizure with regard to the Collateral to which Grantor may be entitled under applicable state law.

Grantor represents and warrants to Lender that Grantor's correct social security or employer identification number is included on the first page of this Agreement. Grantor additionally agrees to notify Lender in writing should Grantor ever change its name, legal status, or change or obtain a new social security or employer identification number. Grantor further agrees to notify Lender in writing in advance of any change in Grantor's mailing address or the location of Grantor's principal office. Grantor agrees that any failure or delay on the part of Lender to exercise any of the rights and remedies granted under this Agreement shall not constitute a waiver of such rights or remedies. Any waiver or forbearance on the part of Lender shall be effective against Grantor only if agreed to in writing. This Agreement shall be governed and construed in accordance with the laws of the State of Louisiana. The parties agree that the jurisdiction/venue for any court proceeding arising out of or related to this agreement shall lie exclusively in the 5th Judicial Court, Richland Parish, Louisiana, except that Lender may waive this provision, at its sole option. If any provision of this Agreement is deemed to be invalid or unenforceable for any reason, such invalidity or unenforceability will not effect the validity and enforceability of the remaining provisions of this Agreement. The caption headings of this Agreement are for convenient reference only and are not to be construed as a summary of each provision of this Agreement. If there is more than one Grantor under this Agreement, their obligation in favor of Lender shall be joint and "several" and "solidary" in nature.

DELAYED RIGHTS:  If Grantor should ever make a payment on , or if any of Grantor's collateral or other property is ever used to pay, a loan or other obligation to Lender of a company as to which Grantor is or may at any time be an "insider" within the context of Section 101(30) of the Bankruptcy Code (11 U.S.C. Section 101(30), Grantor agrees that any rights that it may have to collect from or be reimbursed by such a company or by any other guarantor or surety, whether as a result of subrogation to Lender's rights or otherwise, will be delayed until the thirteen month anniversary date following full and final payment to Lender.

SPOUSAL INTERVENTION:  Any now unto these presents, to the extent applicable, intervenes Grantor's spouse, appearing herein for the limited purpose of concurring with the granting of a security interest in the Collateral in favor of Lender consistent with state law, without creating any liability to the separate property of Grantor's spouse not subject to this Agreement, as well as for the purpose, to the extent applicable, of waiving any exemption from seizure with regard to the Collateral to which Grantor's spouse may be entitled under state law. Grantor's spouse further agrees and concurs that Grantor, acting alone or with others, may obtain additional loans or other extensions of credit from Lender, secured by the Collateral subject to this Agreement, without the necessity that Grantor's spouse further agree to or concur in each such additional loan or other extension of credit.

POWER OF ATTORNEY:  Grantor hereby appoints Lender as his attorney-in-fact to endorse Grantor's name on all instruments and other remittances payable to Grantor with respect to the indebtedness or other papers pertaining to

15

Lender's actions in connection with the indebtedness. In addition, Lender shall be entitled, but not required to perform any action or execute any paper required to be taken or executed by Grantor under this agreement and to carry out and enforce all or any portion of the incorporeal rights on which Grantor has granted a security interest (or which Grantor has assigned) to Lender, including, but not limited to, the right to direct any insurer to pay all proceeds directly to Lender, to file any proof of claim, to settle or compromise any claim, to cancel any policy of insurance, to endorse Grantor's name on any draft or negotiable instrument drawn by any insurer, and to apply for a certificate of title for the Collateral. Lender's performance of such action or execution of such papers shall not relieve Grantor from any Obligation or cure any default under this agreement. The powers of attorney described in this paragraph are coupled with an interest and are irrevocable.

☐     CROSS-COLLATERALIZATION: Borrower hereby acknowledges that collateral pledged to secure other indebtedness in favor of Lender, whether existing now or in the future, is also pledged herein by cross-collateralization to secure the indebtedness represented by the Promissory Note.
SIGNATURES: I WITNESS WHEREOF, Grantor has executed this Agreement on 3/1/2018.

Lakeshore Farms, Inc

_____
GRANTOR Jonathan Lee Russell


_____
GRANTOR


_____
GRANTOR


_____
GRANTOR


_____
BORROWER Jonathan Lee Russell

_____
BORROWER

_____
BORROWER

_____
BORROWER

_____
INTERVENING SPOUSE


_____
ARM

16

# Agricultural Security Agreement Addendum(s)

Exhibit A

Any and all accessions, additions, replacements, payments for participation in any state or federal farm programs and substitutions (including rights under Commodity Credit Corporation programs, FSA payment in kind, Federal Crop Insurance Program or any general intangibles or programs); all records of any kind related to any of the foregoing; all proceeds (including insurance, general tangibles, rents and account proceeds). Any and all crops/farm products of every kind and description, planted or growing, or to be planted or grown including but not limited to the following:

MO/Andrew/FSN 1969
MO/Atchison/FSN 3404, 4039, 2875, 3119, 2876, 4128
MO/Holt/FSN 61, 3493, 4172, 3628, 3627, 3634, 6481, 4100, 8143
MO/Nodaway/FSN 480, 493, 568, 581, 844, 1015, 1951, 624, 5689, 6329, 6480, 7650, 8407
MO/Buchanan/FSN 836

Exhibit B

not applicable

17

## Guaranty Agreement

In consideration of credit given by Agrifund, LLC ("ARM"), a Delaware corporation, to:
Lakeshore Farms, Inc
Jonathan Lee Russell
24806 Hwy 159
Forest City, MO 64451

hereinafter referred to be "PRINCIPAL BORROWER", the undersigned GUARANTOR(S) unconditionally guarantees payment to ARM, Rayville, Louisiana of : 1)The present balance due from the PRINCIPAL BORROWER to ARM, and 2) Payment of any and all future indebtedness from the PRINCIPAL BORROWER to ARM conditioned only as provided below. It is understood and agreed that this guaranty is accepted by ARM and credit extended to the PRINCIPAL BORROWER upon the following conditions:

With regard to the sums owed by PRINCIPAL BORROWER and guaranteed hereby, ARM may, without notice to the undersigned, extended the time for payment and/or accept partial payments, notes, drafts, and/or security, all without in any way affecting the obligations hereunder.

The undersigned waives notice of the acceptance of this guaranty by ARM and notice of all credits extended and sales and deliveries of merchandise made hereunder.

This instrument is intended to be and shall be construed to be a continuing guaranty and shall remain in full force and effect until the undersigned shall have given ARM notice in writing to make no further advances on the security of this guaranty and until such written notice shall be given ARM. Proof of receipt by ARM of such notice shall be on the undersigned. Such notice shall be delivered to ARM at its address shown below. Such revocation when made shall apply only to sales made to the PRINCIPAL BORROWER subsequent to the receipt of such notice of revocation, and any payments thereafter made by the PRINCIPAL BORROWER shall be applied as ARM may elect.

In the event of default by the PRINCIPAL BORROWER in payment of the debt guaranteed hereunder, or any part thereof, recovery thereof may be had directly against the undersigned guarantor without previous notice and/or without requiring the prosecution of the claim against the PRINCIPAL BORROWER.

It is expressly understood and agreed that this guaranty shall not be revoked by the death of the undersigned and that the insolvency or bankruptcy or the PRINCIPAL BORROWER shall in no respect affect the liability of the guarantor under this agreement. If more that on executes this agreement as guarantor, the singular as used herein shall include the plural and the obligations of the guarantors shall be joint and several.

Notice to ARM required hereunder should be delivered to:
**Agrifund, LLC ("ARM")**
**1401 Hudson Lane, STE 300**
**Monroe, LA 71201**

_____

GUARANTOR Jonathan Lee Russell

_____

GUARANTOR

_____

GUARANTOR

_____

GUARANTOR

18

## Acknowledgment of Credit Limit

Agrifund, LLC ("ARM") has agreed to make:

Lakeshore Farms, Inc
Jonathan Lee Russell
24806 Hwy 159
Forest City, MO 64451

an agricultural loan for the 2018 crop year. The total amount of credit agreed to extend the undersigned customer shall not exceed $2,373,879.00. The extension of this credit is to the sole discretion of ARM and subject to the clauses and conditions in our Agricultural Security Agreement and Promissory Note.

