MOW 7016-1.21 (04/14)

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

Lakeshore Farms, Inc. )
)
) Case No. 18-50077
)
Debtor )

## EXHIBIT INDEX

|  | = | Offered & Admitted w/o objection | X | = | Offered & Admitted over objection |
| --- | --- | --- | --- | --- | --- |
| Ex. | = | Offered, but objected to and excluded | N.O. | = | Marked but not offered |
| D.B. | = | Admitted, de bene | W.D. | = | Offered then withdrawn exhibit |
| Ltd. | = | Admitted for limited purpose | | | |

| Exhibit Number | Action Taken | Date | Time | Description |
| --- | --- | --- | --- | --- |
| GWB 1 | | | | Settlement Agreement |
| GWB 2 | | | | Revisions to Agreement by Frontier Bank |
| GWB 3 | | | | Additional Revisions to Agreement by Frontier Bank |
| GWB 4 | | | | Commitment for Title Insurance |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Page # _____   I CERTIFY that I have this date _____ received from the Clerk, U. S. Bankruptcy Court, Western District of Missouri, the following numbered exhibits for which I will hold myself responsible:

PRINTED NAME                                              SIGNATURE

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**") is made as of March \_\_\_\_, 2018 (the "**Effective Date**"), by and among Jonathan L. Russell, Sarah L. Russell and Lakeshore Farms, Inc. (collectively, "**Russell**"), Manville Farms, John Manville, John Manville Farms, Inc., Bethany Grain, LLC, Ridgeway Grain, LLC and Cainsville Grain, LLC (collectively, "**Manville**") and Great Western Bank ("**GWB**") and Frontier Bank ("**Frontier**"). Russell, Manville, GWB, and Frontier are hereinafter collectively referred to as the "**Parties**" and each individually as a "**Party**."

## RECITALS

The following recitals are a material part of this Agreement.

A.   On September 22, 2017, Russell commenced certain litigation (the "**Litigation**") against Manville in the Circuit Court of Holt County, Missouri, Case No. 17HO-CC0050 asserting certain claims for breach of contract, an accounting and wrongful foreclosure. GWB is an intervening defendant in the Litigation. Manville has asserted certain claims against Russell in the Litigation (the "**Counterclaims**") alleging that Russell is indebted to Manville in connection with certain loan transactions by and between Manville and Russell related to their respective farming operations and for foreclosure of certain real and personal property that Manville alleges secures the amounts owed to Manville by Russell.

B.   GWB asserts claims against Russell related to certain guaranty agreements (the "**Guaranty Agreements**") executed by Russell in connection with certain loan transactions by and between GWB and Manville. GWB has not, however, filed any claims in the Litigation. In addition, GWB is an assignee of Manville with respect to certain claims asserted in connection with the Counterclaim.

C.   As of the Effective Date, Russell is the owner of following real estate: (i) that certain real property located in Holt County, Missouri, legally described on **Exhibit A** attached hereto and commonly referred to as the Forbes Farm (the "**Forbes Farm**"); (ii) that certain real property located in Holt County, Missouri, legally described on **Exhibit B** attached hereto and commonly referred to as the Bin Site (the "**Bin Site**"); and (iii) that certain real property located in Holt County, Missouri, legally described on **Exhibit C** attached hereto and commonly referred to as the Russell home and shop (the "**Russell Property**").

D.   As of the Effective Date, Russell is also the owner and holder of a certain crop insurance claim (the "**Claim**") related to Russell's farming operations in 2013. The Claim is currently the subject of certain litigation filed in the United States District Court for the Western District of Missouri and currently pending before the Eighth Circuit Court of Appeals (the "**Claim Litigation**").

E.   Manville asserts a security interest in the Forbes Farm, the Bin Site and the Russell Property (collectively, the "**Property**"). GWB may also assert an interest in the Property

61476862.5

CLERK U.S. BANKRUPTCY COURT
Exhibits:
Creditor GWB #1
Case No. 18-50077

through an assignment from Manville or in connection with the Guaranty Agreements. Manville and GWB also assert an interest in the Claim.

F.      Frontier also asserts an interest in some of the Property and in the Claim.

G.      As of the Effective Date, Manville is indebted to GFG Ag Services, LLC or one of its related entities (referred to herein as "**Gage**") in the amount of $117,163.89 in connection with certain inventory supplied by Gage in connection with the farming operations of Manville (the "**Gage Claim**"). Gage has made demand on Manville and Russell for payment of the Gage Claim.

H.      As of the Effective Date, Manville is the owner and holder of a certain claim (the "**Syngenta Claim**") asserted against Syngenta that relates to certain damages sustained by Manville and Russell in connection with their farming operations. The Syngenta Claim includes damages to land owned or leased and farmed by Manville (the "**Manville Syngenta Claim**") and damages to land owned or leased by Manville but farmed by Russell (the "**Russell Syngenta Claim**").

I.      The Parties have reached an agreement with respect to the Litigation and all other claims and rights asserted against each other, all as and subject to the terms and conditions further provided for in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      The Recitals set forth above are true and accurate, are a material part of this Agreement, and are hereby incorporated by reference, and the Parties are entitled to rely thereon.

2.      On the Closing Date (as hereinafter defined), Russell shall transfer to GWB title to the Forbes Farm pursuant to a general warranty deed (the "**Warranty Deed**") in the same form and substance as is attached hereto as **Exhibit D**, and subject to the following terms and conditions:

(a)      GWB has obtained at its sole cost and expense a title commitment (the "**Forbes Commitment**") to issue an owner's policy of title insurance in the amount of $490,000.00 naming GWB as the insured, which commitment shall provide that said policy shall be issued after the Warranty Deed is recorded with the Holt County recorder. The Forbes Commitment shall include copies of all title exceptions, covenants, conditions, reservations and encroachments and a copy shall be delivered to Russell upon receipt by GWB. Within three business days after receipt of the Forbes Commitment, GWB will notify Russell in writing of any objections to the Forbes Commitment. If no objections are timely received by Russell, the Forbes Commitment will be deemed accepted by GWB. Russell shall take reasonable effort to correct or satisfy any GWB objections to the Forbes Commitment prior to the Closing Date. If the title defects cannot be corrected or satisfied, then this Agreement shall be void, unless GWB gives notice to the Russell in writing of its election to waive such defects.

2

(b)    On or before the Closing Date, Russell shall pay all general real estate taxes levied and assessed against the Forbes Farm for 2017 and prior years.

(c)    On the Closing Date, Russell shall deliver possession of the Forbes Farm to GWB. No tenant or sharecropper shall have any rights in the Forbes Farm.

(d)    The transfer of the Forbes Farm shall take place on a date mutually agreeable between Russell and GWB but no later than March 16, 2018 except with the consent of GWB (the "**Closing Date**").

(e)    Russell agrees not to interfere or attempt to interfere with the sale of the Forbes Farm by GWB.

3.    On the Closing Date, Russell shall pay to GWB in immediately available funds the sum of $250,000.00 for the release of all liens of Manville and GWB on the Bin Site, on the Russell Property, and on all other real and personal property currently or formerly owned by Russell, provided, however, nothing herein shall impair GWB's rights with respect to the Claim as provided for herein. Within five days after the Closing Date, and provided that all terms and conditions set forth herein have been satisfied, GWB and Manville shall record with the Holt County recorder a Release of Real Estate Deed of Trust and the General Pledge of Note/Pledge of Collateral in the same form and substance as is attached hereto as **Exhibit E**, and shall file any necessary UCC-1 terminations reflecting a release of any UCCs held by GWB or Manville related to any property currently or formerly owned by Russell or his corporation Lakeshore Farms, Inc., provided, however, that Manville and/or GWB may maintain in effect any UCC-1 that perfects a security interest in the Claim so long as any now existing UCC-1 is amended to release all other property currently or formerly owned by Russell. Russell hereby authorizes Manville and/or GWB to file such amendments as are necessary to effectuate the terms of this Section 3.

4.    Within five days after the Closing Date, the Parties shall file in the Litigation a stipulation in the same form and substance as is attached hereto as **Exhibit F**, pursuant to which the Parties agree that the $25,000 deposit paid by Russell in the Litigation in lieu of a bond shall be distributed by the Holt County Clerk of Court as follows:  (i) $12,500.00 shall be returned to Russell and (ii) $12,500.00 shall be delivered to GWB.

5.    On the Closing Date, Russell shall absolutely and unconditionally assign 85 percent of Russell's right, title, and interest in the Claim to GWB and Frontier will release any claim it has to the 85 percent. On the Closing Date, Russell shall also deliver to GWB evidence that any other assignments of the 85 percent of the Claim have been released, including, but not limited to, the Assignment of Indemnity granted by Russell to Frontier Bank. If possible under crop insurance regulations, GWB will release 15 percent of its Assignment of Indemnity on the Claim and Frontier will retain its interest in the 15 percent. The Parties further agree that in the event Russell prevails on Russell's claims with respect to the Claim and becomes entitled to receive any proceeds payable in connection with the Claim (collectively, the "**Claim Proceeds**"), such Claim Proceeds shall be distributed as follows:  (i) first, to the unpaid attorneys' fees and litigation expenses incurred in connection with the Claim Litigation (the "**Claim Expenses**"); (ii) second, 85 percent of the Claim Proceeds minus the Claim Expenses to GWB (the "**GWB Proceeds**"); and (iii) third, 15 percent

3

of the Claim Proceeds minus the Claim Expenses to Frontier (the "**Frontier Proceeds**").  No Party will challenge the right of GWB to receive 85 percent of the Claim Proceeds minus the Claim Expenses, and no Party will challenge the right of Frontier to receive 15 percent of the Claim Proceeds minus the Claim Expenses.  In connection with the Claim Litigation, Russell hereby represents that all information submitted in connection with the Claim has been true and accurate and that Russell shall cooperate in pursuing the Claim to final judgment, provide truthful testimony when required, and provide records necessary to support the Claim. Russell will further take reasonable effort in the Claim Litigation to seek approval to have the GWB Proceeds delivered directly to GWB and the Frontier Proceeds to Frontier, or, in the alternative to have all Claim Proceeds delivered to GWB in which case, GWB shall within ten days upon receipt of the Claim Proceeds deliver to Frontier the Frontier Proceeds.