This credit limit is based upon the intended acres, crop mix, and crop insurance type and levels that were communicated to ARM. If intended planted acres, crop mix, and/or crop insurance type and levels change, I agree to promptly notify ARM.

I have read, understand, and agree to the clauses and conditions in our Agricultural Security Agreement and Promissory Note. I also acknowledge this agreement and the above credit limit.

This acknowledgment is dated 3/1/2018

_____
BORROWER Jonathan Lee Russell

_____
BORROWER

_____
BORROWER

_____
BORROWER

20

## Acknowledgment of Cash Advance Policy & Procedures

It is the policy of Agrifund, LLC ("ARM") to prudently extend credit for the purpose of agriculture loans. For certain cases, our loan approval board will pre-approve planned cash advances. The Board will only approve cash advances for the specific purpose of raising crops secured by a first lien and subject to the clauses and conditions in our Agricultural Security Agreement and Promissory Note. In addition, the following specific policies and procedures apply to cash advances:

1. Any cash advances should be planned for and factored into the loan at the time the loan is made.

2. It is to the sole discretion of ARM to extend or to suspend the extension of all cash advances.

3. Bills are the sole responsibility of the customer and are not to be mailed directly to ARM. ARM makes no agreement, explicit or implied, to pay other suppliers.

4. All non-planned cash advances that have not been budgeted require an approved *Application for Extension.*

5. Non-Planned cash advances require a minimum of a two day processing period from the time the bill is presented or until an *Application for Extension* has been approved.

6. All crop proceeds will be applied to outstanding debt until entirety of the debt is paid. Release of any crop proceeds including but not limited to deficiency payments can only be done by the way of an approved application for extension.

I have read and understand all of the above Cash Advance Policy and Procedures.

---

BORROWER Jonathan Lee Russell

---

BORROWER

---

BORROWER

---

BORROWER

21

## Authorization to Release Borrower Information

I voluntarily authorized and request disclosure (including paper, oral and electronic interchange) of any information related to my farming operation as requested by Agrifund, LLC ("ARM").

This includes specific permission to release the following:
- Crop Insurance Summary of Coverage
- Schedule of Insurance
- APH Reporting
- Acreage Reporting
- Settlement Sheets and/or Tickets
- Grain or other Crop Contracts
- Claim History
- FSA information including, but not limited to FSA 156, FSA 509B, FSA 578, Farm Plans, Leases, etc., relating to the entity or individual named below
- Any NRCS information including by not limited to CSP information relating to the entity or individual named below

I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above. This authorization applies to below named BORROWER(S) as well as other entities BORROWER(S) may be associated with.

This authorization will remain in effect indefinitely. If no outstanding balance is owed ARM, the undersigned may provide a written revocation of this authorization to ARM.

This notice is dated 3/1/2018

Lakeshore Farms, Inc

_____

BORROWER Jonathan Lee Russell


_____

BORROWER


_____

BORROWER


_____

BORROWER

22

## ACH Authorization

I authorize Agrifund, LLC ("ARM") to initiate electronic deposits to my checking account.

I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. law. I further acknowledge that deposits into this account are to be used for the explicit purpose of the associated loan. This authority will remain in effect until I have cancelled it in writing.

_____

SOCIAL SECURITY OR TID

_____

FINANCIAL INSTITUTION NAME (PLEASE PRINT)

_____

ROUTING NUMBER AT FINANCIAL INSTITUTION

_____

ACCOUNT NUMBER AT FINANCIAL INSTITUTION

_____

FINANCIAL INSTITUTION CITY AND STATE

_____

SIGNATURE

_____

DATE

27

This form is available electronically.

Form Approved – OMB No. 0560-0183
See Page 2 for Privacy Act and Public Burden Statements

**CCC-36**
(06-30-15)

U.S. DEPARTMENT OF AGRICULTURE
Commodity Credit Corporation

## ASSIGNMENT OF PAYMENT

### PART A – GENERAL INFORMATION

1. Producer's (Assignor's) Name and Address *(Including Zip Code)*
Lakeshore Farms, Inc. (Jonathan Russell)
24806 Hwy 159
Forest City, MO 64451

2. Assignee's Name and Address *(Including Zip Code)*
**Agrifund, LLC ("ARM")**
1401 Hudson Lane, STE 300
Monroe, LA 71201

3. Producer's (Assignor's) Tax Identification Number *(9 Digit Number)*
30-0029011

4. Assignee's Tax Identification Number *(9 Digit Number)*
47-4742827

### PART B – APPLICABLE PROGRAM(S)

| 5. Program | 6. Assigned Amount for Each Applicable Year | | | | | 7. State, County, and Reference Number, If Applicable |
|---|---|---|---|---|---|---|
| Agricultural Risk Coverage (ARC) | YEAR 2017 AMOUNT $2,900,323.00 | YEAR 2018 AMOUNT $2,900,323.00 | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |
| Price Loss Coverage (PLC) | YEAR 2017 AMOUNT $2,900,323.00 | YEAR 2018 AMOUNT $2,900,323.00 | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |
| Conservation Reserve Program Annual Rental (CRP) | YEAR 2017 AMOUNT | YEAR 2018 AMOUNT | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |
| Emergency Assistance Livestock Honey Bee and Farm-Raised Fish Program (ELAP) | YEAR 2017 AMOUNT | YEAR 2018 AMOUNT | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |
| Livestock Forage Program (LFP) | YEAR 2017 AMOUNT | YEAR 2018 AMOUNT | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |
| Livestock Indemnity Program (LIP) | YEAR 2017 AMOUNT | YEAR 2018 AMOUNT | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |
| eLoan Deficiency Web Payment (eLDP) | YEAR 2017 AMOUNT $2,900,323.00 | YEAR 2018 AMOUNT $2,900,323.00 | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |
| Noninsured Crop Disaster Assistance Program (NAP) | YEAR 2017 AMOUNT $2,900,323.00 | YEAR 2018 AMOUNT $2,900,323.00 | YEAR 2019 AMOUNT | YEAR 2020 AMOUNT | YEAR 2021 AMOUNT | |

| 8. Other Program Name (All CRP, other than annual rental | 9. Program Year or Payment Year | 10. Assigned Amount | 11. State, County, and Reference Number, If Applicable |
|---|---|---|---|
| | | $ | |

### PART C – REPRESENTATION OF ASSIGNOR AND ASSIGNEE

In order to assign a cash payment in accordance with the programs specified by the assignor in Items 5 and 8, this form must be completed by both the assignor and the assignee. The assignment is effective for all counties unless specify on Items 7 or Item 11. This assignment is applicable only to programs publicly announced before this form is filed and is subject to the terms stated in this form and the provisions of 7 CFR Part 1404.

The assignee agrees to repay promptly to the Federal Government any amount by which the assigned payment exceeds the amount secured by the assignment. The assignor and the assignee agree that they will promptly notify the county FSA office of any change affecting this assignment. This assignment may be revoked at any time by writ en request signed by the assignee.

| 12A. Producer's (Assignor's) Signature (By) | 12B. Title/Relationship of the Individual If Signing in a Representative Capacity | 12C. Date 3/1/2018 |
|---|---|---|
| 13A. Assignee's Signature (By) | 13B. Title/Relationship of the Individual If Signing in a Representative Capacity | 13C. Date (MM-DD-YYYY) 3/1/2018 |

34

**CCC-36** (06-30-15)

| PART D – REVOCATION OF ASSIGNMENT | | |
|---|---|---|
| Assignment of Payment authorization above is hereby revoked. | | |
| 14A. Assignee's Signature (By) | 14B. Title/Relationship of the Individual if Signing in a Representative Capacity | 14C. Date *(MM-DD-YYYY)* |

| FOR COUNTY OFFICE USE ONLY | | |
|---|---|---|
| 15. Receiving State and County | 16. Date Filed *(MM-DD-YYYY)* | 17. Time Filed |

## SPECIAL PROVISIONS RELATING TO ASSIGNMENTS

A. Assignment is effective for all counties unless a specific county is entered in Item 7 or Item 11.

B. If the assignor assigns a specified value of payments to more than one assignee:

    1. CCC and FSA will recognize assignments for each program per program year or group of years if multi-year is selected.

    2. Assignments will be honored in chronological sequence based on the order of filing with the county FSA office.

C. The payment due the producer may be applied first against indebtedness owing by the producer to the United States, including debts arising after the execution of a Form CCC-36, which may be offset in accordance with the regulations governing, 7 CFR Parts 3, 1403, and 1951, and any balance will be subject to assignment.