 In the event Manville and Russell both agree to pursue any claim against the insurance company (the "**Insurance Claim**") related to the Claim Litigation and the refusal of the insurance company to provide insurance, then Manville and Russell agree that any proceeds from the Insurance Claim shall be split with fifty percent of such proceeds going to Manville and fifty percent of such proceeds going to Russell.

6.     On the Effective Date, Manville shall deliver to Russell a release from Gage pursuant to which Gage fully releases Russell from any obligations with respect to the Gage Claim.  Manville irrevocably and unconditionally agrees to indemnify Russell for and with respect to all losses, claims, expenses (including, without limitation, reasonable attorneys' fees and courts costs) and other liabilities that are incurred by Russell and that arise out of, or are attributable to, the Gage Claim.

7.     In the event that Manville is awarded any amounts in connection with the Russell Syngenta Claim (the "**Russell Syngenta Claim Proceeds**"), Manville shall within ten days from receipt of such amounts deliver to Russell all portions of the Russell Syngenta Claim Proceeds that relate to the Russell Syngenta Claim.  Manville further agrees not to assign or encumber any portion of the Russell Syngenta Claim, and GWB hereby acknowledges Russell's right to receive a portion of the Syngenta Claim Proceeds that is attributable to the Russell Syngenta Claim.

8.     GWB and Manville, and their respective past, present and future partners, shareholders, members, managers, officers, directors, employees, agents, attorneys, representatives, successors, assigns, subsidiaries, affiliates, parents, direct and indirect equity holders, owners, and predecessors in interest and all persons claiming by, through, or under any of them, and their respective successors and assigns (collectively, and jointly and severally, the "**GWB/Manville Releasing Parties**") hereby jointly and severally, remise, release, acquit and forever discharge Russell and Russell's affiliates and Frontier, and their subsidiaries, participants or assigns, and all of Russell's past, present, and future shareholders, members, directors, managers, officers, employees, attorneys, advisers, consultants, representatives or agents (collectively, the "**Russell/Frontier Released Parties**") from any and all manner of debts, accounts, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, actions, claims, demands and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, that any

4

of the GWB/Manville Releasing Parties now have or may hereafter have by reason of any act, omission, matter, cause or thing, from the beginning of the world to and including the Effective Date, including matters arising out of or relating to Litigation or the Guaranty Agreements (all of the foregoing released claims are sometimes referred to as the **"GWB/Manville Released Claims"**), provided, however, that nothing herein shall be deemed to release Russell from any of Russell's obligations under this Agreement except as expressly set forth herein. GWB/Manville Releasing Parties acknowledge that, subsequent to the execution of this Agreement, any of the GWB/Manville Releasing Parties might discover claims against a released person or entity that were unknown or unanticipated at the time this Agreement was executed and that, if one or more of the GWB/Manville Releasing Parties had known of the existence of such claims on the date this Agreement was executed, such knowledge may have materially affected one or more of the GWB/Manville Releasing Parties' decision to execute this Agreement. GWB/Manville Releasing Parties further acknowledge that they are assuming a risk with respect to the existence of such unknown or unanticipated claims and agree that this Agreement applies to such unknown or unanticipated claims. Each of the GWB/Manville Releasing Parties expressly waives the benefits of any applicable statutory provision prohibiting, conditioning or restricting the release of unknown or future claims or any of the claims being released in connection with this Agreement.

Nothing herein shall be deemed to be a release of any claims GWB may have against Russell with respect to a certain credit card issued by GWB to Russell or any other consumer accounts obtained by Russell from GWB after the Effective Date.

9.     Frontier Bank, Russell, and Russell's and Frontier's past, present and future partners, shareholders, members, managers, officers, directors, employees, agents, attorneys, representatives, successors, assigns, subsidiaries, affiliates, parents, direct and indirect equity holders, owners, and predecessors in interest and all persons claiming by, through, or under any of them, and their respective successors and assigns (collectively, and jointly and severally, the **"Russell/Frontier Releasing Parties"**) hereby jointly and severally, remise, release, acquit and forever discharge GWB's and Manville's affiliates, subsidiaries, participants or assigns, and all of GWB's and Manville's past, present, and future shareholders, members, directors, managers, officers, employees, attorneys, advisers, consultants, representatives or agents (collectively, the **"GWB/Manville Released Parties"**) from any and all manner of debts, accounts, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, actions, claims, demands and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, that any of the Russell Releasing Parties now have or may hereafter have by reason of any act, omission, matter, cause or thing, from the beginning of the world to and including the Effective Date, including matters arising out of or relating to Litigation (all of the foregoing released claims are sometimes referred to as the **"Russell Released Claims"**), provided, however, that nothing herein shall be deemed to release Manville or GWB from any of their respective obligations under this Agreement except as expressly set forth herein. Russell Releasing Parties acknowledge that, subsequent to the execution of this Agreement, any of the Russell Releasing Parties might discover claims against a released person or entity that were unknown or unanticipated at the time this Agreement was executed and that, if one or more of the Russell Releasing Parties had known of the existence of such claims on the date this Agreement was executed, such knowledge may have materially affected one or more

5

of the Russell Releasing Parties' decision to execute this Agreement. Russell Releasing Parties further acknowledge that they are assuming a risk with respect to the existence of such unknown or unanticipated claims and agree that this Agreement applies to such unknown or unanticipated claims.

Each of the Russell Releasing Parties expressly waives the benefits of any applicable statutory provision prohibiting, conditioning or restricting the release of unknown or future claims or any of the claims being released in connection with this Agreement.

10.     Manville hereby acknowledges that the value of all property, amounts and other rights being transferred herein by Russell to or for the benefit of Manville, including any property, amounts or other rights being transferred to GWB for the benefit of Manville is equal to any obligations owed by Russell in connection with any loan transactions between Russell and Manville. GWB hereby acknowledges that Russell is a guarantor of debt owed by Manville to GWB and not a borrower of GWB and that, accordingly, GWB is not obligated to send to Russell a Form 1099(c).

11.     Except to enforce the terms of this Agreement, each Party agrees and covenants to forever refrain and desist from instituting or asserting against any claim, demand, action or suit of whatever kind or nature, either directly or indirectly, for injuries or damage, to person or property, resulting or to result from any matter released above. This instrument may be pleaded as a counterclaim to or as a defense in bar or abatement of any action of any kind whatsoever, brought, instituted or taken by or on behalf of one party on account of the alleged claim or claims against any other party to this Agreement.

12.     The Agreement represents the entire agreement of the Parties and there are no oral understandings, statements, promises, or inducements contrary to the terms of this Agreement.

13.     The Agreement shall be governed by, construed and enforced in accordance with, and subject to the laws of the State of Missouri.

14.     The Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A photocopied, scanned, facsimile or other electronic signature of any Party to this Agreement shall have the same force and effect for all purposes as an original signature.

15.     In the event of a breach of this Agreement, if such breach is not cured within ten days after written notice of the alleged breach, then if litigation is required to enforce this Agreement, the prevailing Party, in addition to any other remedy, shall be entitled to recover its reasonable attorneys' fees.

16.     This Agreement is binding on the Parties, and their respective heirs, personal representatives, successors and assigns.

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

[Signatures to follow this Page]

6

_____

**Jonathan L. Russell**

_____

**Sarah L. Russell**

**Lakeshore Farms, Inc.**

_____

Jonathan L. Russell, President

**Manville Farms**

_____

John Manville, as general manager and authorized agent

**John Manville Farms, Inc.**

_____

John Manville, as general manager and authorized agent

**Bethany Grain, LLC**

_____

John Manville, as general manager and authorized agent

**Ridgeway Grain, LLC**

_____

John Manville, as general manager and authorized agent

**Cainsville Grain, LLC**

_____

John Manville, as general manager and authorized agent

_____

**John Manville**

**Great Western Bank**

By:     _____
Name:  _____
Title:   _____

**Frontier Bank**

7

By: _____

Name: _____

Title: _____

8

## EXHIBIT A

### Legal Description to Forbes Farm

THAT PART OF THE SOUTHWEST FRACTIONAL QUARTER OF SECTION 5, TOWNSHIP 58 NORTH, OF RANGE 37 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI LYING SOUTH AND OUTSIDE THE UNITED STATES CORPS OF ENGINEERS LEVEE.

AND

THAT PART OF THE WEST 1/2 SECTION 8, TOWNSHIP 58 NORTH, OF RANGE 37 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI LYING SOUTH AND OUTSIDE THE UNITED STATES CORPS OF ENGINEERS LEVEE.