D. Neither the United States of America, the Commodity Credit Corporation, the Secretary of Agriculture, any disbursing officer, nor any other Government employee or official shall be subject to any suit or liable for payment of any amount if payment is inadvertently made to the assignor without regard to this assignment.

E. This assignment does not extend to any successor of the assignee, nor may the assignee re-assign this assignment.

F. The assignee's payment is subject to offset for any delinquent Federal debt owed by the assignee.

18A. COUNTY FSA OFFICE NAME AND ADDRESS *(Including Zip Code)*

**NOTE:** The following statement is made in accordance with the Privacy Act of 1974 (5 USC 552a – as amended). The authority for requesting the information identified on this form is 7 CFR Part 1404, the Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.), and the Agricultural Act of 2014 (Pub. L. 113-79). The information will be used to assign payments made under applicable CCC or FSA programs to a designated assignee. The information collected on this form may be disclosed to other Federal, State, Local government agencies, Tribal agencies, and nongovernmental entities that have been authorized access to the information by statute or regulation and/or as described in applicable Routine Uses identified in the System of Records Notice for USDA/FSA-2, Farm Records File (Automated). Providing the requested information is voluntary. However, failure to furnish the requested information will result in a determination of ineligibility to assign applicable CCC or FSA program payments to a designated assignee.

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0560-0183. The time required to complete this information collection is estimated to average 10 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. For certain programs such as ARC, PLC, CRP, ELAP, LIP, and eLDP, this information collection is exempted from the Paperwork Reduction Act as specified in the Agricultural Act of 2014 (See Pub. L. 113-79, Title I, Subtitle F, Administration and Title II, Subtitle G, Funding and Administration).*RETURN THIS COMPLETED FORM TO YOUR COUNTY FSA OFFICE.*

The U.S. Department of Agriculture (USDA) prohibits discrimination against its customers, employees, and applicants for employment on the basis of race, color, national origin, age, disability, sex, gender identity, religion, reprisal, and where applicable, political beliefs, marital status, familial or parental status, sexual orientation, or all or part of an individual's income is derived from any public assistance program, or protected genetic information in employment or in any program or activity conducted or funded by the Department. (Not all prohibited basis will apply to all programs and/or employment activities.) Persons with disabilities, who wish to file a program complaint, write to the address below or if you require alternative means of communication for program information (e.g., Braille, large print, audiotape, etc.) please contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). Individuals who are deaf, hard of hearing, or have speech disabilities and wish to file either an EEO or program complaint, please contact USDA through the Federal Relay Service at (800) 877-8339 or (800) 845-6136 (in Spanish).

If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at http://www.ascr.usda.gov/complaint_filing_cust.html, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to U.S. Department of Agriculture, Director, Office of Adjudication, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, by fax (202) 690-7442 or email at program.intake@usda.gov. USDA is an equal opportunity provider and employer.

http://www.ascr.usda.gov/complaint_filing_cust.html, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to U.S. Department of Agriculture, Director, Office of Adjudication, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, by fax (202) 690-7442 or email at program.intake@usda.gov. USDA is an equal opportunity provider and employer.

# AUTHORIZATION LETTER

This Authorization Letter (this "Authorization") dated 3/1/2018 relates to (a) loans (the "Loans") made or to be made to the undersigned (the "Borrower") by AGRIFUND, LLC ("Agrifund") and (b) insurance policies related to such Loans (the "Insurance Policies"). The Borrower acknowledges and agrees that Agrifund is one of its creditors, and as one of several conditions precedent to Agrifund making the Loans, Agrifund requires that the Borrower (a) execute and deliver this Authorization and the assignment of indemnity attached to this Authorization as **Exhibit A** (the "AOI") and (b) authorize Agrifund to complete the AOI and submit it to the applicable insurance provider as detailed below.

A. The Borrower acknowledges and agrees that Agrifund and its assignees may, from time to time, assign, transfer, convey and/or grant security interests (each, an "Assignment") in the Loans and the Insurance Policies and any documents, instruments, and agreements evidencing or relating thereto to any other person or entity or to any other person or entity acting as an agent, subagent or trustee on behalf of any such assignee (each, an "Assignee").

B. As part of any such Assignment, the Borrower authorizes Agrifund to complete the AOI by inserting an Assignee's name and address on the AOI, inserting the Insurance Policy numbers, and providing any other information required to complete such assignment.

C. The Borrower further authorizes Agrifund to cause the AOI to be executed by the Assignee and the required witnesses in the spaces provided for such signatures.

D. The Borrower further authorizes Agrifund to submit such completed and executed AOI to the applicable insurance provider and to take all other actions Agrifund deems necessary or desirable to cause the Assignee to be the "creditor" under the AOI in lieu of Agrifund.

**If the Borrower is an individual:**

By:_____

Name: Jonathan Lee Russell

**If the Borrower is a corporation, limited liability company, or partnership:**

Lakeshore Farms, Inc
[FULL LEGAL NAME OF BORROWER]

By:_____

Name: _____

Title: _____

40

**DISTRIBUTOR SECTION**

## Ag-Input Inter-Creditor Agreement

**THIS AGREEMENT,** made and entered into this day between the following BORROWER:

Lakeshore Farms, Inc
Jonathan Lee Russell
24806 Hwy 159
Forest City, MO 64451

, and Agri-Next 3F Farms hereafter referred to as DISTRIBUTOR, and **Agrifund, LLC ("ARM")**

WHEREAS, BORROWER is desirous of carrying on certain farming operations and is obtaining financing on said farm from and ARM and DISTRIBUTOR for the 2018 Crop Year, under the following terms and conditions:

ARM, BORROWER, and DISTRIBUTOR agree to enter into this inter-creditor agreement, for the purposes of funding the cash and product needs of the above named operation, and therefore agree as follows:

1. ARM will fund cash expenses in an amount up to but not to exceed, $2,373,879.00 , plus accrued interest, to be secured by a first lien on all crops to be grown by BORROWER during the crop year, to include any and all crop insurance proceeds and FSA government program payments on said crops. ARM may also require additional collateral deemed necessary to secure the line of credit.

2. DISTRIBUTOR will provide crop inputs to BORROWER in an amount not to exceed, $526,444.00, plus accrued interest, to be secured by a second lien behind ARM on all crops to be grown by the BORROWER during the above crop year, to include any and all crop insurance proceeds and FSA government program payments on said crops.

3. ARM, DISTRIBUTOR, and BORROWER further agree and understand, that all crop proceeds checks shall be made payable jointly to ARM, DISTRIBUTOR, and BORROWER and that once the line established by ARM has been paid in full, ARM will relinquish to DISTRIBUTOR any and all proceeds until such time that the line with DISTRIBUTOR has also been paid in full.

4. ARM, DISTRIBUTOR, and BORROWER agree that both of the ARM and DISTRIBUTOR lines of credit are non-revolving and that no crop proceeds will be released to pay other indebtedness until ARM line of credit is paid in full firstly and then DISTRIBUTOR's line of credit has been paid in full.

5. ARM and DISTRIBUTOR agree to freely exchange information concerning balances and advances and that such information will be provided in a timely manner when requested. Also, each creditor shall agree to and notify the other prior to making any additional advances above and beyond the original line amounts.

6. The BORROWER hereby agrees to execute all documents necessary to create and perfect the lien positions mentioned in this agreement. BORROWER also agrees to hold ARM and DISTRIBUTOR harmless for any crop proceeds forwarded as agreed above.

Signatures on Following Page

43

SIGNATURES:  I WITNESS WHEREOF, Grantor has executed this Agreement on 3/1/2018.

Lakeshore Farms, Inc

_____

BORROWER Jonathan Lee Russell

_____

BORROWER

_____

BORROWER

_____

BORROWER

_____

DISTRIBUTOR Agri-Next 3F Farms

_____

ARM

44

# Promissory Note

**Dated:** 3/1/2018

FOR VALUE RECEIVED, the undersigned Borrower(s), promises to pay to the order of Agri-Next 3F Farms, the full sum of $526,444.00 together with interest at the rate of (12.00%) percent per annum on the outstanding principal balance from date until paid.