## EXHIBIT B

### Legal Description to Bin Site

Commencing at the Southeast Corner of Section 32, Township 61 North, Range 39 West, Holt County, Missouri; thence along Section Line, North 00 degrees 05 minutes 22 seconds East 1329.08 feet to Quarter Quarter Section Line; thence along said line, North 88 degrees 19 minutes 33 seconds West 1408.91 feet to the Point of Beginning; thence along the westerly right-of-way of Missouri Route P the following courses and distances: 23.25 feet by arc distance along a curve to the right having a radius of 1176.30 feet and a chord bearing of North 20 degrees 46 minutes 41 seconds East 23.25 feet to P.C. Station 309+29.9/30 feet right; thence North 20 degrees 38 minutes 27 seconds East 122.63 feet to P.T. Station 308+06.9/30 feet right; thence 65.32 feet by arc distance along a curve to the left having a radius of 1116.30 feet and a chord bearing of North 18 degrees 58 minutes 03 seconds East 65.31 feet to the Southeast Corner of Deed Book 383, Page 871 as recorded with the Holt County Recorder of Deeds; thence along the South Line of said deed and the projection thereof, North 85 degrees 49 minutes 30 seconds West 428.80 feet to the present day East high bank of Little Tarkio Creek; thence along said bank, South 24 degrees 57 minutes 49 seconds West 474.69 feet; thence departing said bank, South 84 degrees 34 minutes 52 seconds East 495.84 feet to a point along the westerly right-of-way of Missouri Route P; thence along said right-of-way 255.76 feet by arc distance along a curve to the right having a radius of 1176.30 feet and a chord bearing of North 13 degrees 58 minutes 59 seconds East 255.26 feet to the point of beginning, containing 4.69 acres, more or less,

## EXHIBIT C

### Legal Description to Russell Property

**Tract I**

Commencing on the South line of Section 36, in Township 61, of Range 39, where the public road running from Mound City, Missouri, to Forest City, Missouri, crosses the same; thence following said public road North to the cemetery in said Section 36; thence East to the top of the Hill; thence South to said Section line; thence West to the place of beginning.

**Tract II**

Also, commencing at a point 12.64 chains East of the intersection of the Easterly line of the CB&Q Railroad right of way line and the South line of Section 2; thence North to the North line of said Section 2; thence East to the Westerly right of way line of Highway 159; thence Southerly along the highway right of way line to the South line of Section 2; thence West to the point of beginning; all in Township 60 North, of Range 39 West of the 5th P.M.

61476862.5

## EXHIBIT D

### Warranty Deed

**(To Follow This Page)**

Title of Document:    General Warranty Deed

Date of Document:    _____, 2018

Grantor:                   Jonathan L. Russell and Sarah L. Russell, husband and wife
                               Jonathan L. Russell, individually
                               24806 Highway 159
                               Forrest City, MO 64451

Grantee:                  **GREAT WESTERN BANK**

Grantee's Mailing Address(es):        Great Western Bank
                                                   P.O. Box 226
                                                   Princeton, MO 64673

Legal Description:    See **Exhibit A**

## GENERAL WARRANTY DEED

**THIS GENERAL WARRANTY DEED** is made as of the _____ day of _____,
2018, by and between Jonathan  L. Russell, individually, and Jonathan  L. Russell and Sarah L.

61476862.5

Case 18-50077-btf11   Doc 58   Filed 03/13/18   Entered 03/13/18 15:31:43   Desc Main
                    Document      Page 14 of 46

Russell, husband and wife (collectively, the "Grantor"), and Great Western Bank, a South Dakota banking association ("Grantee") whose mailing address is P.O. Box 226, Princeton, Missouri 64673.

**WITNESSETH, THAT THE GRANTOR,** in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does by these presents grant, bargain, sell, convey and confirm unto the Grantee, its successors and assigns, all that certain real estate situated in the County of Holt, State of Missouri as described in Exhibit A attached hereto and incorporated herein by this reference (the "Property").

EXCEPT AND SUBJECT TO general real estate taxes not due and payable at the time of transfer; (ii) covenants, conditions and restrictions of record; and (iii) building lines and easements, if any, provided they do not interfere with the current use and enjoyment of the Property (the "Permitted Encumbrances").

TO HAVE AND TO HOLD THE SAME, together with all and singular the rights, privileges, tenements, hereditaments, appurtenances and immunities thereunto belonging or in any wise appertaining to the Grantee and its successors and assigns forever.

And said Grantor, for itself and its successors and assigns, does hereby covenant, promise and agree to and with said Grantee, that the above granted and described Property, with the appurtenances are free, clear, discharged and unencumbered of and from all grants, titles, charges, estates, judgments, taxes, assessments and encumbrances of what nature or kind so ever done or suffered by Grantor, excepting the Permitted Encumbrances, and that it will WARRANT and FOREVER DEFEND the same unto the said Grantee, its successors and assigns against Grantor, its successors and assigns, and all and every person or persons whomsoever, lawfully claiming or to claim the same by, through or under Grantor, except as set forth above.

THE REMAINDER OF THIS PAGE
INTENTIONALLY LEFT BLANK.

**IN WITNESS WHEREOF,** the undersigned authorized representative of Grantor has hereunto set his hand the day and year first above written.

61476862.5

JONATHAN L. RUSSELL, individually

By: _____

STATE OF _____ )
                           : ss.
COUNTY OF _____ )

On this _____ day of _____, 2018, before me personally appeared Jonathan L. Russell, to me known to be the person described herein and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

        IN WITNESS WHEREOF, I have hereunto set my hand and seal the day and year before written.


_____
Notary Public

My commission expires: _____


**ADDITIONAL SIGNATURES FOLLOW THIS PAGE.**

61476862.5

JONATHAN L. RUSSELL AND SARAH L.
RUSSELL, as husband and wife

_____

Jonathan L. Russell

_____

Sarah L. Russell

STATE OF _____     )
                               : ss.
COUNTY OF _____        )

 On this _____ day of _____, 2018, before me personally appeared Jonathan L.
Russell, as husband to Sara L. Russell, to me known to be the person described herein and who
executed the foregoing instrument, and acknowledged that he executed the same as his free act and
deed.

        IN WITNESS WHEREOF, I have hereunto set my hand and seal the day and year before
written.

                              _____
                                       Notary Public
My commission expires: _____

STATE OF _____     )
                               : ss.
COUNTY OF _____        )

 On this _____ day of _____, 2018, before me personally appeared Sarah L.
Russell, as wife to Jonathan L. Russell, to me known to be the person described herein and who
executed the foregoing instrument, and acknowledged that she executed the same as her free act
and deed.

        IN WITNESS WHEREOF, I have hereunto set my hand and seal the day and year before
written.

                              _____
                                       Notary Public

61476862.5

My commission expires: _____

## EXHIBIT A

### LEGAL DESCRIPTION

THAT PART OF THE SOUTHWEST FRACTIONAL QUARTER OF SECTION 5, TOWNSHIP 58 NORTH, OF RANGE 37 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI LYING SOUTH AND OUTSIDE THE UNITED STATES CORPS OF ENGINEERS LEVEE.

AND

THAT PART OF THE WEST 1/2 SECTION 8, TOWNSHIP 58 NORTH, OF RANGE 37 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI LYING SOUTH AND OUTSIDE THE UNITED STATES CORPS OF ENGINEERS LEVEE.

61476862.5

**<u>EXHIBIT E</u>**

**<u>Release</u>**

**(To Follow This Page)**

*(Space above reserved for Recorder of Deeds certification)*

*Title of Document*:  MISSOURI RELEASE OF REAL ESTATE DEED OF TRUST AND
                         RELEASE OF GENERAL PLEDGE OF NOTE

*Date of Document*: _____, 2018


Grantor:          Manville Farms
                  36217 E. 280th Avenue
                  Gillman City, MO 64642

Assignee:         Great Western Bank
                  P.O. Box 226
                  Princeton, MO 64673

*Grantee(s)*:     Jonathan L. Russell and Sarah L. Russell, husband and wife
                  Jonathan L. Russell, individually
                  Lakeshore Farms, Inc.
                  24806 Highway 159
                  Forrest City, MO 64451


*Legal Description*:    Exhibit A

*Document Numbers*:        Document No. 20140084, Book 413, Page 199
                           Document No. 20140520, Book 415, Page 152
                           Document No. 20150310, Book 418, Page 933


*After recording, please return to*:    Polsinelli PC
                                         Attn: Amy Hatch, Esq.


61476862.5

900 W. 48th Place, Suite 900
Kansas City, MO  64112

## MISSOURI RELEASE OF REAL ESTATE DEED OF TRUST AND RELEASE OF GENERAL PLEDGE OF NOTE

**MANVILLE FARMS** ("**Beneficiary**"), the current owner and holder of the note evidencing the debt secured by a Real Estate Deed of Trust executed by **JONATHAN L. RUSSELL and SARAH L RUSSELL, husband and wife, and JONATHAN L. RUSSELL, individually** (collectively, the "**Russell Borrowers**"), to **Nancy Blake,** as Trustee, dated January 27, 2014, and recorded on January 29, 2014 with the Recorder of Deeds for Holt County, Missouri (the "**Recorder**") as **Document No. 20140084**, Book **413**, Page **199**, which Deed of Trust was amended by that certain Amendment to Deed of Trust recorded with the Recorder on June 19, 2014, as **Document No. 20140520**, Book **415**, Page **152** (collectively, the "**Deed of Trust**"), in order to add **LAKESHORE FARMS, INC.** as a borrower ("**Lakeshore**"; and together with the Russell Borrowers; collectively, the "**Borrower**"), and which Deed of Trust was subsequently pledged and assigned as collateral to **GREAT WESTERN BANK** ("**GWB**") pursuant to that certain General Pledge of Note and Pledge of Collateral (the "**Pledge**") recorded with the Recorder on April 15, 2015, as Document No. **20150310**, Book **418**, Page **933**, does, together with GWB, hereby acknowledge that for good and valuable consideration, the property described on **Exhibit A** attached hereto is hereby released from the liens held by Beneficiary related to the Deed of Trust and is hereby released from any liens or claims thereto of GWB related to the Pledge.