Borrower shall pay this Note in one (1) payment of all outstanding principal plus accrued unpaid interest on 2/15/2019

Borrower may prepay this Note in whole or in part at any time without penalty. All payments due hereunder shall be delivered to

Agri-Next 3F Farms
28706 S. State Route 7 S.
Garden City, MO 64747

In the event of Borrower's default under the terms and conditions of the attached Agri-Next 3F Farms security agreement, Agri-Next 3F Farms shall have the right, at Agri-Next 3F Farms's sole option, to increase the interest rate under this Note to a default rate (the "Default Rate") equal to eighteen (18.00%) percent per annum and to further declare this Note to be in default and to accelerate the maturity and insist upon immediate payment in full of the unpaid principal balance then outstanding under this Note, plus accrued interest at the Default Rate Agri-Next 3F Farms shall further be entitled upon Borrower's failure to pay this Note when due to prospectively increase the interest rate to the Default Rate provided hereinabove.

Should this Note be placed in the hands of an attorney for collection, then Borrower agrees to pay reasonable attorney's fees in the amount of twenty-five (25%) of the principal and interest due together with all court costs incurred in the collection of this Note.

Borrower hereby waives presentation for payment, demand, notice of non-payment and protest, all pleas of division or discussion, and consents that time of payment may be extended without notice thereof.

And now appears the undersigned Guarantor(s) who acknowledges and agrees that Guarantor is and shall be bound with Borrower, jointly and in solido, for the faithful performance of this Note and all obligations due by Borrower hereunder.

45

Lakeshore Farms, Inc

_____         _____
BORROWER Jonathan Lee Russell            GUARANTOR Jonathan Lee Russell


_____         _____
BORROWER                                 GUARANTOR


_____         _____
BORROWER                                 GUARANTOR


_____         _____
BORROWER                                 GUARANTOR

46

## Security Agreement

**CREDITOR**
Agri-Next 3F Farms
28706 S. State Route 7 S.
Garden City, MO 64747

**BORROWER(s)**
Lakeshore Farms, Inc
Jonathan Lee Russell
24806 Hwy 159
Forest City, MO 64451

CREDITOR and BORROWER, whose addresses appear above, agree as follows:

1. **Security Interest/Collateral**
   BORROWER hereby grants to CREDITOR a security interest in all the collateral listed below, following a box marked with an "X" (the "Collateral"), together with all substitutions, replacements, products and proceeds thereof, whether now owned or hereafter acquired.

   a. ☒ Crops and Farm Products. All BORROWER's crops whether growing or to be grown; all BORROWER's farm products, grains, feed, seed, fertilizers, agricultural chemicals and other supplies used in BORROWER's business or farming operations;

   b. ☐ Livestock and Poultry. All BORROWER's livestock and poultry, including young, unborn young, and eggs.

   c. ☒ Equipment. All BORROWER's farm machinery, vehicles, furniture, manufacturing equipment, shop equipment, office equipment and other equipment of any description;

   d. ☒ Inventory. All BORROWER's inventory of any kind or description, including all raw materials, work in progress, or other materials consumed in BORROWER's business;

   e. ☐ Accounts, General Intangibles, Documents, Chattel Paper and Other Rights to Payment. All BORROWER's accounts, accounts receivable, insurance receivables, deposit accounts, prepayments, chattel paper, general intangibles, payment intangibles, documents of title, bills of lading, warehouse receipts, instruments, notes, investment, and property, certificated and uncertified securities;

   f. ☒ Government Payments/Programs. All payments, accounts, general intangibles, or other benefits, (including without limitation payments in kind, deficiency payments, quota payments, letters of entitlement, storage payments, emergency assistance program payments, diversion payments, and conservation reserve payments) in which BORROWER now has or in the future may have any rights or interest, and which arise out of any past, now existing or future federal, state, county, or local governmental program; and,

   g. ☐ Other Collateral. In addition the collateral includes, but not limited to the collateral described on Exhibit "A" hereto.

2. **Indebtedness**
   The security interest in the Collateral is given to secure the payment and performance of all debts, liabilities and obligations owed by BORROWER to CREDITOR of any nature, including, without limitation, those arising under any promissory note, invoice, contract, credit agreement, understanding, accounts, guaranty, loan agreement, mortgage, deed of trust, stock pledge agreement, security agreement (including this Agreement) and any modifications, replacements, substitutions, extensions, refinancings, or renewals of any of the foregoing, together with expenses, including attorney fees, incurred or paid by CREDITOR in the preservation

47

or enforcement of CREDITOR's rights under any of the foregoing all whether now existing or hereafter created or otherwise arising. These obligations shall be collectively referred to herein as the "Indebtedness."

3. **Preservation of Collateral/Inspection/Inventory**

BORROWER hereby agrees to do all things necessary to maintain, preserve, and protect the Collateral and to be responsible to CREDITOR for any loss or damage thereto. BORROWER agrees not to cause any waste or unreasonable depreciation of the Collateral. The risk of loss of the Collateral shall be on BORROWER at all times and BORROWER shall promptly pay when due all taxes, assessments, liens or encumbrances levied on or against the Collateral hereunder or for its use or operations, except such as it may in good faith contest or as to which a bona fide dispute may arise. BORROWER shall allow access to the Collateral and any documents or records related thereto for inspections by CREDITOR on demand, and shall provide upon request by CREDITOR a detailed inventory of all Collateral including serial and VIN numbers; brands; ear tag numbers and tattoos identifying any livestock; and the addresses and legal descriptions of land on which any crops are growing or will be grown, livestock is located; or any farm products, equipment, farm machinery, or other Collateral are stored or otherwise located. BORROWER shall maintain insurance acceptable to CREDITOR including appropriate crop insurance, listing CREDITOR as an additional insured thereon. CREDITOR may (but shall not be obligated to) obtain such insurance as CREDITOR deems appropriate, including "single interest" insurance the cost of which shall be added to the Indebtedness owed by BORROWER and secured by this Agreement.

4. **Cooperation**

BORROWER will from time to time, at its expense, perform all acts and execute all documents requested by CREDITOR, including the obtaining, executing, delivering or filing of financing statements, effective financing statements, amendments, assignments of government payments, or insurance proceeds, and renewals thereof, in order to create, perfect, maintain and enforce a valid lien upon, pledge of, or security interest in all of the Collateral in CREDITOR's favor. CREDITOR is expressly authorized by BORROWER to file financing statements and effective financing statements on BORROWER's behalf, without BORROWER's signature to the extent allowed by the Uniform Commercial Code ("UCC") or other applicable law; or to sign as necessary on behalf of BORROWER, any documents necessary or desirable to perfect or maintain CREDITOR's security interest in all of the Collateral under the UCC, the Food Security Act or other applicable law. BORROWER shall provide upon request to CREDITOR any financial statements, state and federal tax returns, and accounting reports, as CREDITOR shall reasonably request.

5. **Power of Attorney**

BORROWER hereby appoints CREDITOR as its true and lawful attorney in-fact, irrevocably, with full power of substitution to do the following: (a) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from, or in connection with the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment of the Collateral; (c) to settle or compromise any and all claims arising with respect to the Collateral, and, in the place and stead of BORROWER, to execute and deliver its release and settlement for any such claim; (d) to execute on BORROWER's behalf all documents necessary to assign or direct payments of any government subsidies, allocations, or payments of any nature and of any insurance proceeds of any nature; and (e) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of BORROWER, or otherwise, which in the discretion of CREDITOR are necessary or advisable for the preservation of the Collateral. This power is coupled with an interest in the Collateral; and is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by CREDITOR in writing.

6. **Notice of Sale of Collateral, Crop, Farm Products, and Livestock**

48

BORROWER shall, at least seven (7) days prior to any sale, transfer, or consignment of crops, livestock or other farm products deliver to CREDITOR a written list of all buyers, commission merchants, and selling agents (including addresses and phone numbers) to or through whom BORROWER may sell any farm products as defined under the Federal Food Security Act of 1985 ("FSA"). CREDITOR is hereby authorized to give written or oral notice to any person of its security interest as required or permitted under the UCC, the FSA, or other applicable law. CREDITOR is further authorized to instruct the recipient of such notice to issue all proceeds from the sale of the Collateral directly to CREDITOR or jointly to BORROWER and CREDITOR whether or not the BORROWER is in default hereunder. CREDITOR may disclose the Social Security or taxpayer identification number of BORROWER, together with such other information as must or may be included for an effective notice under law.