(Signatures on the following page)

IN WITNESS WHEREOF, this Release has been executed effective as of this ___ day of _____, 2018.

**Beneficiary:**          **MANVILLE FARMS**

By: _____
Name:_John Manville_____

_____

61476862.5

Title:  Partner

**GWB:**                    **GREAT WESTERN BANK**

By:  _____

  _____

  _____

Name:
Title:

61476862.5

STATE OF _____          )
                                )  ss.
COUNTY OF _____            )

On this _____ day of _____, 2018, before me, a notary public for said County and State, personally appeared John Manville, to me personally known, who, being by me duly sworn, did state that he is a partner and authorized signatory of Manville Farms, known to me to be the person who executed the foregoing instrument on behalf of Beneficiary and acknowledged to me that he executed the same for the purpose stated therein.

IN WITNESS WHEREOF, I have set my hand and affixed my official seal on the day and year last written above.

                                        _____
                              NOTARY PUBLIC
                              Name: _____

My Commission Expires:

_____


STATE OF _____          )
                                )  ss.
COUNTY OF _____            )

On this _____ day of _____, 2018, before me, a notary public for said County and State, personally appeared _____, to me personally known, who, being by me duly sworn, did state that he is an officer and authorized signatory of Great Western Bank, known to me to be the person who executed the foregoing instrument on behalf of Beneficiary and acknowledged to me that he executed the same for the purpose stated therein.

IN WITNESS WHEREOF, I have set my hand and affixed my official seal on the day and year last written above.

                                        _____
                              NOTARY PUBLIC
                              Name: _____

My Commission Expires:

_____

61476862.5

# EXHIBIT A

## LEGAL DESCRIPTION

**Tract I**

Commencing on the South line of Section 36, in Township 61, of Range 39, where the public road running from Mound City, Missouri, to Forest City, Missouri, crosses the same; thence following said public road North to the cemetery in said Section 36; thence East to the top of the Hill; thence South to said Section line; thence West to the place of beginning.

**Tract II**

Also, commencing at a point 12.64 chains East of the intersection of the Easterly line of the CB&Q Railroad right of way line and the South line of Section 2; thence North to the North line of said Section 2; thence East to the Westerly right of way line of Highway 159; thence Southerly along the highway right of way line to the South line of Section 2; thence West to the point of beginning; all in Township 60 North, of Range 39 West of the 5th P.M.

**Tract III**

THAT PART OF THE SOUTHWEST FRACTIONAL QUARTER OF SECTION 5, TOWNSHIP 58 NORTH, OF RANGE 37 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI LYING SOUTH AND OUTSIDE THE UNITED STATES CORPS OF ENGINEERS LEVEE.

AND

THAT PART OF THE WEST 1/2 SECTION 8, TOWNSHIP 58 NORTH, OF RANGE 37 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI LYING SOUTH AND OUTSIDE THE UNITED STATES CORPS OF ENGINEERS LEVEE.

**TRACT IV**

A tract located in the Northeast Quarter of the Southwest Quarter of Section 10, Township 61 North, Range 39 West, more particularly described as follows:

Commencing at a point on the east line of West Street coinciding with the southwesterly corner of the Chicago Burlington and Quincy Railroad company right of way and being approximately 625 feet generally south of the railroad depot, thence northerly 471 feet along the east line of the West Street parallel to and 150 feet generally west of the main railroad tract, thence easterly 87 feet parallel to the southerly boundary of the Chicago, Burlington, and Quincy Railroad Company right of way, thence southerly parallel to and generally 10.5 feet west of tract number 2 to a point 110 feet generally east of the point of beginning, thence westerly on the southerly boundary of the Chicago, Burlington and Quincy Railroad Company right of way 110 feet to the point of beginning of said parcel of land.

61476862.5

**TRACT V**

Commencing at the Southeast Corner of Section 32, Township 61 North, Range 39 West, Holt County, Missouri; thence along Section Line, North 00 degrees 05 minutes 22 seconds East 1329.08 feet to Quarter Quarter Section Line; thence along said line, North 88 degrees 19 minutes 33 seconds West 1408.91 feet to the Point of Beginning; thence along the westerly right-of-way of Missouri Route P the following courses and distances: 23.25 feet by arc distance along a curve to the right having a radius of 1176.30 feet and a chord bearing of North 20 degrees 46 minutes 41 seconds East 23.25 feet to P.C. Station 309+29.9/30 feet right; thence North 20 degrees 38 minutes 27 seconds East 122.63 feet to P.T. Station 308+06.9/30 feet right; thence 65.32 feet by arc distance along a curve to the left having a radius of 1116.30 feet and a chord bearing of North 18 degrees 58 minutes 03 seconds East 65.31 feet to the Southeast Corner of Deed Book 383, Page 871 as recorded with the Holt County Recorder of Deeds; thence along the South Line of said deed and the projection thereof, North 85 degrees 49 minutes 30 seconds West 428.80 feet to the present day East high bank of Little Tarkio Creek; thence along said bank, South 24 degrees 57 minutes 49 seconds West 474.69 feet; thence departing said bank, South 84 degrees 34 minutes 52 seconds East 495.84 feet to a point along the westerly right-of-way of Missouri Route P; thence along said right-of-way 255.76 feet by arc distance along a curve to the right having a radius of 1176.30 feet and a chord bearing of North 13 degrees 58 minutes 59 seconds East 255.26 feet to the point of beginning, containing 4.69 acres, more or less,

61476862.5

**<u>EXHIBIT F</u>**

**<u>Stipulation</u>**

**(To Follow This Page)**

## IN THE CIRCUIT COURT OF HOLT COUNTY, MISSOURI

JONATHAN L. RUSSELL, SARAH L.   )
RUSSELL, and LAKESHORE FARMS,   )
INC.   )
  )
     Plaintiffs,   )
  )     Case No. 17HO-CC00050
     vs.   )
  )
MANVILLE FARMS, et al.,   )
  )
     Defendants.   )

### STIPULATION BETWEEN PLAINTIFFS AND DEFENDANTS
### REGARDING RELEASE OF CASH DEPOSIT IN LIEU OF BOND

Plaintiffs Jonathan L. Russell, Sarah L. Russell and Lakeshore Farms, Inc. (collectively,

"Plaintiffs"), by and through their undersigned counsel, Defendants Manville Farms, John Manville

Farms, Inc., Bethany Grain LLC, Ridgeway Grain LLC and Cainsville Grain LLC

(collectively, "Defendants"), by and through their undersigned counsel, and Intervening Defendant

Great Western Bank ("GWB"), by and through its undersigned counsel, hereby

stipulate to the following relief:

1.     Plaintiffs commenced the above captioned litigation (the "Litigation") on

September 22, 2017, and in connection therewith, filed a Motion for Temporary Restraining

Order (the "TRO Motion"). On September 29, 2017, the Court entered its Order Granting

Plaintiffs' Motion for Temporary Restraining Order (the "TRO Order"), pursuant to which the

Court enjoined Defendant Manville Farms from conducting a Trustee's Sale foreclosing on a

certain deed of trust (the "Deed of Trust") that is the subject of the Litigation until such time that a

hearing could be held on Plaintiffs' application for a preliminary injunction (the "Injunction

61476862.5

Application"). Thereafter, Plaintiffs filed with the Court a cash deposit in lieu bond in the amount of $25,000 (the "Deposit") as required by the TRO Order.

2.      On November 20, 2017, the Court held a hearing (the "Hearing") on Plaintiffs' Injunction Application. The Court took the Injunction Application under advisement and agreed to extend the TRO Order to 5:00 p.m. on December 11, 2017. On December 13, 2017 the Court entered that certain Order Overruling Plaintiffs' Motion for Temporary Restraining Order and Application for Preliminary Injunction (the "Order Denying Injunction"). In the Order Denying Injunction, the Court ordered that the Deposit be released to Plaintiffs within ten days from the date of the Order Denying Injunction unless the Defendants filed a Motion to Assess Damages with respect to the same.

3.      On December 21, 2017, Defendants filed a Motion to Assess Damages on Cash Deposit in Lieu of Bond (the "Deposit Motion"). In the Deposit Motion, Defendants requested that Deposit be returned in part to Defendants and in part to GWB. Plaintiffs, Defendants and GWB (collectively, the "Parties") have since reached an agreement pursuant to which the Parties have agreed that the Deposit shall be released as follows:  $12,500 to Plaintiffs and $12,500 to Defendants.

IT IS THEREFORE ORDERED AS FOLLOWS:

Having been informed that the Parties have reached an agreement and now hereby stipulate to the release of the Deposit, the Court hereby ORDERS:

The Holt County Clerk shall return $12,500.00 of the Deposit to Plaintiffs at c/o Amy E. Hatch at Polsinelli PC, 900 West 48th Place, Ste. 900, Kansas City, Missouri 64112 and shall return the remaining $12,500 of the Deposit to GWB at c/o Robert Cowherd, Chapman & Cowherd P.C., 903 Jackson Street, Chillicothe, Missouri 64601.

61476862.5

IT IS SO ORDERED.