7.  **Affirmative Representations, Warranties and Covenants**
    BORROWER represents, covenants, and warrants the following:  (a) The information supplied and statements made by BORROWER in any financial, credit or accounting statement or credit applications or in any reports, lists, or statements submitted to CREDITOR are true and correct when made, and have not become untrue or incorrect by subsequent actions or events that have not been disclosed to CREDITOR by BORROWER in writing; (b) The person executing this Agreement is duly authorized and empowered to execute this Agreement on BORROWER's behalf; and, the execution, delivery and performance hereof are within BORROWER's power, have been duly authorized, are not in contravention of law or the terms of BORROWER's Charter, Articles, Bylaws or other incorporation papers (when a corporation) or of any indenture, agreement or undertaking to which BORROWER is a party or by which it is bound; and
    (c) BORROWER shall immediately notify CREDITOR if BORROWER's place of organization, or principal place of business changes from the address listed herein or if any Collateral is to be removed from the BORROWER's principal place of business.

8.  **Events of Default**
    BORROWER shall be in default under this Agreement upon the occurrence of any of the following events or conditions:  (a) Failure by BORROWER to timely pay any Indebtedness to CREDITOR, including, but not limited to principal, interest, or finance charges, when due; (b) Breach, default, termination, or failure to perform by BORROWER of any obligation, covenant, warranty, agreement, or promise, under any contract, agreement, invoice, guaranty, note, mortgage, deed of trust, security agreement, stock pledge, or undertaking in favor of CREDITOR, or any affiliate of CREDITOR, or any third party including, without limitation, those existing under this Agreement; (c) Any warranty, representation, or statement including financial statements and inventories of Collateral provided by BORROWER to CREDITOR are false or misleading in any material respect; (d) This agreement, or any related note, contract, agreement, open account, invoice or guaranty ceases to be in full force and effect or is in any manner deemed unenforceable, including the failure of any such documents to create or maintain a valid perfected security interest; (e) The commencement of any suit for foreclosure or forfeiture proceeding against BORROWER, entry of any judgment, restraining order, or injunction against BORROWER, or the instigation of any action to enforce any such judgment, restraining order or injunction, which in CREDITOR's sole discretion materially and adversely effects BORROWER's operations or ability to repay the Indebtedness or perform its obligations under this Agreement; (f) Death, dissolution, termination of existence, or insolvency of BORROWER; appointment of a receiver over any of the property of BORROWER; assignment for the benefit of CREDITOR or the commencement of any proceeding under any bankruptcy or insolvency laws by or against BORROWER.  Insolvency means BORROWER's inability to generally pay its debts in the ordinary course of business as they become due or that BORROWER's liabilities exceed its assets.  It is understood by the parties that the continuation of BORROWER's solvency is an integral and necessary condition of the CREDITOR's willingness to extend credit to BORROWER; and (g) the sale of any of the Collateral without CREDITOR's prior express consent.

9.  **Remedies Upon Default**
    Upon the default of BORROWER and without any notice to BORROWER, CREDITOR shall have all the rights and remedies available under this Agreement by statute, contract, at law and/or in equity, including but

not limited to the right to declare all Indebtedness owed to CREDITOR immediately due and payable and to peacefully remove any and all of the Collateral from BORROWER's premises, custody or control, and dispose of the same as allowed under the Uniform Commercial Code; to enter upon the premises where any crops are being grown, and at CREDITOR's discretion using BORROWER's equipment, machinery, wells and other improvements of any nature perform any and all actions necessary or desirable to grow, care for, maintain, harvest, store, preserve and protect said crops and any farm products or inventory; and enter upon any premises where any Collateral consisting of livestock are located to feed, inoculate, and care for any such livestock utilizing at CREDITOR's discretion, BORROWER's equipment or improvements. CREDITOR may require BORROWER to deliver to CREDITOR all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. CREDITOR may require BORROWER to assemble the Collateral and make it available to CREDITOR at a place to be designated by CREDITOR. If the Collateral contains other goods not covered by this Agreement at the time of repossession, BORROWER agrees CREDITOR may take such other goods, provided that CREDITOR makes reasonable efforts to return them to BORROWER after repossession. BORROWER acknowledges and agrees that one principal consideration CREDITOR is receiving in exchange for its extension of credit to BORROWER is the ability to setoff or net against amounts owed by BORROWER to CREDITOR, any credit balances or amounts owed (including any pre-paid amounts) to BORROWER by CREDITOR, or any parent, subsidiary or affiliate of CREDITOR. BORROWER therefore agrees that CREDITOR may so net and setoff any such obligations whether owed directly between BORROWER and CREDITOR, or owed between BORROWER and any parent, subsidiary, or affiliate of CREDITOR.

10. **Remedies Cumulative**

All of CREDITOR's rights and remedies, whether evidenced by this Agreement or by any other agreement, note, contract or understanding between BORROWER and CREDITOR, shall be cumulative and may be exercised singularly or concurrently. Election of CREDITOR to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of BORROWER under this Agreement, after BORROWER's failure to perform, shall not affect CREDITOR's right to declare a default and to exercise its remedies.

11. **Miscellaneous**

    a. All agreements, covenants and warranties are severable, and in the event any of them shall be held to be invalid, this Agreement shall be interpreted as if such invalid agreement or covenant was not contained herein;

    b. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective affiliates, heirs, successors and assigns;

    c. This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral and written, among the parties hereto with respect to the subject matter hereof;

    d. All representations, warranties and covenants made in or pursuant to this Agreement are continuing, and shall survive the execution hereof;

    e. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute the same Agreement;

    f. This Agreement shall be governed by and construed in accordance with the laws of the State of MO;

    g. TO THE EXTENT PERMITTED BY APPLICABLE LAW, IN ANY SUIT OR PROCEEDING RELATING TO THIS AGREEMENT, THE PARTIES MUTUALLY WAIVE TRIAL BY JURY;

    h. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THIS AGREEMENT MAY BE ENFORCED IN A COURT OF COMPETENT JURISDICTION AND BORROWER WAIVES ANY ARGUMENT THAT SUCH FORUM IS NOT CONVENIENT; and

    i. All notices which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if given in writing and delivered personally, or by facsimile and confirmed by mail, or mailed by registered, certified or express mail, postage prepaid, or reputable overnight courier, to the address stated above for BORROWER and CREDITOR.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this document as of 3/1/2018

**BORROWER(s)**

_____

BORROWER Jonathan Lee Russell

_____

BORROWER

_____

BORROWER

_____

BORROWER


**CREDITOR:**

_____

Agri-Next 3F Farms

## Continuing Unconditional Guaranty

FOR VALUABLE CONSIDERATION, including the inducement of CREDITOR to extend credit to BORROWER as hereinafter defined, receipt of which is hereby acknowledged, the undersigned (whether one or more "Guarantor"), (jointly and severally if more than one) absolutely and unconditionally guaranty to CREDITOR (as hereinafter defined), the full and prompt payment of all Indebtedness (as hereinafter defined) which exist now or may arise in the future owing from the following or any successor, affiliate, or assign thereof (hereinafter referred to as "BORROWER"):

**CREDITOR**
Agri-Next 3F Farms
28706 S. State Route 7 S.
Garden City, MO 64747

**BORROWER(s)**
Lakeshore Farms, Inc
Jonathan Lee Russell
24806 Hwy 159
Forest City, MO 64451

This Guaranty is made without any agreement or expectation of indemnity from BORROWER.

"Indebtedness" means all debts, liabilities and obligations owing by BORROWER to CREDITOR of any nature, including, without limitation, those arising under any promissory note, account, invoice, contract, understanding, or loan agreement, mortgage, deed of trust, stock pledge agreement or agreement, and any extension, renewal, or replacement of any of the foregoing, whether now existing or hereafter created between BORROWER and CREDITOR, including, without limitation, all attorney's fees, filing fees, court costs, other costs and expenses incurred in the enforcement of any such debt or obligation. Guarantor's obligations under this Guaranty are unconditional and continuing, and are not subject to any setoffs, adjustments or credits and apply to each BORROWER if more than one is described above.