Date: _____

_____
Honorable Roger M. Prokes

Respectfully submitted,

**POLSINELLI PC**

_____/s/ Todd H. Bartels_____
Edwin H. Smith           MO #26608
Todd H. Bartels          MO #45677
3101 Frederick Avenue
St. Joseph, MO 64506
Phone:  (816) 572-4418 Fax:
(888) 253-8293
esmith@polsinelli.com
tbartels@polsinelli.com

Amy E. Hatch             MO #53116
900 West 48th Place
Kansas City, MO 64112
Phone:  (816) 360-4178 Fax:
(816)             753-1536
ahatch@polsinelli.com
**ATTORNEYS FOR PLAINTIFFS**


**MURPHY TAYLOR SIEMENS & ELLIOTT P.C.**

_____
Nancy L. Potter          MO #61443
3007 Frederick Avenue
St. Joseph, MO 64506
Phone:   (816) 364-6677  Fax:
(816)             364-9677
nancypotter@mtselaw.com
**ATTORNEYS FOR DEFENDANTS**

**CHAPMAN AND COWHERD, P.C.**

_____
Robert Cowherd
903 Jackson Street

Chillicothe, MO 64601
Phone:   (660) 646-0627  Fax:
(660)                646-1105
rcowherd@ccttlaw.com
**ATTORNEYS FOR INTERVENOR**

**CERTIFICATE          OF
SERVICE**

I hereby certify that on _____ __, 2018, I caused the foregoing to be e-filed
with the Clerk of the Court using the ECF system, which sent notification of such filing to all parties
whose attorneys have entered their appearances in the above-referenced case.


                                    ___/s/ *Todd H. Bartels*_____

                            Attorneys for Plaintiff

61476862.5

(b)    On or before the Closing Date, Russell shall pay all general real estate taxes levied and assessed against the Forbes Farm for 2017 and prior years.

(c)    On the Closing Date, Russell shall deliver possession of the Forbes Farm to GWB. No tenant or sharecropper shall have any rights in the Forbes Farm.

(d)    The transfer of the Forbes Farm shall take place on a date mutually agreeable between Russell and GWB but no later than March 16, 2018 except with the consent of GWB (the "**Closing Date**").

(e)    Russell agrees not to interfere or attempt to interfere with the sale of the Forbes Farm by GWB.

3.    On the Closing Date, Russell shall pay to GWB in immediately available funds the sum of $250,000.00 for the release of all liens of Manville and GWB on the Bin Site, on the Russell Property, and on all other real and personal property currently or formerly owned by Russell, provided, however, nothing herein shall impair GWB's rights with respect to the Claim as provided for herein.  Within five days after the Closing Date, and provided that all terms and conditions set forth herein have been satisfied, GWB and Manville shall record with the Holt County recorder a Release of Real Estate Deed of Trust and the General Pledge of Note/Pledge of Collateral in the same form and substance as is attached hereto as **Exhibit E**, and shall file any necessary UCC-1 terminations reflecting a release of any UCCs held by GWB or Manville related to any property currently or formerly owned by Russell or his corporation Lakeshore Farms, Inc., provided, however, that Manville and/or GWB may maintain in effect any UCC-1 that perfects a security interest in the Claim so long as any now existing UCC-1 is amended to release all other property currently or formerly owned by Russell.  Russell hereby authorizes Manville and/or GWB to file such amendments as are necessary to effectuate the terms of this Section 3.

4.    Within five days after the Closing Date, the Parties shall file in the Litigation a stipulation in the same form and substance as is attached hereto as **Exhibit F**, pursuant to which the Parties agree that the $25,000 deposit paid by Russell in the Litigation in lieu of a bond shall be distributed by the Holt County Clerk of Court as follows:  (i) $12,500.00 shall be returned to Russell and (ii) $12,500.00 shall be delivered to GWB.

5.    On the Closing Date, Russell shall absolutely and unconditionally assign 85 percent of Russell's right, title, and interest in the Claim to GWB and Frontier will release any claim it has to the 85 percent.  On the Closing Date, Russell shall also deliver to GWB evidence that any other assignments of the 85 percent of the Claim have been released, including, but not limited to, the Assignment of Indemnity granted by Russell to Frontier Bank.  ~~If possible under crop insurance regulations,~~On the Closing Date, Russell shall absolutely and unconditionally assign the remaining 15 percent of Russell's right, title, and interest in the Claim to Frontier and GWB will release ~~15 percent of~~any claim it has to said 15 percent. GWB hereby assigns to Frontier any rights it has to said 15 percent interest in the Claim under its Assignment of Indemnity ~~on the Claim~~and Frontier will retain ~~its~~all right title and interest in ~~the~~and to said 15 percent.  The Parties further agree that in the event Russell prevails on Russell's claims with respect to the

CLERK U.S. BANKRUPTCY COURT
Exhibits:
Creditor GWB #2
Case No. 18-50077

Claim and becomes entitled to receive any proceeds payable in connection with the Claim (collectively, the "**Claim Proceeds**"), such Claim Proceeds shall be distributed as follows:  (i) first, to the unpaid attorneys' fees and litigation expenses incurred in connection with the Claim Litigation (the "**Claim Expenses**"); (ii) second, 85 percent of the ~~Claim Proceeds minus~~amount remaining after the Claim Expenses are deducted from the Claim Proceeds shall be distributed to GWB (the "**GWB Proceeds**"); and (iii) third, 15 percent of the ~~Claim Proceeds minus~~amount remaining after the Claim Expenses are deducted from the Claim Proceeds shall be distributed to Frontier (the "**Frontier Proceeds**").  No Party will challenge the right of GWB to receive ~~85 percent of~~the ~~Claim~~GWB Proceeds ~~minus the Claim Expenses~~, and no Party will challenge the right of Frontier to receive ~~15 percent of~~the ~~Claim~~Frontier Proceeds ~~minus the Claim Expenses~~. In connection with the Claim Litigation, Russell hereby represents that all information submitted in connection with the Claim has been true and accurate and that Russell shall cooperate in pursuing the Claim to final judgment, provide truthful testimony when required, and provide records necessary to support the Claim. Russell will further take reasonable effort in the Claim Litigation to seek approval to have the GWB Proceeds delivered directly to GWB and the Frontier Proceeds to Frontier, or, in the alternative to have all Claim Proceeds delivered to GWB in which case, GWB shall within ten days upon receipt of the Claim Proceeds deliver to Frontier the Frontier Proceeds.

In the event Manville and Russell both agree to pursue any claim against the insurance company (the "**Insurance Claim**") related to the Claim Litigation and the refusal of the insurance company to provide insurance, then Manville and Russell agree that any proceeds from the Insurance Claim shall be split with fifty percent of such proceeds going to Manville and fifty percent of such proceeds going to Russell.

6.      On the Effective Date, Manville shall deliver to Russell a release from Gage pursuant to which Gage fully releases Russell from any obligations with respect to the Gage Claim. Manville irrevocably and unconditionally agrees to indemnify Russell for and with respect to all losses, claims, expenses (including, without limitation, reasonable attorneys' fees and courts costs) and other liabilities that are incurred by Russell and that arise out of, or are attributable to, the Gage Claim.

7.      In the event that Manville is awarded any amounts in connection with the Russell Syngenta Claim (the "**Russell Syngenta Claim Proceeds**"), Manville shall within ten days from receipt of such amounts deliver to Russell all portions of the Russell Syngenta Claim Proceeds that relate to the Russell Syngenta Claim.  Manville further agrees not to assign or encumber any portion of the Russell Syngenta Claim, and GWB hereby acknowledges Russell's right to receive a portion of the Syngenta Claim Proceeds that is attributable to the Russell Syngenta Claim.

8.      GWB and Manville, and their respective past, present and future partners, shareholders, members, managers, officers, directors, employees, agents, attorneys, representatives, successors, assigns, subsidiaries, affiliates, parents, direct and indirect equity holders, owners, and predecessors in interest and all persons claiming by, through, or under any of them, and their respective successors and assigns (collectively, and jointly and severally, the "**GWB/Manville Releasing Parties**") hereby jointly and severally, remise, release, acquit and forever discharge

| | |
|---|---|
| **From:** | Michael M. Tamburini |
| **To:** | Janice Stanton (janice.stanton@sbcglobal.net); Robert Cowherd (rcowherd@ccttlaw.com) |
| **Subject:** | Settlement Agreement - Assignment Language |
| **Date:** | Tuesday, March 13, 2018 2:34:54 PM |
| **Attachments:** | image003.png |

Janice and Robert,

Per my discussions with each of you, below is suggested added language for the following corresponding provisions in the settlement agreement:

Section 5 (bottom of last paragraph): Russell shall assign and immediately transfer to Frontier all such proceeds he, or any entity that he controls, receives from any such Insurance Claim.

Section 7: Russell shall assign and immediately transfer to Frontier all Syngenta Claim Proceeds that he, or any entity that he controls, receives that are attributable to the Russell Syngenta Claim.

Let me know any comments.