CREDITOR may enforce this Guaranty without first resorting to the BORROWER or realizing upon any collateral interest granted by BORROWER or any other persons. Guarantor agrees that CREDITOR has full authority to and may, without notice to or further consent from Guarantor or BORROWER and without in any manner affecting Guarantor's liability hereunder: (a) substitute or release any security; (b) release in whole or part BORROWER, Guarantor, surety or any other person who may be responsible for payment of all or a portion of the Indebtedness; (c) renew, extend or modify, in whole or part, the terms relating to payment of the Indebtedness including extending the time for payment; (d) settle or compromise the terms of the Indebtedness; (e) delay or forbear from exercising CREDITOR's rights against BORROWER, Guarantor, any third party, or against any collateral given as security for the Indebtedness; (f) accept partial payments from BORROWER or anyone else on account of Indebtedness; (g) fail to perfect any security interest or otherwise impair any collateral given as security for the Indebtedness; (h) release or substitute any collateral given as security for the Indebtedness; (i) procure additional security or guaranties of persons who agree to be liable for any of the Indebtedness; (j) delay, refuse or fail to enforce the collection of the Indebtedness; (k) extend new, additional, or unrelated credit to BORROWER; and (l) assign the Indebtedness, in whole or part, to any third party; all without releasing Guarantor from any of the obligations contained herein.

Guarantor waives notice of acceptance of this Guaranty, notice of the creation, existence of maturity of all Indebtedness, notice of default or extension of time, protest, presentment, demand for payment, notice of dishonor and diligence in collection.

Notwithstanding anything to the contrary in this Guaranty, Guarantor hereby irrevocably waives all rights Guarantor may have at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of CREDITOR) to seek contribution, indemnification or any other form of reimbursement from BORROWER, any other guarantor, or any other person now or hereafter primarily or secondarily liable for any obligations of BORROWER to CREDITOR, for any disbursement made by Guarantor, or either of them, under or in connection with this Guaranty or otherwise.

**GUARANTOR AGREES TO INDEMNIFY AND HOLD CREDITOR HARMLESS FROM AND AGAINST ANY LIABILITY ASSERTED AGAINST CREDITOR BASED UPON ANY CLAIM OR LEGAL ACTION FILED AGAINST CREDITOR BASED IN WHOLE OR PART UPON A CLAIM UNDER 11 U.S.C. §§ 544, 547(b), 548(a) OR 550 RESULTING FROM OR CONNECTED WITH THIS GUARANTY.**

Guarantor hereby understands, acknowledges and agrees that the invalidity of any provision of this Guaranty as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

Guarantor represents and warrants to CREDITOR that: (i) Guarantor has had an opportunity to review the terms of this Guaranty; (ii) understands the terms hereof and enters into this Guaranty freely and voluntarily; (iii) this Guaranty is given to guaranty a non-consumer business debt; (iv) the Guaranty is given voluntarily by the Guarantor, who is actively involved in the BORROWER's business operations or will otherwise benefit there from such that good and valuable consideration in addition to any other consideration sufficient to support this Guaranty has been received; and (v) the individual executing this guaranty is fully authorized and empowered to enter into this guaranty on behalf of Guarantor, and the same is fully enforceable according to its terms.

This Guaranty shall be effective upon delivery to CREDITOR, without further act, condition or acceptance by the CREDITOR, shall be binding upon the Guarantor and the heirs and assigns of the Guarantor, and shall inure to the benefit of the CREDITOR and its successors and assigns. This Guaranty supersedes the "Individual Guaranty for Entity Debt," if any, contained in the Credit Application and Agreement executed by BORROWER and Guarantor. This Guaranty represents the final agreement between the parties with respect to the subject matter hereof and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. This Guaranty may be modified only by a written agreement signed by both Guarantor and CREDITOR. THERE IS NO OTHER AGREEMENT BETWEEN GUARANTOR AND CREDITOR RELATED TO THIS GUARANTY.

Any invalidity or enforceability of any provision or application of this Guaranty shall not affect other lawful provisions and application hereof, and to this end, the provisions of this Guaranty are declared to be severable.

This Guaranty is continuing and covers all Indebtedness whether now existing or future Indebtedness; and regardless whether at any point or time the Indebtedness to CREDITOR may have been paid in full or otherwise extinguished. This Guaranty shall remain in full force and effect until any existing or future Indebtedness owed to CREDITOR is paid in full. Notwithstanding the irrevocable nature of this Guaranty, if Guarantor delivers notice of the revocation thereof to CREDITOR and if the effectiveness of such revocation is upheld in any appropriate court action, Guarantor shall nevertheless remain liable under this Guaranty with respect to (i) all Indebtedness in existence at the time of CREDITOR's receipt of such notice of revocation, (ii) any Indebtedness arising from future advances which CREDITOR is, at the time of such receipt, committed to make, even though such future advances are made after CREDITOR's receipt of such notice, and (iii) any amendments, modifications, renewals, refinancing, extensions of, or other liabilities arising out of, any such Indebtedness described in (i) or (ii) whether occurring before or after CREDITOR's receipt of such notice of revocation.

This Guaranty shall be governed and construed in accordance with the laws of the State of MO. Should CREDITOR be required to hire an attorney to enforce the terms of this Guaranty or should litigation be required to enforce this Guaranty, Guarantor agrees to pay to CREDITOR its reasonable attorney's fees, costs and out-of-pocket expenses incurred in the enforcement hereof.

THIS GUARANTY MAY BE ENFORCED IN ANY COURT OF APPROPRIATE JURISDICTION SITTING IN THE STATE OF MO AND GUARANTOR WAIVES ANY ARGUMENT THAT SUCH FORUM IS INCONVENIENT. TO THE EXTENT PERMITTED UNDER APPLICABLE LAW CREDITOR AND GUARANTOR WAIVE THEIR RIGHTS TO ANY JURY TRIAL WITH RESPECT TO ANY LITIGATION ARISING UNDER, OR IN CONNECTION WITH THIS GUARANTY.

NOTICE TO WISCONSIN MARRIED PERSONS: No provision of any Marital Property Agreement, unilateral statement under Wis. Stats. Section 766.59 or court decree under Wis. Stats. Section 766.70 adversely affects the interest of CREDITOR, prior to the time credit is granted or a credit plan is entered into, is furnished with a copy of the Agreement, statement or decree or has actual knowledge of the adverse provision.

Guarantor, by signing below, acknowledges its credit history and financial condition may be a necessary factor in the extension of credit and evaluation of this Guaranty, and hereby expressly consents to and authorizes CREDITOR to obtain, review, and utilize a credit report on the undersigned from time to time as CREDITOR deems appropriate.

54

If this guaranty is signed by more than one party, each such party acknowledges and agrees that they shall be jointly and severally liable hereunder, and that such liability shall continue and survive the incapacity, lack of authority, death or disability of one or more Guarantor and shall not operate to release or excuse the liability of any other guarantor hereunder. The terms hereof shall apply to each Guarantor jointly and severally as if they had each executed a separate guaranty.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this document as of 3/1/2018

**Guarantor(s):**

_____
GUARANTOR Jonathan Lee Russell

_____
GUARANTOR

_____
GUARANTOR

_____
GUARANTOR

**<u>Exhibit A</u>**

**Assignment of Indemnity**

(See attached)

☐ CROP-HAIL INSURANCE and/or
☒ MULTIPLE PERIL CROP INSURANCE

2017-NCIS 757_Rev. 09-2017

## ASSIGNMENT OF INDEMNITY

| | Approved Insurance Provider's Name & Address: |
| Lakeshore Farms, Inc | RAIN & HAIL, L.L.C. |
| **Insured's Name** | 9200 Northpark Dr, Ste 200 |
| | Johnston, IA 50131 |

| Jonathan Lee Russell | | |
| **Insured's Authorized Representative** | | |

| 24806 Hwy 159 | ALL | MP-0791127 |
| **Street or Mailing Address** | **Crop(s)** | **Policy Number** |

| Forest City | MO | 64451 | ALL | 2018 |
| **City** | **State** | **Zip Code** | **County(ies)** | **Effective Crop Year** |

The insured
assigns to   AgriFund, LLC
       **(Name of Creditor)**

of   5506 Corporate Drive, Suite 1760
       **(Street and/or Mailing Address)**

St. Joseph, MO 64507
       **(City, State and Zip Code)**

the right and interest of any indemnity payment(s) which may be payable to the insured under the insurance policy for the county(ies)/commodity(ies) shown above.