Thanks,
Mike



Michael M. Tamburini
Attorney
**LEVY CRAIG LAW FIRM**
A PROFESSIONAL CORPORATION
4520 Main Street, Suite 1600
Kansas City, MO  64111
Direct Dial  816-460-1843
Direct Fax  816-382-6606
Email  mtamburini@levycraig.com

CLERK U.S. BANKRUPTCY COURT
Exhibits:
Creditor GWB #3
Case No.  18-50077

**Confidentiality Notice:** The information transmitted by this email is intended only for the addressee and may contain confidential and/or privileged material. We do not waive attorney-client or work product privilege by the transmission of this email. If you are not the intended recipient, please be aware that any review, disclosure, copying or use of this communication is prohibited, and please immediately notify the sender and delete all copies of this communication.
**Email Security:** Please note that this email is sent without encryption and has been created in the knowledge that Internet email is most commonly sent without encryption. Unencrypted email is not necessarily a secure communications medium. We advise you to understand and observe this lack of security when communicating by unencrypted email with us. If at any time you do not want to receive unencrypted email communications, please let us know immediately.
**Virus Protection:** Email and any attachments to email may contain viruses or defects that might negatively affect any computer system. The recipient should, consistent with prudent computing practices, check this email and any attachments for the presence of any viruses and defects.
**IRS Circular 230 Notice:** Any tax advice contained in this email (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties that may be imposed by any governmental taxing authority or agency, or (b) promoting, marketing or recommending any transaction or other matter addressed herein.

# First American Title Insurance Company

**3723 Beck Road**
**St. Joseph, MO 64506**

February 28, 2018

Robert Cowherd
Chapman, Cowherd, Turner & Tschannen, P.C.
903 Jackson Street
Chillicothe, MO 64601
Phone: (660)646-0627
Fax:    (660)646-1105

| | |
|---|---|
| Title Officer: | Melissa Williams |
| Phone: | (816)279-3095 |

Order Number:    1484722

| | |
|---|---|
| Owner: | Russell |
| Property: | |
| | Missouri |

Attached please find the following item(s):

Commitment

Thank You for your confidence and support.

## *Customer First!*

***With cyber-crimes on the increase, it is important to be ever-vigilant. If you receive an
email, or any other communication that appears to be generated from our office, containing
new, revised or altered bank wire instructions, consider it suspect and call our office at a
number you trust. Our bank wire instructions seldom change.***

CLERK U.S. BANKRUPTCY COURT
Exhibits:
Creditor GWB #4
Case No. 18-50077

ALTA Plain Language Commitment (2006)                              Commitment No.: **1484722**
                                                                   Page Number: **1**

# ALTA Plain Language Commitment Form



### INFORMATION

The Title Insurance Commitment is a legal contract between you and the company.  It is issued to show the basis on which we will issue a Title Insurance Policy to you.  The Policy will insure you against certain risks to the land title, subject to the limitations shown in the policy.

The Company will give you a sample of the Policy form, if you ask.

The Policy contains an arbitration clause.  All arbitrable matters, when the Amount of Insurance is $2,000,000.00 or less, shall be arbitrated at the option of either the Company or you as the exclusive remedy of the parties.  You may review a copy of the arbitration rules at http://www.alta.org/.  **THIS PARAGRAPH DOES NOT APPLY IN THE STATE OF MISSOURI.**

The Commitment is based on the land title as of the Commitment Date.  Any changes in the land title or the transaction may affect the Commitment and the Policy.

The Commitment is subject to its Requirements, Exceptions and Conditions.

This information is not part of the title insurance commitment.  You should read the Commitment very carefully.

If you have any questions about the Commitment, contact: FIRST AMERICAN TITLE INSURANCE COMPANY, 1 First American Way, Santa Ana, California 92707

### TABLE OF CONTENTS

|                                                          | Page |
|----------------------------------------------------------|------|
| Agreement to Issue Policy                                | 2    |
| Schedule A                                               |      |
| 1.   Commitment Date                                     | 3    |
| 2.   Policies to be Issued, Amounts and Proposed Insured | 3    |
| 3.   Interest in the Land and Owner                      | 3    |
| 4.   Description of the Land                             | 3    |
| Schedule B-1 - Requirements                              |      |
| Schedule B-2 - Exceptions                                |      |
| Conditions                                               |      |

ALTA Plain Language Commitment (2006)                                    Commitment No.: **1484722**
Page Number: **2**



COMMITMENT FOR TITLE INSURANCE

Issued by

## *First American Title Insurance Company*

Agreement to Issue Policy

We agree to issue a policy to you according to the terms of this Commitment.

When we show the policy amount and your name as the proposed insured in Schedule A, this Commitment becomes effective as of the Commitment Date shown in Schedule A.

If the Requirements shown in this Commitment have not been met within six months after the Commitment Date, our obligation under this Commitment will end.  Also, our obligation under this Commitment will end when the Policy is issued and then our obligation to you will be under the Policy.

Our obligation under this Commitment is limited by the following:

     The Provisions in Schedule A.

     The Requirements in Schedule B-I.

     The Exceptions in Schedule B-II.

     The Conditions.

This Commitment is not valid without Schedule A and Sections I and II of Schedule B.

FIRST AMERICAN TITLE INSURANCE COMPANY has caused this Commitment to be signed by its authorized officers

**First American Title Insurance Company**

Dennis J. Gilmore
President

Jeffrey S. Robinson
Secretary

This commitment is invalid unless the insuring provisions and Schedules A and B are attached.

ALTA Plain Language Commitment (2006)

Commitment No.:  **1484722**
Page Number:  **3**

## SCHEDULE A

Commitment Amendment:

1.    Commitment Date: February 09, 2018 at 7:30 A.M.

2.    Policy or Policies to be issued:                                              Amount

      (A)    **ALTA Owner's Policy**                                              $0.00
      Proposed Insured:
      Foreclosure Commitment

3.    Fee Simple interest in the land described in this Commitment is owned, at the Commitment Date,
      by

      Jonathan L. Russell, aka Jonathan Lee Russell, aka Jonathan Russell

4.    The land referred to in this Commitment is described as follows:
      **TRACT I**
      **COMMENCING ON THE SOUTH LINE OF SECTION 36, IN TOWNSHIP 61, OF RANGE 39,**
      **WHERE THE PUBLIC ROAD RUNNING FROM MOUND CITY, MISSOURI, TO FOREST**
      **CITY, MISSOURI, CROSSES THE SAME; THENCE FOLLOWING SAID PUBLIC ROAD**
      **NORTH TO THE CEMETERY IN SAID SECTION 36; THENCE EAST TO THE TOP OF THE**
      **HILL; THENCE SOUTH TO SAID SECTION LINE; THENCE WEST TO THE PLACE OF**
      **BEGINNING.**

      **TRACT II**
      **ALSO, COMMENCING AT A POINT 12.64 CHAINS EAST OF THE INTERSECTION OF THE**
      **EASTERLY LINE OF THE CB&Q RAILROAD RIGHT OF WAY LINE AND THE SOUTH LINE**
      **OF SECTION 2; THENCE NORTH TO THE NORTH LINE OF SAID SECTION 2; THENCE**
      **EAST TO THE WESTERLY RIGHT OF WAY LINE OF HIGHWAY 159; THENCE**
      **SOUTHERLY ALONG THE HIGHWAY RIGHT OF WAY LINE TO THE SOUTH LINE OF**
      **SECTION 2; THENCE WEST TO THE POINT OF BEGINNING; ALL IN TOWNSHIP 60**
      **NORTH, OF RANGE 39 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI. EXCEPT**
      **THEREFROM THAT PART CONVEYED TO THE STATE OF MISSOURI BY BOOK 243 AT**
      **PAGE 108, OF OFFICIAL RECORDS.**

      **TRACT III**
      **THAT PART OF THE SOUTHWEST FRACTIONAL QUARTER OF SECTION 5, TOWNSHIP**
      **58 NORTH, OF RANGE 37 WEST OF THE 5TH P.M., HOLT COUNTY, MISSOURI LYING**
      **SOUTH AND OUTSIDE THE UNITED STATES CORPS OF ENGINEERS LEVEE.**

      **AND**

      **THAT PART OF THE WEST ½ SECTION 8, TOWNSHIP 58 NORTH, OF RANGE 37 WEST**
      **OF THE 5TH, P.M., HOLT COUNTY, MISSOURI LYING SOUTH AND OUTSIDE THE**
      **UNITED STATES CORPS OF ENGINEERS LEVEE.**

      **TRACT IV**
      **COMMENCING AT THE SOUTHEAST CORNER OF SECTION 32, TOWNSHIP 61 NORTH,**
      **RANGE 39 WEST, HOLT COUNTY, MISSOURI; THENCE ALONG SECTION LINE, NORTH**

ALTA Plain Language Commitment (2006)

Commitment No.: **1484722**
Page Number: **4**

00 DEGREES 05 MINUTES 22 SECONDS EAST 1329.08 FEET TO QUARTER QUARTER
SECTION LINE; THENCE ALONG SAID LINE, NORTH 88 DEGREES 19 MINUTES 33
SECONDS WEST 1408.91 FEET TO THE POINT OF BEGINNING; THENCE ALONG THE
WESTERLY RIGHT-OF-WAY OF MISSOURI ROUTE P THE FOLLOWING COURSES AND
DISTANCES: 23.25 FEET BY ARC DISTANCE ALONG A CURVE TO THE RIGHT HAVING A
RADIUS OF 1176.30 FEET AND A CHORD BEARING OF NORTH 20 DEGREES 46
MINUTES 41 SECONDS EAST 23.25 FEET TO P.C. STATION 309+29.9/30 FEET RIGHT;
THENCE NORTH 20 DEGREES 38 MINUTES 27 SECONDS EAST 122.63 FEET TO P.T.
STATION 308+06.9/30 FEET RIGHT; THENCE 65.32 FEET BY ARC DISTANCE ALONG A
CURVE TO THE LEFT HAVING A RADIUS OF 1116.30 FEET AND A CHORD BEARING OF
NORTH 18 DEGREES 58 MINUTES 03 SECONDS EAST 65.31 FEET TO THE SOUTHEAST
CORNER OF DEED BOOK 383, PAGE 871 AS RECORDED WITH THE HOLT COUNTY
RECORDER OF DEEDS; THENCE ALONG THE SOUTH LINE OF SAID DEED AND THE
PROJECTION THEREOF, NORTH 85 DEGREES 49 MINUTES 30 SECONDS WEST 428.80
FEET TO THE PRESENT DAY EAST HIGH BANK OF LITTLE TARKIO CREEK; THENCE
ALONG SAID BANK, SOUTH 24 DEGREES 57 MINUTES 49 SECONDS WEST 474.69
FEET; THENCE DEPARTING SAID BANK, SOUTH 84 DEGREES 34 MINUTES 52
SECONDS EAST 495.84 FEET TO A POINT ALONG THE WESTERLY RIGHT-OF-WAY OF
MISSOURI ROUTE P; THENCE ALONG SAID RIGHT-OF-WAY 255.76 FEET BY ARC
DISTANCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1176.30 FEET AND
A CHORD BEARING OF NORTH 13 DEGREES 58 MINUTES 59 SECONDS EAST 255.26
FEET TO THE POINT OF BEGINNING.