### CONDITIONS

1. This assignment will be binding upon the person(s) who succeeds the Insured's interest in the insurance policy.
2. Indemnity payments made under the insurance policy will be subject to a deduction for any indebtedness due this Approved Insurance Provider by the Insured.
3. This assignment will not grant the Creditor any greater rights than originally held by the Insured.
4. The Creditor's interest will be recognized upon Approved Insurance Provider's approval of this assignment and the Creditor will have the right to submit the loss notices and other forms as required by the insurance policy.
5. The Approved Insurance Provider will determine the person(s) entitled to any indemnity payment(s) and the payment(s) will be by joint check.
6. If the assignment is not cancelled according to item 7 below, the assignment will cease at the end of the effective crop year.
7. Cancellation of this assignment prior to and during the crop year stated above will be accepted by the Approved Insurance Provider only upon notification in writing by the above identified Creditor(s).

This assignment was filed with the Approved Insurance Provider on _____, _____ at _____ a.m./p.m.
                                            **[MONTH] [DAY]**    **[YEAR]**    **[INSERT HOUR]**

*(See Reverse Side for Required Statements & Signature Blocks)*

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT
### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIP's contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination against its customers, employees, and applicants for employment on the bases of race, color, national origin, age, disability, sex, gender identity, religion, reprisal, and where applicable, political beliefs, marital status, familial or parental status, sexual orientation, or all or part of an individual's income is derived from any public assistance program, or protected genetic information in employment or in any program or activity conducted or funded by the Department. (Not all prohibited bases will apply to all programs and/or employment activities.)

To File a Program Complaint

If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at https://www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, by fax (202) 690-7442 or email at program.intake@usda.gov.

Persons with Disabilities

Individuals who are deaf, hard of hearing or have speech disabilities and wish to file either an EEO or program complaint please contact USDA through the Federal Relay Service at (800) 877-8339 or (800) 845-6136 (in Spanish).
Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email. If you require alternative means of communication for program information (e.g., Braille, large print, audiotape, etc.) please contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

---

It is understood and agreed that this assignment will be subject to the terms and conditions of the insurance policy.

| | |
|---|---|
| Insured's Printed Name | Creditor's Authorized Representative Printed Name |
| Insured's Signature                          Date | Creditor's Authorized Representative Signature          Date |
| | Creditor's Authorized Representative's Telephone Number |
| Witness' Printed Name | Witness' Printed Name |
| Witness' Signature                          Date | Witness' Signature                          Date |
| AIP's Authorized Representative's Printed Name | |
| AIP's Authorized Representative's Signature          Date | |

---

☐ CROP-HAIL INSURANCE and/or                                          2017-NCIS 757_Rev. 09-2017
☒ MULTIPLE PERIL CROP INSURANCE

## ASSIGNMENT OF INDEMNITY

| | Approved Insurance Provider's Name & Address: |
|---|---|
| Lakeshore Farms, Inc | RAIN & HAIL, L.L.C. |
| **Insured's Name** | 9200 Northpark Dr, Ste 200 |
| | Johnston, IA 50131 |
| Jonathan Lee Russell | |
| **Insured's Authorized Representative** | |

| 24806 Hwy 159 | | | ALL | MP-0791127 |
|---|---|---|---|---|
| **Street or Mailing Address** | | | **Crop(s)** | **Policy Number** |
| Forest City | MO | 64451 | ALL | 2018 |
| **City** | **State** | **Zip Code** | **County(ies)** | **Effective Crop Year** |

The insured
assigns to

        **(Name of Creditor)**

of

        **(Street and/or Mailing Address)**

        **(City, State and Zip Code)**

the right and interest of any indemnity payment(s) which may be payable to the insured under the insurance policy for the county(ies)/commodity(ies) shown above.

### CONDITIONS

1. This assignment will be binding upon the person(s) who succeeds the Insured's interest in the insurance policy.
2. Indemnity payments made under the insurance policy will be subject to a deduction for any indebtedness due this Approved Insurance Provider by the Insured.
3. This assignment will not grant the Creditor any greater rights than originally held by the Insured.
4. The Creditor's interest will be recognized upon Approved Insurance Provider's approval of this assignment and the Creditor will have the right to submit the loss notices and other forms as required by the insurance policy.
5. The Approved Insurance Provider will determine the person(s) entitled to any indemnity payment(s) and the payment(s) will be by joint check.
6. If the assignment is not cancelled according to item 7 below, the assignment will cease at the end of the effective crop year.
7. Cancellation of this assignment prior to and during the crop year stated above will be accepted by the Approved Insurance Provider only upon notification in writing by the above identified Creditor(s).

This assignment was filed with the Approved Insurance Provider on _____, _____ at _____a.m./p.m.
                                                 [MONTH] [DAY]  [YEAR]  [INSERT HOUR]

**(See Reverse Side for Required Statements & Signature Blocks)**

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT
### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIP's contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

## NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination against its customers, employees, and applicants for employment on the bases of race, color, national origin, age, disability, sex, gender identity, religion, reprisal, and where applicable, political beliefs, marital status, familial or parental status, sexual orientation, or all or part of an individual's income is derived from any public assistance program, or protected genetic information in employment or in any program or activity conducted or funded by the Department. (Not all prohibited bases will apply to all programs and/or employment activities.)

**To File a Program Complaint**

If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at https://www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, by fax (202) 690-7442 or email at program.intake@usda.gov.

**Persons with Disabilities**

Individuals who are deaf, hard of hearing or have speech disabilities and wish to file either an EEO or program complaint please contact USDA through the Federal Relay Service at (800) 877-8339 or (800) 845-6136 (in Spanish).
Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email. If you require alternative means of communication for program information (e.g., Braille, large print, audiotape, etc.) please contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

---

**It is understood and agreed that this assignment will be subject to the terms and conditions of the insurance policy.**

| | |
|---|---|
| Insured's Printed Name | Creditor's Authorized Representative Printed Name |
| Insured's Signature                     Date | Creditor's Authorized Representative Signature      Date |
| | Creditor's Authorized Representative's Telephone Number |
| Witness' Printed Name | Witness' Printed Name |
| Witness' Signature                      Date | Witness' Signature                      Date |
| AIP's Authorized Representative's Printed Name | |
| AIP's Authorized Representative's Signature     Date | |

---

## Notice to Buyer of Security Interest in Farm Products

**BUYER**
Cargill

**SECURED PARTY**
Agrifund, LLC ("ARM")
1401 Hudson Lane, STE 300
Monroe, LA 71201

**BORROWER(S)**
Lakeshore Farms, Inc.
Jonathan Lee Russell
24806 Hwy 159
Forest City, MO 64451

**SECURITY INTEREST:** You are hereby notified pursuant to the Federal Food Security Act of 1985 that ARM (the "Secured Party") holds a security interest in the Farm Products, as described below. The name and address of the Secured Party are shown above. This Notice is effective for a period of one year from the date of your receipt of this Notice.

**FARM PRODUCTS:** The Secured Party holds a security interest in all of the following described property

| Farm Product | Amount | Crop Year | State | County |
|---|---|---|---|---|
| ALL CROPS | ALL | 2018 | MO | ALL |

**DESCRIPTION OF PROPERTY:** The following is a reasonable description of the property:

All crops growing in the above state(s) for the above crop year

**PAYMENT OBLIGATIONS:** The following payment obligations are applicable to this Notice as conditions for waiver or release of the security interest in the Farm Products:

**Proceed checks are to be issued jointly to borrower and Agrifund, LLC, the secured party.**

**ACKNOWLEDGEMENT:** Please acknowledge receipt of this Notice by signing below and returning to the Secured Party at the address shown above.