ALTA Plain Language Commitment (2006)

Commitment No.:  **1484722**
Page Number:  **5**

**SCHEDULE B**
**SECTION I**

**REQUIREMENTS**

The following requirements must be met:

(A)    Pay the agreed amounts for the interest in the land and/or the mortgage to be insured.

(B)    Pay us the premiums, fees and charges for the policy.

(C)    Documents satisfactory to us creating the interest in the land and/or the mortgage to be insured
must be signed, delivered and timely recorded.

(D)    You must tell us in writing the name of anyone not referred to in this Commitment who will get
an interest in the land or who will make a loan on the land.  We may make additional
requirements or exceptions relating to the interest or the loan.

(E)    We have been informed that the Deed of Trust shown as Document No. 20140084 in Book 413 at
page 199, as set forth in Schedule B-Part II, hereof is to be foreclosed.

In this respect, and in strict compliance with Section 443.325, R.S.Mo., we require the following:
i. An affidavit, which is to be recorded, executed by the foreclosing Trustee, and supplying the
necessary date of mailing notices, persons to whom mailed and the addresses to which the
notices were mailed; or, if the foreclosing Trustee deems it more convenient, the necessary
statement of facts may be recited in the Trustee's Deed, in which case, the receipts for registered
or certified mail should be attached to the deed and incorporated therein by reference;
ii. Compliance with all the recorded requests for notice of sale under the Deed of Trust to be
foreclosed. As of the effective date of this commitment, as set forth in Schedule B-Part II hereof.
iii. That, in addition, proper notice of sale be given to any subsequent lienholder and

Nevertheless, we must bring to your attention the fact that because we do not know the
scheduled date of the foreclosure, we are not able to specify herein the name of the record
owner as of forty days prior to the scheduled date of sale nor to say whether or not any request
for notice will be filed after the effective date of this Commitment and forty or more days prior to
the foreclosure.

In addition, we require the following:
iv. Proof that no owner died within six months next preceding the date of the Foreclosure Sale;
v. The property described in this Deed of Trust is located within the limits of Holt County, and as
required in 443.320 R.S.Mo., publication of the notice of foreclosure must be made in a
newspaper published in said County;
vi. Proof that no owner is entitled to protection of the Servicemembers Civil Relief Act, 50 U.S.C.
§§ 501 et seq.;
vii. Proof that no owner has given notice of intention to redeem;
viii. We reserve the right to make further requirements in regard to Federal Tax Liens or
Bankruptcy proceedings which might intervene after the commitment and prior to the sale;
ix. Issuance of the Policy is conditioned upon the purchaser's obtaining possession of the
property peacefully;
x. We reserve the right to make such further requirements when the identity of the purchaser
and the sale price are known as the title company may deem necessary. In the event that there
is a substantial discrepancy between the amount of the debt and the amount of the bid at the
sale, a waiver of the right to sue for a deficiency may be requested as a condition to insuring the

ALTA Plain Language Commitment (2006)

title of the purchaser at such sale.

xi. Your attention is directed to the fact that Bankruptcy Code Section 362 operates as an automatic stay of any proceedings to foreclose, so that an examination of the Bankruptcy Court records will have to be made through and including the date of foreclosure in order to determine whether or not a petition in bankruptcy has been filed by or against an owner.

xii. If the Deed of Trust is a "Second Mortgage Loan" as defined by Section 408.231 R.S.Mo., as amended, furnish proof of strict compliance with the provisions of Sections 408.554 and 408.555 R.S.Mo., as amended, pertaining to notice of default and right to cure default.

xiii. In the event the proposed insured is the foreclosing mortgagee or any other party who does not constitute a bona fide purchaser for the present fair equivalent value, the Owner's Policy will contain the following exception:

Right of any party interested to sue or petition to have set aside, modified or contest the foreclosure sale had on or the deed pursuant thereto through which title to the land insured is derived.

NOTE: State of Missouri, County of Holt recording information:

Recording Fees are $24.00 for the first page and $3.00 each additional page thereafter per Document.

NOTE:   This company E-Records all documents in Missouri counties where available. There is an E-Recording Fee of $2.25 per document, which is in addition to the above county recording fees.

For additional recording fees for documents not listed, please call the recording department. Phone: (816)279-3095.

ALTA Plain Language Commitment (2006)

Commitment No.: **1484722**
Page Number: **7**

## SCHEDULE B
## SECTION II

## EXCEPTIONS

Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction.

1.      Rights or claims of parties in possession.

2.      Easements, or claims of easements, not shown by the Public Records.

3.      Any encroachment, encumbrance, violation, variation or adverse circumstances affecting Title that would be disclosed by an accurate and complete survey of the Land or that could be ascertained by an inspection of the Land.

4.      Any liens, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

5.      Taxes, or special assessments, if any, not shown as existing liens by the Public Records.

6.      The lien of the General, State, County and City taxes for 2018 and subsequent years.


NOTE: General, state, county and city taxes for the year 2017 in the amount of $1,778.77 are PAID.
        Parcel Number 13-7-36-00-00-06.000 (Tract I)
        (Prior City Number N/A)
        Alt. No. N/A
        Cama No. N/A

NOTE: General, state, county and city taxes for the year 2017 in the amount of $165.58 are PAID.
        Parcel Number 16-1-02-00-00-01.001 (Tract II)
        (Prior City Number N/A)
        Alt. No. N/A
        Cama No. N/A

NOTE: General, state, county and city taxes for the year 2017 in the amount of $105.53 are PAID.
        Parcel Number 23-3-05-00-00-02.002 (Tract III)
        (Prior City Number N/A)
        Alt. No. N/A
        Cama No. N/A

NOTE: General, state, county and city taxes for the year 2017 in the amount of $72.35 are PAID.
        Parcel Number 23-3-05-00-00-02.003 (Tract III)
        (Prior City Number N/A)
        Alt. No. N/A
        Cama No. N/A

NOTE: General, state, county and city taxes for the year 2017 in the amount of $52.76 are PAID.
        Parcel Number 23-3-08-00-00-03.000 (Tract III)

ALTA Plain Language Commitment (2006)                                          Commitment No.: **1484722**
                                                                                Page Number: **8**

(Prior City Number N/A)
Alt. No. N/A
Cama No. N/A

NOTE: General, state, county and city taxes for the year 2017 in the amount of $63.31 are PAID.
Parcel Number 23-3-08-00-00-03.001 (Tract III)
(Prior City Number N/A)
Alt. No. N/A
Cama No. N/A

NOTE: General, state, county and city taxes for the year 2017 in the amount of $1,805.25 are PAID.
Parcel Number 13-9-32-04-04-03.002 (Tract IV)
(Prior City Number N/A)
Alt. No. N/A
Cama No. N/A

7.   The consequences of the use of monuments as boundaries in the legal description(s) of the Land which monuments are not definite, or are subject to more than one interpretation or have been relocated, including but not limited to the inability to locate the boundaries of the land and any dispute regarding the location of said boundaries. (Tract I)

8.   Terms and provisions of the oil and gas lease executed between C.H. Patterson and his wife Anna M. Patterson, lessor, and Paul C. Brooke, lessee, dated November 21, 1938, filed December 19, 1938, recorded in Book 183 at Page 27, together with all subsequent assignments and conveyances. (Tract II)

9.   Terms and provisions of the oil and gas lease executed between C.E. Patterson and his wife Anna M. Patterson, lessor, and Paul C. Brooke, lessee, dated November 21, 1938, filed June 01, 1939, recorded in Book 186 at Page 151, together with all subsequent assignments and conveyances. (Tract II)

10.  An easement for drainage inlet ditch with the right of ingress and egress granted to State of Missouri for the use of the State Highway Commission of Missouri  in the document recorded September 10, 1956 as Book 220 at Page 213 of Official Records. (Tract II)

11.  An easement for underground communication systems with the right of ingress and egress granted to United Telephone Company of Missouri, Inc.  in the document recorded April 08, 1969 as Book 241 at Page 256 of Official Records. (Tract II)

12.  An easement for pipes or tiles for transmission of water with the right of ingress and egress granted to Public Water Supply District No.1 of Holt County, Missouri  in the document recorded August 06, 2001 as Book 338 at Page 798 of Official Records. (Tract II)