This Notice is dated 3/1/2018

_____
ARM

## ACKNOWLEDGEMENT

The undersigned acknowledges receipt of this Notice

_____
BUYER

23

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LAKESHORE FARMS, INC., | ) | Case No 18-50077-btf11 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN POST PETITION
FINANCING PURSUANT TO 11 U.S.C §§ 105, 363, 364(c)(1), 364(c)(2), 364(d)(1),
AND 503(b)(1) AND SCHEDULING A FINAL HEARING PURSUANT TO
FED. R. BANKR. P. 2002, 4001 and 9015**

This matter came before the Court for emergency hearing on the 7th day of March, 2018,

upon the motion of Lakeshore Farms, Inc. ("**Debtor**"), Debtor-in-Possession, for entry of an

interim order authorizing Debtor to obtain post-petition, secured financing from Agrifund, LLC

and its participating Distributor, Agri-Next 3F Farms ("**the Financing Motion**")(collectively

**"ARM")** in the aggregate principal amount of up to $2,900,323.00 ("**the DIP LOAN**").

Appearances are as noted on the record.

Notice of the Financing Motion having been given to the Office of the United States

Trustee, United States Attorney's Office, and all creditors and parties in interest; and the Court

having conducted a preliminary hearing to consider the relief requested in the Financing Motion

("**the Preliminary Hearing**"); and upon the entire record of the Preliminary Hearing, including

any evidence presented or statements of counsel at the Preliminary Hearing, after due

deliberation and for good and sufficient therefore, it is hereby,

**ORDERED, ADJUDGED AND DECREED** that:

1.      This Court has jurisdiction over these proceedings and the parties and property

affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding under 28

U.S.C. § 157(b)(2)(A), (D), and (O).

00776171

In the United States Bankruptcy Court, For the Western District of Missouri
In re Lakeshore Farms, Inc.
Case No. 18-50077-btf11
INTERIM ORDER AUTHORIZING DEBTOR TO  OBTAIN POST PETITION FINANCING PURSUANT TO
11 U.S.C §§ 105, 363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1) AND SCHEDULING A FINAL HEARING PURSUANT
TO FED. R. BANKR. P. 2002, 4001 AND 9014
Page 2 of 5

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Financing Motion is **GRANTED** on an interim basis to the extent set forth herein.

4.      The terms and conditions articulated in the Financing Motion and during the hearing are hereby approved.

5.      Debtor is authorized, on an interim basis prior to final hearing hereof, to obtain credit and borrow up to $2,900,323.00 from **ARM,** in accordance with the terms of this Order, the Financing Motion, and representations made during the hearing.

6.      Debtor is authorized to perform and do all acts that are required or contemplated by or in connection with this Order, the Financing Motion, and representations made during the hearing, including executing and delivering any and all documents contemplated under the DIP Loan and/or necessary to effectuate the terms of the Financing ("**the Financing Documents**").

7.      Debtor is further authorized to execute and deliver the Financing Documents, to comply with and perform all of the terms and conditions of the DIP Loan, and to repay to ARM the amounts borrowed in accordance with and subject to the terms and conditions set forth in the DIP Loan, any other Financing Documents, and this Order.

8.      All obligations under this Order and the DIP Loan that Debtor owes to ARM shall constitute obligations that are valid, binding, and enforceable against Debtor and its estate in accordance with their terms.

In the United States Bankruptcy Court, For the Western District of Missouri
In re Lakeshore Farms, Inc.
Case No.  18-50077-btf11
INTERIM ORDER AUTHORIZING DEBTOR TO  OBTAIN POST PETITION FINANCING PURSUANT TO
11 U.S.C §§ 105, 363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1) AND SCHEDULING A FINAL HEARING PURSUANT
TO FED. R. BANKR. P. 2002, 4001 AND 9014
Page 3 of 5

9.      Other than the claim of ARM, no other claim or lien having a priority superior to

or *pari passu* with the DIP Loan shall be granted while any of the obligations under the DIP

Loan remain outstanding.

10.      As security for the DIP Loan, ARM shall have and hereby is granted pursuant to

sections 364 (c)(1), 364(c)(2), and (c)(3) and (d)(1) of the Bankruptcy Code (effective upon entry

of this Interim Order and without the necessity of the execution by Debtor of mortgages, security

agreements, pledge agreements, financing statements, or otherwise) valid, enforceable, and

perfected security interests in and liens of the highest available priority on the Collateral

described in the DIP Loan and during the hearing, whether now owned or hereafter acquired

("**the Liens**").  Additionally, the obligations owing under the DIP Loan shall constitute a super-

priority administrative claim pursuant to Sections 364 (c)(1) and 503 (b)(1) of the Bankruptcy

Code, and shall have priority over all other administrative expenses under Sections 503(b)(1) and

507(b) of the Bankruptcy Code.

11.      The Liens shall constitute valid and duly perfected security interests and liens,

and ARM shall not be required to file or serve financing statements, notices of lien, or similar

instruments that otherwise may be required under federal or state law in any jurisdiction, or take

any action, including taking possession, to validate and perfect such security interests and Liens;

and the failure by Debtor to execute any documentation relating to the Liens shall in no way

affect the validity, perfection, or priority of such Liens. If, however, ARM, in its sole discretion,

shall decide to file any such financing statements, notices of lien, or similar instruments, or to

In the United States Bankruptcy Court, For the Western District of Missouri
In re Lakeshore Farms, Inc.
Case No. 18-50077-btf11
INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN POST PETITION FINANCING PURSUANT TO
11 U.S.C §§ 105, 363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1) AND SCHEDULING A FINAL HEARING PURSUANT
TO FED. R. BANKR. P. 2002, 4001 AND 9014
Page 4 of 5

otherwise confirm perfection of such Liens, Debtor shall reasonably cooperate with and assist in

such process, and the stay imposed by section 362(a) of the Bankruptcy Code is hereby lifted to

the limited extent necessary to allow the filing and recording of a certified copy of this Order or

any such financing statements, mortgages, notices of lien, or similar instruments, and all such

documents shall be deemed to have been filed or recorded at the time of and on the date of this

Order.

12.      All credit extended and loans made to Debtor by ARM in connection with the DIP

Loan shall be and hereby are deemed to have been extended in good faith, as that term is used in

section 364(e) of the Bankruptcy Code.

13.      The provisions of this Order and the DIP Loan shall be binding upon Debtor, its

successors and assigns (including any Chapter 7 trustee hereinafter appointed for Debtor's estate

to the extent allowed under applicable law), and all creditors, shareholders, and parties in interest

to this bankruptcy case and shall inure to the benefit of Debtor, Debtor's estate and ARM.  The

provisions of this Order and the DIP Loan shall survive entry of any order that may be entered

converting or dismissing the case, and the claims and liens granted herein shall maintain their

priority and validity against Debtor and its estate, as provided herein.

14.      In the event of any inconsistency between the provisions of this Order and the

provisions of the DIP Loan and any documents and instruments executed in connection

therewith, the provisions of this Order shall govern.  Debtor and ARM are authorized to make

any nonmaterial amendments, modifications or waivers to the DIP Loan without notice or further

In the United States Bankruptcy Court, For the Western District of Missouri
In re Lakeshore Farms, Inc.
Case No.  18-50077-btf11
INTERIM ORDER AUTHORIZING DEBTOR TO  OBTAIN POST PETITION FINANCING PURSUANT TO
11 U.S.C §§ 105, 363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1) AND SCHEDULING A FINAL HEARING PURSUANT
TO FED. R. BANKR. P. 2002, 4001 AND 9014
Page 5 of 5

order of the Court and are authorized to execute any additional agreements necessary to

document such amendments, modifications or waivers.

15.     This Order shall be effective immediately upon entry by the Court.

16.     The Court shall conduct a final hearing to consider the relief requested in the

Financing Motion on the _____ day of _____, 2018 at _____.  Debtor shall give

immediate notice of final hearing to all creditors and parties in interest and file a certificate of

service.

IT IS SO ORDERED.


_____
HON. BRIAN T. FENIMORE
United States Bankruptcy Judge


Submitted by:

Evans & Mullinix, P.A.

*/s/ Joanne B. Stutz*
Joanne B. Stutz, KS#12365, MO#30820
7225 Renner Road, Suite 200
Shawnee, KS  66217
(913) 962-8700; (913) 962-8701 (Fax)
jstutz@emlawkc.com
*Attorneys For Lakeshore Farms, Inc.*