13.  An easement for right of way granted to the State of Missouri  in the document recorded as Book 243 at Page 108 of Official Records. (Tract II)

14.  Subject property lies within the boundaries of Atchison-Holt Ambulance District; Soil & Water District of Holt County; Southern Fire Protection District; Levee #7, and therefore may be subject to possible assessments and taxation. (Tract III)

ALTA Plain Language Commitment (2006)

Commitment No.: **1484722**
Page Number: **9**

15.  Terms and provisions of the oil and gas lease executed between Hall's Hi-View, Inc., lessor, and I.E.D. Corporation, lessee, dated March 09, 1982, filed August 09, 1982, recorded in Book 270 at Page 605, together with all subsequent assignments and conveyances. (Tract III)

Document re-recorded as Book 275 at Page 208 of Official Records. (Tract III)

16.  Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B. (Tracts II & III)

17.  Any adverse claim to any portion of said land which has been created by artificial means or has accreted to such portion so created. (Tract III)

18.  Any consistencies in boundaries caused by accretions, relictions or avulsion, of the Missouri River. (Tract III)

19.  This policy does not insure any portion of the subject property which constitutes the bed of the Missouri River. (Tract III)

20.  Rights of the United States of America and the public, in and to lands lying below the high water line of the Missouri River and in and to the lands lying between the harbor or levee lines as established by Governmental authority and the low water line of the Missouri River. (Tract III)

21.  Rights of the Public, State of Missouri, County of Holt in and to that part of the premises in question, if any, taken or used for Parkstone Drive, Quail Road, and Sunset Drive. (Tract III)

22.  The inability to locate the boundaries of the land and/or any dispute over the location of the boundaries by reason of the use of the "levee" as a monument, for which no recorded description exists. (Tract III)

23.  An easement for water line in the document recorded August 06, 2001 as Book 338 at Page 798 of Official Records. (Tract IV)

24.  The consequences of any change in the location of the contour line which forms the westerly boundary line of subject property. (Tract IV)

25.  A public easement for navigation and the incidents of navigation such as boating, fishing, swimming, hunting and other recreational uses in and under the Little Tarkio Creek and including a public right of access to the water. (Tract IV)

26.  Rights of riparian owners in and to the free and unobstructed flow of Little Tarkio Creek. (Tract IV)

27.  Consequences of referring to Highway Stations as calls on the legal description of the land described herein. (Tract IV)

28.  Rights of the Public, State of Missouri, County of Holt in and to that part of the premises in question, if any, taken or used for Missouri Route P. (Tract IV)

ALTA Plain Language Commitment (2006)

Commitment No.:  **1484722**
Page Number:  **10**

29.   A Deed of Trust to secure an original indebtedness of $225,000.00, of the following: (Tract I)

| | |
|---|---|
| Dated: | April 28, 2002 |
| Recorded: | May 05, 2008 |
| Document No.: | 423 in Book 384 at Page 226 |
| Mortgagor: | Jonathan L. Russell, a single person |
| Trustee: | Dan Smith, attorney-at-law |
| Mortgagee: | Richardson County Bank & Trust Co |

30.   A Deed of Trust to secure an original indebtedness of $50,499.60, of the following: (Tract II)

| | |
|---|---|
| Dated: | September 30, 2009 |
| Recorded: | October 13, 2009 |
| Document No.: | Book 391 at Page 904 |
| Mortgagor: | Jonathan L. Russell aka Jonathan Russell, a single person |
| Trustee: | Dan Smith, attorney-at-law |
| Mortgagee: | Richardson County Bank & Trust Co |

A document recorded April 18, 2014 as Book 414 at Page 412 of Official Records provides that the Deed of Trust/Mortgage or the obligation secured thereby has been modified.

31.   A Deed of Trust to secure an original indebtedness of $7,000,000.00, of the following:  (Tracts I - IV)

| | |
|---|---|
| Dated: | January 27, 2014 |
| Recorded: | January 29, 2014 |
| Document No.: | 20140084 in Book 413 at Page 199 |
| Mortgagor: | Jonathan L. Russell and Sarah L. Russell, husband and wife and Jonathan L. Russell, individually |
| Trustee: | Nancy Blake |
| Mortgagee: | Manville Farms |

NOTE: Partial Release of above Deed of Trust in Book 414 at Page 651. (Releases original Tract V of above Deed of Trust)

NOTE: Amendment to Deed of Trust recorded June 19, 2014 as Document No. 20140520 in Book 415 at Page 152. (Adds a new Tract V to above Deed of Trust, which is Tract IV of this commitment)

NOTE: General Pledge of Note recorded April 15, 2015 as Document No. 20150309 in Book 418 at Page 922. (Uses original Tract V instead of new Tract V)

NOTE: General Pledge of Note recorded April 15, 2015 as Document No. 20150310 in Book 418 at Page 933. (Uses original Tract V instead of new Tract V)

NOTE: The tract shown as Tract IV on the original deed of trust is not owned by borrower.

ALTA Plain Language Commitment (2006)                                    Commitment No.:  **1484722**
Page Number:  **11**

32.   A financing statement recorded November 18, 2013 as Document No. 20131020 in Book 412 at Page 393 of Official Records. (Secures Additional Property)
Debtor:                    Jonathan Russell
Secured party:             Manville Farms

An amendment to the financing statement was recorded May 02, 2014 as Document No. 20140410 in Book 414 at Page 655 of Official Records.

33.   Rights of parties in possession of any part of the premises under unrecorded leases.

NOTE: This is a foreclosure commitment and has been issued as a report as to the status of title for foreclosure purposes only, and as such should not be relied upon for a Real Estate Transaction. This is not a commitment to insure title, and no insurance is provided by this Foreclosure Commitment. If a Commitment for Title Insurance is desired, the identity of the entities to be insured and policy amounts must be disclosed to this Company and this Company will issue a Commitment of Title Insurance disclosing all requirements for the issuance of the policy, as sell as any additional exceptions which may be taken.

ALTA Plain Language Commitment (2006)

Commitment No.: **1484722**
Page Number: **12**

## CONDITIONS

1. **DEFINITIONS**
(a)"Mortgage" means mortgage, deed of trust or other security instrument.
(b)"Public Records" means title records that give constructive notice of matters affecting the title according to the state law where the land is located.

2. **LATER DEFECTS**
The Exceptions in Schedule B - Section II may be amended to show any defects, liens or encumbrances that appear for the first time in the public records or are created or attached between the Commitment Date and the date on which all of the Requirements (a) and (c) of Schedule B - Section I are met. We shall have no liability to you because of this amendment.

3. **EXISTING DEFECTS**
If any defects, liens or encumbrances existing at Commitment Date are not shown in Schedule B, we may amend Schedule B to show them. If we do amend Schedule B to show these defects, liens or encumbrances, we shall be liable to you according to Paragraph 4 below unless you knew of this information and did not tell us about it in writing.

4. **LIMITATION OF OUR LIABILITY**
Our only obligation is to issue to you the Policy referred to in this Commitment, when you have met its Requirements. If we have any liability to you for any loss you incur because of an error in this Commitment, our liability will be limited to your actual loss caused by your relying on this Commitment when you acted in good faith to:

comply with the Requirements shown in Schedule B - Section I
or
eliminate with our written consent any Exceptions shown in Schedule B - Section II.

We shall not be liable for more than the Policy Amount shown in Schedule A of this Commitment and our liability is subject to the terms of the Policy form to be issued to you.

5. **CLAIMS MUST BE BASED ON THIS COMMITMENT**
Any claim, whether or not based on negligence, which you may have against us concerning the title to the land must be based on this commitment and is subject to its terms.

ALTA Plain Language Commitment (2006)

Commitment No.: **1484722**
Page Number: **13**

 *First American Title*

**Privacy Information**
**We Are Committed to Safeguarding Customer Information**
In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**
This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its Fair Information Values.

**Types of Information**
Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

**Use of Information**
We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**
Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**
We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**
First American Financial Corporation is sensitive to privacy issues on the Internet. We believe it is important you know how we treat the information about you we receive on the Internet.
In general, you can visit First American's Web sites on the World Wide Web without telling us who you are or revealing any information about yourself. Our Web servers collect the domain names, not the e-mail addresses, of visitors. This information is aggregated to measure the number of visits, average time spent on the site, pages viewed and similar information. First American uses this information to measure the use of our site and to develop ideas to improve the content of our site.
There are times, however, when we may need information from you, such as your name and email address. When information is needed, we will use our best efforts to let you know at the time of collection how we will use the personal information. Usually, the personal information we collect is used only by us to respond to your inquiry, process an order or allow you to access specific account/profile information. If you choose to share any personal information with us, we will only use it in accordance with the policies outlined above.

**Business Relationships**
First American Financial Corporation's site and its affiliates' sites may contain links to other Web sites. While we try to link only to sites that share our high standards and respect for privacy, we are not responsible for the content or the privacy practices employed by other sites.

**Cookies**
Some of First American's Web sites may make use of "cookie" technology to measure site activity and to customize information to your personal tastes. A cookie is an element of data that a Web site can send to your browser, which may then store the cookie on your hard drive.
FirstAm.com uses stored cookies. The goal of this technology is to better serve you when visiting our site, save you time when you are here and to provide you with a more meaningful and productive Web site experience.
-------------------------------------------------------------------------------
**Fair Information Values**
**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.
**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.
**Use** We believe we should behave responsibly when we use information about a consumer in our business. We will obey the laws governing the collection, use and dissemination of data.
**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.
**Education** We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy. We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.
**Security** We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.