## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

In re:

**Lakeshore Farms, Inc**

**Case No. 18-50077**
**Chapter 11**

Debtor.

## FIRST AMENDED DISCLOSURE STATEMENT FILED BY LAKESHORE FARMS, INC

This Disclosure Statement is prepared and filed by Lakeshore Farms, Inc, a Missouri Subchapter S corporation.

Debtor filed this Chapter 11 case in the United States Bankruptcy Court for the Western District of Missouri on February 28, 2018.

Under the provisions of §1125 of the Bankruptcy Code, a debtor may not solicit acceptance of a plan "from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court, as containing adequate information."

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, *including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case,* that would enable *such hypothetical investor* of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan *and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information;"*

**THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW OF THE PLAN BY EACH HOLDER OF EACH**

1

**CLAIM OR INTEREST ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT SUCH REVIEW.  HOLDERS OF CLAIMS SHOULD REVIEW THE PLAN ITSELF AND ANY RELATED AGREEMENTS OR TRANSACITONS FOR A FULL UNDERSTANDING OF ITS PROVISIONS.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE TERMS OF THE PLAN AND ANY RELATED AGREEMENTS ARE CONTROLLING, SHOULD ANY INCONSISTENCY EXIST BETWEEN THEM AND THE DISCLOSURE STATEMENT.**

**NO STATEMENTS OR INFORMATION CONCERNING THE DEBTOR OR ANY OTHER ENTITY DESCRIBED IN THE DISLOSURE STATEMENT OR THE PLAN, PARTICULARLY AS TO ITS FUTURE BUSINESS OPEARATIONS, PROFITS, FINANCIAL CONDITIONS, ASSETS, LIABILITIES OR THE DEBT SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT.**

The Debtor is unable to warrant or represent that the information set forth in the Disclosure Statement is without any inaccuracy.  To the extent practicable, however, great effort has been made to ensure that all such information is fairly presented.

## I.
## PROCEDURAL INFORMATION

Voting.  Under 11 U.S.C. §1126 and Federal Rule of Bankruptcy Procedure 3018(a), only creditors whose claims are deemed allowed pursuant to §502 of the Bankruptcy Code, or have been allowed by an Order of the Bankruptcy Court, are entitled to vote on the Plan.  A Holder of an unimpaired claim is deemed to have accepted the Plan.

Except as otherwise provided in the Disclosure Order, Ballots are being sent with the Disclosure Statement to the known Holders of all Claims against the Debtor, as of the commencement date of this on February 28, 2018, including those that have been or will be objected to by the Debtor.  The Holders of Claims and Interests that have been objected to by the

Debtor are not entitled to vote on the Plan unless otherwise ordered by the Bankruptcy Court in accordance with Federal Rule of Bankruptcy Procedure 3018(a), which provides, in pertinent part, that: "Notwithstanding objection to a claim or interest, the Court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan".

All pleadings and other documents referred to in the Disclosure Statement as being on file with the Bankruptcy Court are available for inspection and review during normal business hours at the office of the Clerk of the Bankruptcy Court, 400 E. Ninth St., Kansas City, Missouri 64106.

ANY CHANGES TO THESE DOCUMENTS WILL BE DESCRIBED AT THE HEARING ON THE CONFIRMATION OF THE PLAN.

After carefully reviewing the Plan, this Disclosure Statement and Exhibits annexed thereto, please indicate your vote(s) with respect to the Plan on the ballot sent to you and return it by the deadline to Debtor's counsel.  If you have a Claim in more than one Voting Class, you are entitled to vote each Claim.  **PLEASE VOTE AND RETURN EVERY BALLOT THAT YOU RECEIVED, IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY _____.**

**The Court will hold a hearing on confirmation of the Plan commencing at _____ A.M./P.M.  on _____, 2019 (the "Confirmation Hearing").**

## II.
## HISTORY OF THE BUSINESS

Lakeshore Farms, Inc., a Missouri Corporation, was formed by Jonathan L. Russell as an S Corporation on January, 26, 2001. At that time, the Debtor's primary business was as a custom combine and trucking company to haul grain for other farmers and operations. In 2015, at the suggestion of its then lender, Richardson County Bank & Trust Co., now Frontier Bank, because Mr. Russell was already farming under another entity and the equipment was owned by Lakeshore Farms, the Debtor commenced its own farming operations.

Lakeshore Farms currently leases approximately 7,085 acres spread out over 18 tracts of land, at an annual cost of approximately $1,885,973.84. The lease payments are typically made in the Spring from the farm loan. Planting starts in late April with harvesting commencing in October. Grain is then delivered to the elevators for sale over several months, using trucks owned by Lakeshore Farms.

The costs of farming – fuel, chemicals, seed, repairs, irrigation, labor, leased equipment and land are paid from the operating loans obtained in the Spring, which are repaid from the proceeds of the harvested crops. Lakeshore employs seasonal labor on a monthly basis as independent contractors. Typically about 3 or 4 are employed during planting and 5 are employed during harvesting.

Crop insurance is paid in arrears. Thus, the 2017 crop insurance payment was not due until early, 2018. And the 2018, crop insurance premium will not be due until the spring of 2019. If the crop insurance premium is not paid, the Debtor will be unable to obtain crop insurance for the then current crop. The crop insurance premium is approximately $197,000.

The 2017 crop year was not good. Lakeshore planted both white corn and beans. Mr. Russell sells as much as he can on the futures market, usually with success. However, the December, 2017 prices paid for corn on the futures market cost Lakeshore $1.00 per bushel. Coupled with the fact that the corn crop was not good and Mr. Russell had problem selling the corn, Lakeshore's 2017 year was not as good as in the past and Lakeshore lost money.

The 2018 crop year will be better as Lakeshore planted only beans, which are less expensive to grow and store. Mr. Russell expects to harvest approximately 380,000 bushels, having lost about 350 bushels to flooding. He has sold 300 bushels on the futures market at $10.00/bushel and believes the remaining 80,000 bushels, at market value will bring approximately $700,000. Thus, total income should be approximately $3,700,000.00.

The Debtor typically funds its annual crops through loans which are issued in the spring and paid in the fall or winter with the proceeds of the grain sales. Historically, the Debtor has, generated an annual net profit of about $600,000.00.

For many years Frontier Bank was the Debtor's primary lender, holding liens on essentially all assets. However, in 2017 Frontier Bank declined to continue lending to Lakeshore, primarily because of the litigation surrounding the 2013 crop insurance and the Manville foreclosure. By that time, Lakeshore owed the Bank approximately $3.6 million and proceeded to foreclose.  In order to stop pending foreclosure actions and reorganize its financial affairs, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code on February 28, 2018

Subsequent to the Chapter 11 filing, the Debtor was able to replace Frontier Bank by obtaining funding from ARM.

In March, 2017, ARM loaned Lakeshore approximately $4,000,000.00, secured by the 2017 grain crop. However, a portion of the 2017 grain crop was also secured to Frontier Bank. ARM's 2017 loan was fully paid.

Prior to the filing of this Chapter 11 case, Jonathan Russell sold or returned to creditors some equipment he deemed unnecessary for the Debtor's operations.

## II.
## HISTORY OF THE CASE

Since the Debtor's Chapter 11 filing, the Debtor has negotiated a consensual debt restructure with Frontier Bank whereby $1,300,000 of the approximately $2,633,748.93  allowed Claim of Frontier Bank is treated as a Class 4 Secured Claim under the plan with the approximately $1,333,748.93 balance of the of the allowed Claim of Frontier Bank treated as a Class 12 unsecured Claim under the Plan.

On March 9, 2018, in accordance with the order of the court, the Debtor has been

authorized to use cash collateral in the following items: $210,552.00 for 2017 crop insurance premiums to critical vendor Rain and Hail; approximately $6,000.00 for tire repairs to critical vendor Riley's Tire; $12,542.61 for semi repairs to critical vendor Foley Equipment; and up to $38,000.00 to various parties for labor and fuel to haul the remaining 2017 grain. Debtor is to pay $60,000.00 adequate protection payment to counsel for Frontier Bank, who shall hold that payment in his trust account pending further order of this court on the disbursement of those funds. Creditors holding an enforceable and perfected interest in the cash collateral shall receive, as adequate protection for their interests, replacement liens in (1) the Debtor's current assets that will have the same priority as their prepetition liens and (2) the Debtor's 2018 crops, 2018 government program payments, and 2018 crop insurance that are junior to the liens granted to the DIP lenders

On March 9, 2018, the Court approved the Debtor's request for interim debtor in possession financing of $1,770,973.84 to pay the 2018 rents for 2018 cropland according to the following terms: The Debtor is authorized to execute the promissory notes, agricultural security agreements and other loan docs with Agrifund, LLC ($2,373,879.00) and Agri-Next 3F Farms ($526,444.00). The contract interest rate is 12% per annum, with an additional 6% default interest rate. The loans will be secured by first priority liens against the Debtor's 2018 crops, 2018 government program payments, and 2018 crop insurance. The debtor in possession financing and liens will be governed by Missouri law. The loans will mature on February 15, 2019.

Other significant events since filing are listed below:

- On March 16, 2018, the Final Orders authorizing payment of critical vendors and assumption of the leases were entered. Formal Interim Orders on the Debtor-in-Possession financing and use of Cash Collateral were also entered.

- On March 28, 2017, Final Orders on the Debtor-in-Possession financing and use of Cash Collateral were entered.

- On April 4, 2018 The Court entered its Order setting May 25, 2018, as the Bar Date for filing Proofs of Claim.

- On July 31, 2018  Evans & Mullinix, P.A. filed an application for payment of its fees and expenses through June 27, 2018, in the amount of $42,649.22. This was granted by Order of the Court on August 24, 2018.

6

- On August 7, 2018, an application for payment of Columbia Consulting Group, PLLC's fees and expenses through July 20 2018, in the amount of 2,851.25 was filed. This was granted by Order of the Court on August 30, 2018.
- On November 19, 2018, a Motion to Withdraw as Attorney was filed by Evans & Mullinix, PA. (Stutz, Joanne).
- On November 20, 2018, an Application to Employ Ronald S. Weiss, Joel Pelofsky, and the firm of Berman, DeLeve, Kuchan & Chapman, LLC as Attorneys for Debtor Filed by Lakeshore Farms, Inc was filed with hearing set for December.
- On November 27, 2018, Final Application for Compensation for Evans & Mullinix, P.A. in the amount of - Fees: $28,865.00, Expenses: $1,066.24. Filed by Evans & Mullinix, PA. (Stutz, Joanne) (Entered: 11/27/2018).

## THE PROFESSIONALS APPROVED BY THE COURT

On February 28, 2018, the Debtor filed an Application to employ the firm of Evans and Mullinix, P. A. as its bankruptcy counsel. The Application also sought Court approval of an arrangement for payment to the attorneys providing for the payment of a sum equal to 80% of the fees and 100% of expenses billed monthly to the Debtor. The Order approving the Application and the fee arrangement was entered on March 27, 2018.

On April 3, 2018, the Debtor filed an Application to employ Jeffrey A. Worley and Columbia Consulting Group, PLLC as Financial Consultant, to assist in the preparation of the monthly operating reports. The Order approving the Application was entered on April 27, 2018.

On July 6, 2018, the Debtor filed an Application to employ The Hood Law Group as special counsel to pursue several claims on behalf of Jon Russell and the Debtor. The claim on behalf of the Debtor is that against RSR Ranch and/or Janet Longenecker for excavating work performed by the Debtor in exchange for the Debtor's right to continue to operate under a farm lease on farmlands owned by the Clark Rhoden Trust and managed by Farmers National Company. There may be additional possible claims in connection with the Debtor's substantial economic investment made in reliance upon the agreement to continue to lease and continue the Debtor's farming operation on the property.  This litigation is in its early stages; thus, it is too soon to speculate on when or if there will be a

recovery and the Debtor with Counsel will assess over time what benefits, if any to the creditors, there are to pursuing this litigation.

## III.
## SUMMARY OF THE PLAN

A copy of the Plan is attached hereto and made a part hereof to this Disclosure Statement as "**Exhibit A**" The Plan explains how each claim held by a creditor is to be paid. In accordance with the requirements of § 1122(a) of the Code, a claim or interest may be placed in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. As a practical matter, this means that each creditor holding a secured claim is classified separately and other classes may include the claims of several creditors. The classes are as follows:

2.1    **Class 1, Administrative Claims.** Each Allowed Administrative Claim is to be paid in full in cash (or otherwise satisfied in accordance with the terms of the Plan or the terms agreed to by Debtor and the holder of such Claim) by Debtor on the latest of: (a) the Effective Date; (b) such date as may be fixed by the Bankruptcy Court; (c) the tenth business day after such Claim is Allowed; and (d) such date as the Holder of such Claim and Debtor may agree; or as soon thereafter as is practicable.

2.2    **Class 2, Priority Tax Claims and Other Allowed Priority Non-Tax Claims.**

**Priority Tax Claims.** As set forth more fully in the Plan, unless otherwise agreed by the holder of a Priority Tax Claim and the Reorganized Debtor, each Tax Creditor will receive, in full satisfaction of its Allowed Priority Tax Claim, deferred cash payments totaling the Allowed amount of such Claim over a period not exceeding five (5) years from the Petition Date, as required by the Bankruptcy Code, which period shall conclude on or about February 28, 2023. The Plan provides that payments on the Allowed Priority Tax Claims will be made beginning on the first Semi-Annual Distribution Date following the Effective Date and shall continue to become due on each subsequent Semi-Annual Distribution Date until the Priority Tax Claims are paid in full. The payments on the Allowed Priority Tax Claims shall be made in equal semi-annual installments of principal and simple interest accruing from the Effective Date at the current rate of interest required by law on the unpaid portion of each Allowed Priority Tax Claim

(or upon such other terms determined by the Bankruptcy Court to provide the holders of Priority Tax Claims with deferred cash payments having a value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claims).  No payments will be made on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim.  The Reorganized Debtor will have the right and discretion to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full, at any time on or after the Effective Date, without premium or penalty and without further order of the Court if cash is available to do so.  **THE DEBTOR DOES NOT BELIEVE THERE ARE PRIORITY TAX CLAIMS TO BE PAID UNDER THE PLAN.**

**Other Allowed Priority Non-Tax Claims.**  Under the Plan, as soon as practicable after the later of the Effective Date and the date the Claim becomes an Allowed Claim, each holder of an Allowed Priority Non-Tax Claim against a Reorganized Debtor will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim a Distribution from the applicable Reorganized Debtor:  (i) in Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim against the Debtor, or (ii) in such amounts and on such other terms as may be agreed between the holder of the Allowed Priority Non-Tax Claim and the Debtor, or (iii) in accordance with the terms of the particular agreement under which such Priority Non-Tax Claim arose.  To the extent that any Creditor's total Allowed Priority Non-Tax Claim exceeds the amount entitled to Priority treatment under 11 U.S.C. § 507, the remaining amount of such Claim shall be treated as a Class 16 Allowed Unsecured Claim.  **THE DEBTOR DOES NOT BELIEVE THERE ARE ANY UNPAID NON-TAX CLAIMS TO BE PAID UNDER THE PLAN.**

**2.3   Class 3, Allowed Secured Claims of ARM.**  ARM may hereinafter be referred to as the "Class 3 Claimant."

The Class 3 Claim consists of the post-petition Debtor in Possession lender. The Class 3 Claimant shall be paid in full, from the proceeds of the 2018 crop sales in accordance with the terms of the loan documents.

**This class is unimpaired.**

**2.4    Class 4, Allowed Secured Claims of Frontier Bank fka Richardson County Bank & Trust Co.**   Frontier Bank may hereinafter be referred to as the "Class 4 Claimant."

Frontier Bank may hereinafter be referred to as the "Class 4 Claimant."

The Class 4 Claimant's claim consists of monies owed to the Class 4 Claimant under loan # 110-052-632.7. An accurate and full description/copy of the loan documents; and each is more fully described and attached in **Exhibit G** and incorporated herein by reference, (collectively, the "Loan Documents")] The Class 4 claim is evidenced by an individual promissory note executed, by the Debtor (loan # 110-052-632.7) hereinafter referred to as the Original Note.   The Original Note is secured by duly recorded UCC-1's on the Lakeshore Equipment, and Lakeshore personal property A schedule of the personal property and equipment and any recorded UCC 1's is attached in **Exhibit G** and incorporated herein by reference, and is also secured by duly recorded deeds of trust conveying interests in real estate owned by Jon Russell and assignments of rents in real estate described in such deeds of trust.  A description of the recorded deeds of trust and assignments of rents in real estate described in such deeds of trust is attached in **Exhibit G** and incorporated herein by reference All of Class 4 Claimant's claim is personally guaranteed, jointly and severally, by Jon Russell and Sarah Russell, and also by GDD Lakeshore Properties, LLC and the Debtor.

As of the date of this Disclosure Statement, the total debt on the Class 4 Claim is $2,633,748.93, consisting of $2,207,571.85 in principal and $426,177.08 in accrued interest. The Class 4 Claimant's claim is under-secured as the collateral securing the Class 4 Claimant's claim is believed to be less than the balance owing the Class 4 Claimant. The Debtor and the Class 4 Claimant have agreed to treat $1,300,000 of Class 4 Claimant's claim as a fully secured allowed claim, with the $1,333,748.93 balance of the Class 4 Claimant's Claim treated as an allowed unsecured Class 12 claim.

The Debtor or Reorganized Debtor shall pay the total allowed amount of the Class 4 Claim pursuant to the terms of the Original Note and Loan Documents, subject to the following modifications (hereinafter referred to as the "Modified Note"): (1) the principal balance owed under the Modified Note shall be $1,300,000.00; (2) interest shall accrue on the outstanding principal balance owed under the Modified Note at the fixed rate of 5.5% per annum from the Effective Date which shall be on or before April 15, 2019 and on or before April 15 of each calendar year, the Debtor/Reorganized Debtor shall make annual payments on the outstanding principal and interest owed on the Modified Note based on an eight (8) year amortization schedule, with the first payment due on or before April 15, 2019 and the final payment due on or before April 15, 2026; and (4) the Debtor/Reorganized Debtor may prepay the Modified Note at

any time without penalty. Under the Plan, Class 4 will recover 100%.

The Debtor is marketing the equipment below that is collateralized by the Class 4 Claimant for sale and will make a principal reduction payment of approximately $302,000 reducing the modified note to $1M on or before 4/15/19.  In the event all of the equipment listed below is not sold, the Modified Note will only be reduced by the dollar amount of the equipment that is sold.

One 2013 Case IH Nutri-Placer 930, appraised at $36,000;

One 2013 Case IH Nutri-Placer 940, appraised at $40,000;

One 2013 John Deere 9560 RT Crawler, Tractor, appraised at $175,000;

Three 2012 AG Systems AG206 Anhydrous Carts w/ Two 1450 Gallon Anhydrous Tanks & Running Gear appraised at $25,500;

Three 2012 B&B Behnke Gooseneck Anhydrous Wagons w/ Two 1450 Gallon Anhydrous Tanks & Running Gear appraised at $25,500;

Combined Value:    $302,000

The remaining balance owed under the Original Note in the amount of $1,333,748.93 shall be converted to an unsecured promissory note (hereinafter referred to as the "Unsecured Note") and included in Class 12 as an allowed unsecured claim.  Pursuant to the terms of the Unsecured  Note, on or before April 15 of each calendar year, the Debtor/Reorganized Debtor shall make equal annual payments to Frontier Bank in the amount of three percent (3.0%) of the principal amount of the Promissory Note for seven (7) years.

The Debtor/Reorganized Debtor and Frontier Bank shall fully and expeditiously cooperate after confirmation of the Plan to execute any and all documents necessary to incorporate the modifications to the Original Note described herein, including, but not limited to, the Modified Note and payment schedule. On or before the 15th of each quarter, the Debtor/Reorganized Debtor shall submit to Frontier Bank monthly financial statements for the

prior month which shall include, at a minimum, an income statement, balance sheet, and sources and uses of funds statement.

Other than as set forth above, all terms and conditions of the Original Note and Loan Documents shall remain unmodified and unimpaired and the Debtor/Reorganized Debtor shall remain bound by and shall comply with their terms and conditions. Frontier Bank's Class 4 and Class 12 claims shall be treated in accordance with all of the terms and conditions of the Loan Documents respecting such claims, as modified herein, and the legal, equitable, and contractual rights and remedies to which Frontier Bank is entitled under the Original Note and Loan Documents shall not be further altered, included Frontier Bank retaining all priority lien and security interest positions with the same status and priority as it maintained prior to the Petition Date.

Except as otherwise expressly provided for under the Plan, nothing contained in the Plan is intended to nor shall have the effect of binding, discharging, or releasing the individual or corporate Guarantors in any way or for any purpose or otherwise affecting their obligations under their respective Guarantees. Confirmation of the Plan shall not discharge or release the Guarantors from their obligations under their respective Guarantees or otherwise affect such obligations in any way whatsoever.

Upon payment in full of the Modified Note and payment of twenty-one percent (21%) of the original principal balance of the Unsecured Note (that is treated as a Class 12 claim), and when provided under the terms and conditions of such Notes, the liens evidenced by the Loan Documents shall be deemed satisfied and shall be deemed canceled and all personal guarantees by Jon Russell and Sarah Russell, and guaranty by GDD Lakeshore Properties, LLC, and any other guarantees related to the Original Note, the Modified Note, the Unsecured Note, or the Loan Documents shall be deemed satisfied and paid in full and the Debtor as well as Jon Russell, Sarah Russell, and GDD Lakeshore Properties, LLC shall be released of any further obligations, monetary or otherwise,  to Frontier Bank.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 4 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

**Class 4 and Class 12 are impaired.**

     **2.5**     **Class 5, Allowed Secured Claim of Union Bank.**  Union Bank may hereinafter be referred to as the "Class 5 Claimant."

     Class 5 consists of the allowed secured claim of Union Bank. The class 5 claim in the amount of $23,050.21 as of February 28, 2018 is secured by a 2015 Ford F350. During this case payments to this creditor have been made according to the terms of the note. Monthly payments in the amount of $1,026.80 will continue to be made until the note paid on January 20, 2020, at which time, the Class 5 Claimant shall promptly deliver to Debtor the "paid note" and release of liens.

     Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 5 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

     **This Class is unimpaired.**

     **2.6**  **Class 6, Allowed secured claim of TD Auto**.  TD Auto may hereinafter be referred to as the "Class 6 Claimant."

     Class 6 consists of the allowed secured claim of TD auto. The class 6 claim, in the amount of $47,161.66 as of the petition date is secured by a 2016 Ford F350. During this case payments to this creditor have been made according to the terms of the note. Monthly payments in the amount of $1,059.52 will continue to be made until the note is fully paid on March 2, 2022, at which time the Class 6 claimant shall promptly deliver to the debtor for the "paid note" and release of liens.

     Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 6 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

     **This Class is unimpaired.**

     **2.7**     **Class 7, Allowed Secured Claim of TD Auto.** TD Auto may hereinafter be referred to as the "Class 7 Claimant."

     Class 7 consists of the allowed secured claim of TD auto. The class 7 claim, in the amount of $44,806.19 as of the petition date, is secured by a 2016 Cadillac Escalade. During this case payments to this creditor have been made according to the terms of the note. Monthly payments in the amount of $1,024.78 will continue to be made until the note is fully paid on January 6, 2022, at which time, the Class 7 claimant shall promptly deliver to the debt the "paid

note" and release of liens.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 7 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

**This Class is unimpaired**.

**2.8**   **Class 8, Allowed Secured Claims of Translease**   Translease may hereinafter be referred to as the "Class 8 Claimant."

Class 8 consists of the allowed secured claim of Translease. The Class 8 Claim derives from two leases, one of a 2013 Bulk Tank International Trak Trailer and the other of a 2014 Timpte Hopper Grain Trailer. Payments to this Creditor were delinquent on the Petition Date. Pursuant to a Stipulation of Settlement dated August 9, 2018, and approved by the Court on August 22, 2018, this Creditor is currently being paid and shall continue to be paid as follows: Commencing in August 2018, monthly lease payments and the residual due under each of the Leases shall be repaid by the Debtor on a monthly basis until all sums due thereunder are paid in full. The Debtor shall be responsible for ongoing monthly Lease payments in the aggregate amount of $1,617.46, consisting of $982.24 for the 2013 Bulk Tank International Tank Trailer, and $655.22 for the 2014 Timpte Hopper Grain Trailer. The arrears due the Class 8 Creditor for April through July 2018, in the amount of $6,469.84, were paid pursuant to the Order approving the Stipulation of Settlement. The Class 8 Claimant will retain its security interest in the collateral until the Leases are satisfied, at which time, the Class 8 Claimant shall promptly deliver to the Debtor the "Paid" Note and titles to the 2013 Bulk Tank International Trak Trailer and the 2014 Timpte Hopper Grain Trailer.  The debtor accepts all of the Class 8 leases.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 8 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

**This Class is unimpaired.**

**2.9**   **Class 9, Allowed Secured Claims of Northland Capital Equipment Finance.**
Northland Capital Equipment Finance may hereinafter be referred to as the "Class 9 Claimant."

Class 9 consists of the allowed secured claim of Northland Capital Equipment Finance. Class 9 claim derives from a master lease dated March 8, 2011, in the following finance leases:

February 6, 2013 lease of a 2013 10 Timpte model for 4228 super Hopper GRAIN trailer

(the 4228 trailer) with five annual payments of $8,430.88 ending May 2018. This lease has been fully paid; Debtor has requested the Class 9 Claimant deliver to the debtor the "paid note" and release of liens on 4228 trailer ion accordance with the 4228 trailer lease and has not yet received the "paid note" and release of liens.

The Debtor accepts the November 6, 2014, lease of a 2014 Horsch RT – 370 Joker with annual payments of $18,450 ending November 29, 2019;

The Debtor accepts the February 22, 2016 lease of a 2017 10 Timpte 4228 super Hopper trailer with annual payments of $7,449.90 ending January 28, 2022;

The Debtor accepts the August 23, 2016 lease of the 2017 lease of the 2017 Timpte 228 super Hopper trailer with five annual payments of $8,867.24 ending January 2022.

The annual payments on the above referenced leases will continue to be made until the finance leases are fully paid, with the exercise of the purchase option, on their contracted dates, at which time, the class 9 claimant shall promptly deliver to the debtor the "paid note" and release of liens.

The Debtor also has leases with the Class 9 Claimant that the Debtor is rejecting as detailed below.

First Northland Lease Rejected

The Debtor has a January 8, 2016 lease of a 2014 John Deere 4940 self-propelled sprayer with StarFire 3000 receiver (hereinafter the 4940 lease and or 4940 Sprayer) with the Class 9 Claimant.  The Debtor rejects the 4940 lease.  The balance on the 4940 lease on February 1, 2018 was $188,399.44. The lease called for annual payments of $39,345.56 with the final payment due on January 1, 2021. The Debtor made payments in 2016, 2017, and 2018 to Northland Capital under this lease and the lease matures on January 1, 2021 meaning the debtor is defaulting on three payments, of $39,345.56 for a total default under the lease of $118,036.68.

The debtor believes the fair market value of the 2014 John Deere 4940 self-propelled sprayer is approximately $150,000 and the debtor therefore anticipates that there will be no deficiency payable to North land equipment finance under the lease when the tractors returned to North land

15

equipment finance and subsequently credited to the debtor or sold to make the remaining payments due under the lease.

In the event there is a deficiency due to the Class 9 Claimant under 4940 Sprayer lease, by way of the debtor rejecting 4940 Sprayer lease, any monies owed to Northland Capital Equipment Finance by way of the debtor rejecting the 8345rt lease shall be an unsecured deficiency claim and be added to the unsecured creditors' claims in Class 12 and Northland Capital Equipment Finance shall be treated as a Class 12 unsecured creditor for the amount of any deficiency under the 4940 Sprayer lease, and be able to vote its unsecured deficiency claim as a Class 12 creditor and be paid in accordance with the treatment of the Class 12 creditors under the plan

2nd Northland Lease Rejected

The debtor has a February 16, 2016 lease of a 2008 John Deere 8430 tractor (hereinafter the 8430 lease) with the Class 9 Claimant the debtor rejects the 8430 lease the balance on the 8430 lease on February 1, 2018 was $113,453.56. The lease called for annual payments of $32,475.67 with the final payment due on January 28, 2021 the debtor made payments in 2016 and 2017 to Northland Capital under this lease and the lease matures on January 28, 2021 meaning the debtor is defaulting on four payments of $32,475.67 for a total default under the lease of $129,902.68.

The debtor believes the fair market value of the 2008 John Deere 8430 tractor is approximately $85,000 and the debtor therefore anticipates there will be a deficiency of approximately $44,902.68 under the 8430 lease. The exact amount, (Debtor estimates there is an approximate $44,902.68 deficiency) owed to Northland Capital by way of the debtor rejecting the 8430 lease is an unsecured deficiency claim, and shall be added to the unsecured creditors' claims in Class 12 and Northland Capital shall be treated as a class 12 unsecured creditor for their unsecured deficiency claim and be able to vote the exact amount of its unsecured deficiency claim as Class 12 creditor and be paid in accordance with the treatment of the class 12 creditors under the plan.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 9 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

**This Class is unimpaired.**

**2.10**    **Class 10, Allowed Secured Claims of Wells Fargo Equipment Finance.** Class 10 is purposely deleted as Class 10 previously referred to Wells Fargo Equipment Finance lease that Debtor had not yet rejected; however, The Debtor rejects the Wells Fargo Equipment Finance March 28, 2016 finance lease of a 2013 John Deere 8335R Tractor (the 8335 tractor and or 8335 Tractor Lease) with five annual payments of $48,167.37 ending March 2021 which lease was initially held by Northland Capital.

The Debtor made payments in 2016 and 2017 and the lease matures in 2020 meaning the Debtor is defaulting on 3 payments of $48,167.37 for a total default under the lease of $144,502.11

The debtor believes the fair market value of the 2013 John Deere 8335R Tractor is $160,000 and the debtor therefore anticipates that there will be no deficiency payable to Wells Fargo Equipment Finance under the lease when the tractor is returned to Wells Fargo Equipment Finance and subsequently credited to the Debtor or sold to make the remaining payments due under the lease.

In the event there is a deficiency due to the Class 10 Claimant under the 8335 tractor lease, by way of the debtor rejecting the 8335R tractor lease, any monies owed to Wells Fargo Equipment Finance by way of the debtor rejecting the 83355 Tractor lease shall be shall be an unsecured deficiency claim and added to the unsecured creditors' claims in Class 12 and  Wells Fargo Equipment Finance shall be treated as a Class 12 unsecured credit for the amount of any unsecured deficiency claim deficiency under the 8335 lease, and be able to vote its unsecured deficiency claim as a Class 12 creditor and be paid in accordance with the treatment of the Class 12 creditors under the plan

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 10 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

**This Class is unimpaired.**

**2.11**    **Class 11, Allowed Secured Claims of Cobank Farm Credit Leasing.** Cobank Farm Credit Leasing may hereinafter be referred to as the "Class 11 Claimant."

Class 11 consists of the allowed secured claim of Cobank Farm Credit Leasing.  The

Class 11 claim is secured by a 2014 Soucy Tracks -Contract #001-0066417-000 (the Soucy Lease), with annual payments of $14,842.36 and personal property taxes of $309, a 2015 Phillips Harrow -Contract #001-0071287-000 (the Harrow Lease) with annual payments of $6,072.33 and personal property taxes of $184.    The debtor accepts the Soucy lease and the Harrow lease. claimant shall promptly deliver to the debtor the "paid note" and release of liens

During this case, payments to this creditor have not been made according to the terms of the finance lease. The back payments will be cured on or before April 15, 2019 and the annual payments will continue to be made until the finance leases are fully paid with the exercise of the purchase option on their contracted dates at which time, the class 11 claimant shall promptly deliver to the debtor the "paid note" and release of liens.

One Cobank Farm Credit Lease Rejected

The Debtor also has a lease with the Class 11 Claimant of a 2014 8345rt John Deere Tractor (8345rt Tractor) – Contract #001-0066962-000

The Debtor rejects the lease of the 2014 8345rt John Deere Tractor – Contract #001-0066962-000 whose annual payments are approximately $51,559.89. The debtor made payments under Contract #001-0066962-000 in 2015 2016 and 2017. The lease expires in 2020.  On November 13, 2018, the 2018 lease payment had accumulated late charges and the total due on the 2018 lease payment as of November 13, 2018 was $61,633.29 which includes monthly late payments of $793.53 and personal property taxes of $1344.2. By rejecting the lease, the debtor is defaulting on this $61,633.29 payment plus 2 more late payments of $793.53 for a total of $63,220.35 as well as to future payments of $51,559.89 for total default under the lease of approximately $166,340.13

This tractor has been operated for approximately 1600 hrs. and the debtor believes its fair market value is $200,000 and the debtor therefore anticipates that there will be no deficiency payable to CoBank under the lease when the tractor is returned to CoBank and subsequently credited to the debtor or sold to pay the remaining payments due under the lease.

In the event there is a deficiency due to the Class 11 Claimant under 8345rt Tractor lease, by way of the debtor rejecting 8345rt Tractor lease, any monies owed to Cobank Farm Credit by way of the debtor rejecting the 8345rt lease shall be an unsecured deficiency claim and be added to the

18

unsecured creditors' claims in Class 12 and  Cobank Farm Credit shall be treated as a Class 12 unsecured creditor for the amount of any deficiency under the 8345rt lease, and be able to vote its unsecured deficiency claim as a Class 12 creditor and be paid in accordance with the treatment of the Class 12 creditors under the plan

**This Class is unimpaired.**

**2.12    Class 12, Allowed Unsecured Claims.** This class shall be the claims of unsecured creditors. Before making any provision for deficiencies that would be added to the Class 12 claims by way of the debtors' rejection of various leases with Northland Capital, CoBank, and Wells Fargo Equipment Finance, the Class 12 claims approximate $2,733,191 and include the $1,333,748.93 Frontier Bank Unsecured Note. The debtor estimates that there will be a deficiency through the debtor's rejection of the 8430 tractor lease with Northland Capital of approximately $44,902.68 which will be added to the Class 12 Claims. Out of an abundance of caution, the debtor has provided for up to $300,000 in deficiencies that could be resultant from the debtor's rejection of the various leases with Northland Capital, CoBank, and Wells Fargo Equipment Finance, by adding $300,000 to the $2,733,191 in unsecured claims such that in the projections the unsecured creditors claims in Class 12 total $3,033,191.   In the event the deficiencies resultant from the debtor's rejection of the various leases with our greater or less than the $300,000, the payments to the Class 12 creditors shall reflect the exact amount of those deficiencies that are added to the Class 12 claims.

These claims will be paid over 7 years in an annual principal reduction payment equal to 3% of each claimant's claim beginning on April 15, 2019 and ending on April 15, 2025

Total payout to the Class 12 claimants under the plan equals 21% of each class claimant's claim.

**This class is impaired.**

**2.13    Class 13, Equity Interests.** The Debtor's principal, Jon Russell will retain his interest in the Debtor.

## IV.
## DISCLOSURE  OF EMPLOYMENT

Jon Russell will manage the post confirmation affairs of the Debtor but will receive no

compensation from the Debtor.

# V.
## LIQUIDATION ANALYSIS

Under the provisions of § 1129 (a)(7) of the Code as amended, a plan of reorganization may be confirmed if, inter alia the holders of impaired claims accept the Plan or will receive under the Plan "property of a value... that is not less than the amount such holder would receive or retain if the Debtor were liquidated under Chapter 7... "

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the plan, then that claimant or interest holder must receive or retain under the plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this plan, the Court must find that all creditors and interest holders who do not accept the plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Debtor maintains that this requirement is met here for the following reasons: The Debtor's primary assets are the Lakeshore Equipment and cross collateralized real estate owned by Jon Russell that would be liquidated under a Chapter 7 liquidation. The Debtor also owns two vehicles encumbered by auto loans with TD Auto. The TD Auto loans total approximately $92,000 in debt. The Lakeshore Equipment and cross collateralized real estate are encumbered by UCC-1's and deeds of trust in favor Frontier Bank. The balances of the notes securing the Lakeshore Equipment and cross collateralized real estate as of the filing of this plan are approximately $2,633,748.93.

Based upon the Debtor's estimate, the liquidated value of the Lakeshore Equipment and

cross collateralized real estate as well as the three vehicles is $1,013,813.00. The Debtor arrives at this value by estimating is the sum of 70% of the cumulative value of the three vehicles plus the appraised liquidated value of the Lakeshore Equipment plus the Debtor's estimate of a value equal to 70% of the fair market value of the cross collateralized Jon Russell personal residence and shop land. Based upon the assumption that in a Chapter 7 proceeding the liquidation values referenced herein could be obtained, and further assuming that there would be normal costs of sale and other costs of administration attendant to the Chapter 7 proceeding, there would not be sufficient proceeds generated by a sale of the three vehicles, the Lakeshore Equipment and the cross collateralized real estate to pay all of the secured creditors.  The conclusion that necessarily follows is that the secured creditors of the estate would receive substantially less than their claims under a Chapter 7 liquidation and that the unsecured creditors of the Debtor's estate would not receive any distribution were this Chapter 11 proceeding converted to one under Chapter 7 of the Code. Indeed, under a Chapter 7 liquidation and pursuant to the detailed liquidation analysis which attached as **Exhibit C**, TD Auto would receive 70% of their claims under a chapter 7 liquidation. The Debtor estimates that Union Bank and TD Auto would receive 70% of their claims under a Chapter 7 liquidation, Frontier Bank would receive 35.44% of their Claim under a chapter 7 liquidation and the unsecured creditors would receive 0% of their claims under a Chapter 7 liquidation.  **Note: On August 22, 2018 Frontier Bank appraised all of the farm equipment that is both owned as well as leased by the Debtor. That appraisal is attached hereto as Exhibit D and incorporated herein by reference. For purposes of the liquidation analysis the Debtor did not include the leased farm equipment in its liquidation analysis (because it is not owned by the Debtor) and only included the appraised liquidated value of the Frontier Bank Farm Equipment Collateral that is owned by the Debtor when evaluating the liquidated value of farm equipment in Exhibit D.  The cumulative farm equipment liquidated values reflected in the August 22, 2018 appraisal are therefore greater than the cumulative farm equipment liquidated values in Exhibit D because Exhibit D does not include the liquidated values of farm equipment that is not owned by the Debtor but that was included in the appraisal.**

**In addition to the liquidated value of the Frontier Bank Farm Equipment Collateral, the Debtor's estimate of the liquidated value of the TD Auto and Union Bank collateral that is owned by the Debtor as well as the liquidated value of the cross**

**collateralized Jon Russell real estate are also included in the Exhibit C liquidation analysis.**

The plan, which provides for a 100% distribution to TD Auto and Union Bank, a 59.99% distribution to Frontier Bank and a 21% distribution to the unsecured Creditors, clearly provides a greater return to both the secured and the unsecured creditors than that which would be achieved in a Chapter 7.

Consequently, the Debtor believes that the plan, as proposed, provides to secured and unsecured creditors more than they would receive were the Debtor's case converted to one under Chapter 7 of the Code. The plan proposes to pay general unsecured creditors 21% of their total claims while a liquidation of the Debtor's estate would result in a 0% dividend.  In a Chapter 7 case, a trustee is appointed and entitled to compensation from the Bankruptcy Estate in an amount not to exceed 25% on the first $5,000 of moneys disbursed, 10% on any amount over $5,000 but less than $50,000, 5% on any amount over $50,000 but not in excess of $1 million and 3% on all amounts over $1 million.  In this case, the Trustee's compensation is estimated to equal $56,941 based upon a liquidated value of the Lakeshore Equipment and cross collateralized real estate of $1,013,813 which is equal to 70% of value of the three vehicles, plus the appraised liquidated value of the Lakeshore Equipment plus the debtors estimate of a value equal to 70% of the fair market value of the cross collateralized Jon Russell personal residence and shop land. Through the plan however, no trustee's compensation will be incurred.

Below is a demonstration, in balance sheet format, reflecting that all creditors and interest holders will receive at least as much under the plan as such creditor or interest holder would receive under a Chapter 7 liquidation. This information is provided by the Debtor .

### ASSETS VALUED AT LIQUIDATION VALUES

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
| --- | --- | --- |
| Cash on hand | 0 | Not applicable |

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Jon Russell Real Property @ Frontier Cross Collateral at liquidation value | $185,000 | The liquidation value is based on a 70% reduction of the approximated fair market value of the personal residence and shop land |
| Recovery From Avoidance Actions | $.00 | The Debtor does not anticipate that there will be any Avoidance Actions filed. |
| Total Frontier Equipment Collateral at Liquidation Value | $748,300 | |
| Total TD Auto Vehicle Collateral at Liquidation Value | $64,377 | |
| Total Union Bank Vehicle Collateral at Liquidation Value | $16,135 | |
| Total Cross Collateralized Jon Russell Real Estate | $185,000 | |
| Total Cash Available for Payment to Creditors | $1,013,813 | |
| LESS LIABILITIES IN CHAPTER 7 CASE | | |
| Less: Chapter 7 trustee's fees and expenses | $56,941 | |
| Less: Secured Creditor Recovery 1 | $2,748,766 | |
| Less: Chapter 11 administrative expenses (Estimated) | $75,000 | |
| Less: Priority Claims | $0.00 | |

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Balance for unsecured Claims | $0.00 | |
| Balance for Under-secured Claims | $0.00 | |
| Total amount of Unsecured Claims (Frontier under-secured claim is included in Secured Creditor Recovery) | $1,400,163 | |
| % OF THEIR CLAIMS WHICH UNSECURED CREDITORS WOULD RECEIVE OR RETAIN IN A CHAPTER 7 LIQUIDATION: | 0.00% | |
| % OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THIS PLAN: 100% | 21% | |

Below is a demonstration, in tabular format, that all creditors and interest holders will receive at least as much under the plan as such creditor or holder would receive under a Chapter 7 liquidation.

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|

| | | |
|---|---|---|
| Administrative Claims | 100% | 0% Estimated funds available for Administrative Claims would be $0 (Chapter 7 Administrative Fees and Costs and Chapter 11 Administrative Fees and Costs are estimated at $75,000) |
| Secured Class 4 Frontier Bank (thru a combination of payment of its' secured and under-secured claims under | 59.99% | 35.44% |
| Secured Class 5 TD Auto | 100.00% | 70% |
| Secured Class 6 TD Auto | 100.00% | 70% |
| Secured Classes 7 Union Bank | 100.00% | 70% |
| Classes 8-11 are Lessors unaffected by liquidation | N/A | N/A |
| Class 12 General Unsecured Creditors | 21% | 0% |

## VI.
## MEANS OF IMPLEMENTING  OF THE PLAN

*MEANS OF IMPLEMENTING THE PLAN*

The Debtor has continued to operate as it always has. The problems experienced by the Debtor were not the result of failed operations, but the result of failed business relationships. The Debtor will seek to avoid those relationships which are not in its and its creditors' best interests. The Debtor has also divested itself of equipment it does not require and will continue to analyze its equipment needs annually.

For the reasons outlined, Mr. Russell intends to recommence farming in his name, with him signing as an individual, the ARM loan used to fund the farming operation.  He will utilize the interest cost savings and increased FSA payments outlined below to make payments to Lakeshore Farms under the plan by leasing the Lakeshore Equipment for $ $300,000 in the first year of the plan and then $350,000 annually thereafter and contributing annual New Value to Lakeshore Farms.

A supplement will be attached hereto as **Exhibit E** and incorporated herein by reference and will be the Lease Agreement by and between Lakeshore Farms Inc., and Jon Russell as soon as available.

Attached hereto as **Exhibit F** and incorporated herein by reference is the Agreement between Jon Russell and Lakeshore Farms Inc. for Jon Russell to contribute New Value to Lakeshore Farms.

The end result of Jon Russell running the farm, leasing the Lakeshore Equipment from Lakeshore Farms and making New Value contributions to Lakeshore Farms is the ability for Lakeshore Farms to make substantially greater payments to all of its creditors under the plan than if Lakeshore Farms were to continue to run the farm and formulate a plan around Lakeshore Farms operating the farm.

### *BACKGROUND AND STEPS FORWARD*

For approximately 27 years prior to 2015, Mr. Russell farmed the land himself, eventually using equipment owned by the Debtor to farm. The transition to farming under the Debtor's name came at the request of Frontier Bank in 2015, after they loaned the Debtor approximately $3,323,000.00 to acquire the Lakeshore Equipment.  Farming under the Debtor's name has cost Mr. Russell approximately $100,000.00 each year in FSA subsidies as well as created some complexity that have proven to be unhelpful to the farming operations.  As it relates to FSA subsidies, Mr. Russell has determined that in 2018 he would have received approximately $200,000.00 in FSA subsidies had he been operating the farm as John Russell, as compared to the $100,000.00 in FSA subsidies the Debtor received in 2018 operating the farm as Lakeshore Farms.

As it relates to farm loans, Mr. Russell has determined that he is more credit worthy than Lakeshore Farms both at the present time and once Lakeshore Farms emerges from Chapter 11.  To that end, prior to Lakeshore Farms, Inc.'s filing Chapter 11, its financing with ARM was structured as a loan with an interest rate of 9%. Once Lakeshore Farms filed Chapter 11, the interest rate on the ARM loan increased to 12%. John Russell has spoken with ARM who has indicated that they will return the interest rate on the loan to 9% if the loan is signed by John Russell and not by Lakeshore Farms.  John Russell intends to sign the ARM loan for 2019 and anticipates that the interest rate on the loan will

reduce back down from 12% to 9% interest.

Jon Russell proposes to make payments to Lakeshore Farms over the 8-year term of the Lakeshore Farms plan out of profits from his farming operation; therefore, savings he is able to make (such as lowered ARM interest payment) will flow into the Lakeshore Farms Plan. To that end, the projected ARM interest savings over the 8-year period in which Jon Russell will make payments to Lakeshore Farms under the Plan are approximately $424,000.00 as summarized in the Jon Russell 8-year projections. Those projections tie into the Lakeshore Farms 8-year projections and are both attached to this Disclosure Statement. The approximately $424,000.00 in interest savings over 8 years resultant from Jon Russell signing the ARM loan directly benefit the creditors of Lakeshore Farms by way of John Russell being able to utilize those $424,000.00 in interest savings to maintain profitability in the Jon Russell farm which in turn enables Jon Russell to make the annual lease payments to Lakeshore Farms.

As it relates to the FSA subsidies, the doubling of the FSA subsidies to approximately $200,000.00 payable to Jon Russell compared to approximately $100,000.00 that would be payable to Lakeshore Farms, will enable Jon Russell to make an annual New Value Contribution that in accordance with the financial projections (per **Exhibit B2**) averages approximately $150,000.00 in annual New Value paid to Lakeshore Farms for each of the first 7 years of the plan. In the first month of the 7th year of the plan, the Class 12 unsecured creditors will have been paid under the plan. A final New Value contribution of approximately $100,000.00 in first month of the 8th year will then be made by Jon Russell to Lakeshore Farms at which time the final payments under the plan will have been made and the Class 4 claim of Frontier Bank will be satisfied in full.

As it relates to any tax benefits that Lakeshore Farms might lose by way of Jon Russell operating the farm, Lakeshore Farms is a Subchapter S Corporation meaning Lakeshore Farms itself is not subject to federal income tax and instead, the sole shareholder, Jon Russell, is taxed on 100% of the Lakeshore Farms income. Form 1120S is the form used for an S-corps annual tax return. As it relates to Lakeshore Farms, there is an approximate $7M net operating loss (NOL) reported in its Form 1120S and the NOL has always and will continue to flow to Jon Russell's personal tax return. In sum, under the IRS

tax code, all of the profits and losses of Lakeshore Farms are passed to Jon Russell and reported on his personal income tax return; therefore, no benefit to Lakeshore Farms is being removed by Jon Russell running the farming operation. Indeed, because of the projected lower interest rates, and projected doubling of FSA payments, it is the Lakeshore Farms who benefits from the farming operation being run by Jon Russell.

Under the Jon Russell 8-year projections, the vast majority of revenues generated from farming operations after payment of ARM Debt Service and operating expenses is paid to Lakeshore Farms. Indeed, in any given year, after Jon Russell has paid the annual lease payment and contributed the New Value to Lakeshore Farms, the Jon Russell projections (per **Exhibit B2**) demonstrate after tax profits that do not exceed $ 63,000 after Jon Russel pays himself a projected salary of $$3,500  per month in years one and two, , $4,000.00 per month in year three  and $6,000.00 per month in years 4 through 8.  In year 8 Lakeshore makes its final payment to Frontier Bank under the Plan and at that time, Lakeshore has paid all creditors under the Plan.  Also, under the Jon Russell 8-year projections, the tax rate is 15.3% (FICA only, no state or federal taxes are incurred) because of the $7M Net Operating Loss in Lakeshore that flows to Jon Russell under the IRS code. What this means is Jon Russell is not unfairly profiting by returning the operation to himself and running it under his name.  Indeed, it is Lakeshore Farms benefitting from his running the farm due to lower borrowing interest rates and increased FSA payments enabling Jon Russel to make the Lakeshore lease and New Value payments.

As it relates to the land leases signed by Lakeshore Farms in 2018 and which mature at the end of each 12 month calendar year term,  in discussions with the landowners who have leased the farmland to Lakeshore Farms, and who in prior years have leased the land to Jon Russell, the leases are short term with one year maturity dates and must be re-signed annually and the landlords have informed Mr. Russell that starting Calendar year 2019, they prefer leasing to Jon Russell as an individual and do not want to sign leases with Lakeshore Farms; therefore, Jon Russell will be returning to his pre-2015 practice, when Jon Russell farmed, and signed the land leases.

Although Frontier Bank originally requested Mr. Russell farm the land under Lakeshore Farms, the Debtor has obtained the support from Frontier Bank to return to

farming under his name, lease the farm land under his name, sign the ARM loan under his name, and lease the Lakeshore Equipment under his name from Lakeshore Farms all as an integral part of the Plan of Reorganization and an integral aspect of the means of implementing the Plan.

## VII.
## IMPLEMENTATION OF THE PLAN

A.    **Effect of Confirmation.** Upon the entry of an Order of Confirmation, the Debtor shall be vested with all of the property of the Estate, subject only to outstanding liens created and/or recognized by this Plan and free and clear of all other claims, liens, encumbrances, charges and other interests of creditors, and shall be entitled to operate its business and manage its affairs free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules, or any local rules of the Bankruptcy Court and without further order of the Bankruptcy Court, except as otherwise expressly provided under the Plan.

B.    **Post-Confirmation Operations.** Notwithstanding the entry of an Order of Confirmation, the Debtor shall continue as Debtor-in-Possession until entry of a final decree closing this Chapter 11 case; shall have all rights and powers of a trustee serving in a case under this Chapter of the Bankruptcy Code; shall retain and remaining possession after confirmation of this Plan of all causes of action as they may have under the Bankruptcy Code; and as Debtor-in-Possession shall be authorized to prosecute such actions as fully and completely as if the same were being prosecuted by a Trustee in Bankruptcy. The Bankruptcy Court shall have and retain jurisdiction over such causes of action.

The plan is a New Value Plan wherein Jon Russell both leases equipment from Lakeshore farms and contributes New Value to Lakeshore Farms enabling Lakeshore Farms to meet its payment obligations under the Plan. Because Jon Russell is returning to the pre-2015 business model for the reasons discussed in Section VI above, the Debtor has provided with this Disclosure Statement projections for both the Jon Russell farming operation as well as projections for Lakeshore Farms. The eight-year projections for John Russell and Lakeshore Farms are attached hereto, made a part hereof and marked "**Exhibit B1" (Jon Russell Projections) and** "**Exhibit B2" (Lakeshore Farms Projections)**.

**C.**      **Discharge of Debtor.** The Debtor will be discharged from all pre-petition obligations upon completion of the Plan.

**D.**      **Executory Contracts.** All executory contracts set forth on the schedule of assumed executory contracts filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing shall be deemed assumed by Debtor, as of the Effective Date, except for any executory contract (a) that has been rejected pursuant to an Order of the Bankruptcy Court entered prior to the Effective Date, or (b) as to which a motion for approval of the rejection of such executory contract, if applicable, has been filed with the Bankruptcy Court prior to the Effective Date.

**E.**      **Unexpired Leases.** All unexpired leases set forth on the schedule of assumed unexpired leases filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing shall be deemed assumed by Debtor as of the Effective Date, except for any unexpired lease (a) that has been rejected pursuant to an Order of the Bankruptcy Court prior to the Effective Date, or (b) as to which a motion for approval of the rejection of such unexpired lease, if applicable, has been filed with the Bankruptcy Court prior to the Effective Date.

**F.**      **Deemed Rejection.** All executory contracts and unexpired leases not specified on the schedule of assumed executory contracts and unexpired leases, filed with the Bankruptcy Court prior to the Effective Date or not previously rejected shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to a final order entered on or before the Effective Date, or (b) that is the subject of a pending motion to assume or an order relating to assumption that has not yet become a final order as of the Effective Date. A list of the rejected leases is attached hereto as Exhibit H and incorporated herein by reference.

**G.**      **Approval of Assumption or Rejection.** Entry of the Confirmation Order shall constitute (a) the approval, pursuant to § 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan. Notwithstanding anything contained herein to the contrary, Debtor shall have the right to add or delete any executory contract or unexpired lease to the schedules filed with the Bankruptcy Court on or before the Effective Date.

**H.**      **Post-Petition Date Contracts and Leases.** Executory contracts and unexpired

leases entered into, and other obligations incurred after the Petition Date, by Debtor shall be performed by Debtor, as applicable, in the ordinary course of their business.

**I.** **Administrative Expenses.** There are no unpaid, post-petition debts. U.S. Trustee fees will be due for the first and second quarters of 2018. The U.S. Trustee fees will be paid by the Effective Date. Attorneys' fees will either be paid on the Effective Date or in equal installments during the six months following confirmation. If sufficient funds are not available from the Debtor, Jon Russell will pay those fees and expenses.

**J.** **Continuation of Liens.** The valid liens of the secured creditors will continue throughout the life of the Plan or until the claims are paid in full.

**K.** **Officers and Managers.** Jon Russell is the only officer and manager of the Debtor and will receive management fees during the life of the Plan.

**L.** **Management.** Jon Russell will manage the Debtor. He will be assisted by the necessary accounting and clerical personnel, although the costs will be minimal and will approximate the past costs expended during the pendency of this reorganization proceeding.

**M.** **Members of the Debtor.** Jon Russell is the sole shareholder of Debtor.

**N.** **Validity of Frontier Bank Lien.** The Debtor recognizes and acknowledges the validity of the lien of Frontier Bank.

**O.** **Causes of Action.** The Debtor shall retain all causes of action, known or unknown that exist at the time of confirmation. At the present time, the Debtor is in litigation regarding a payment on crop insurance which recovery (if received) will be paid 15% to Frontier Bank and 85% to Manville. No other known causes of action exists other than the litigation for which Hood Law group was retained by the Debtor which is referenced in section II of this Disclosure Statement.

**P.** **Powers of the Debtor.** The Debtor will have the powers of a Trustee, to the extent necessary to carry out the provisions of the Plan.

**Q.** **Guarantee of Jon Russell.** Jon Russell is the sole shareholder of the Debtor and will be financially responsible for any shortage or inability of the Debtor to make the plan payments.

**R.** **Provisions of Loan and Lease Documents.** The terms and provisions of loan and lease documents between the Debtor and the Class 4 through 11 Claimants shall remain unchanged, except for those terms that are specifically changed by confirmation of the Plan and

incorporated as part of the Plan or pursuant to Court order.

  **S.**   **Class 1 through Class 11 Claimants' Claims.** The claims of the Class 1 through Class 11 Claimants are allowed.

  **T.**   **Impaired Classes to Vote.** Each Holder of an Allowed Claim in an impaired class shall be entitled to vote separately to accept or reject this Plan unless such Holder is deemed to accept or reject this Plan. ANY BALLOT NOT INDICATING AN ACCEPTANCE OR REJECTION WILL BE DEEMED AN ACCEPTANCE OF THIS PLAN AND ANY HOLDER OR A CLAIM ENTITLED TO VOTE ON THIS PLAN FAILING TO RETURN A BALLOT BY THE VOTING DEADLINE (AS DEFINED IN THE DISCLOSURE STATEMENTS) SHALL BE DEEMED TO HAVE VOTED SUCH HOLDER'S CLAIMS TO ACCEPT THE PLAN. Allowed Secured Claims and Allowed Nonpriority Unsecured Claims are impaired and are entitled to vote. Allowed Administrative Claims, allowed Ordinary Course Administrative Claims and allowed Priority Claims are unimpaired, are deemed to accept, and are not entitled to vote.

  **U.**   **Acceptance by Class of Creditors and Holders of Interests.** An impaired Class of Holders of Claims shall have accepted this Plan. If this Plan is accepted by at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such Class that have voted to accept or reject this Plan. A class of Holders of Claims shall be deemed to accept this Plan in the event that no holder of a claim within that class submits a Ballot by the Ballot Date.

  **V.**   **Cramdown.** If any impaired Class of Claims entitled to vote shall not accept this Plan by the requisite statutory majorities provided in § 1126(c) of the Bankruptcy Code, Debtor reserves the right to request that the Bankruptcy Court confirm this Plan under§ 1129(b) of the Bankruptcy Code.

  **W.**   **Jurisdiction.** Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court retains such jurisdiction over the Chapter 11 case on and after the Effective Date as is legally permissible, including, without limitation, jurisdiction.

    (1)   to allow, disallow, determine, liquidate, classify, estimate, or establish the amount of priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance of priority of Claims;

(2)    to adjudicate all claims as to ownership interest  in  any property of  the Debtor  or of this Estate and of any proceeds thereof;

(3)    to adjudicate all claims or controversies arising out of any purchase, sale or contract made or undertaken by  the Debtor during the pendency of this Chapter  11 proceeding;

(4)    to determine the  validity, extent and priority of all liens against property of the  Debtor Estate;

(5)    to determine the value of the property  securing any Claim;

(6)    to grant or deny any  applications for allowance of compensation or reimbursement  of expenses authorized  under the Bankruptcy Code or the Plan;

(7)    to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which Debtor is party and to hear, determine, and if necessary liquidate any claims arising from or cure amounts related to such assumption or rejection;

(8)    to decide or resolve any motions, adversary proceedings or contested matters, and to grant or deny any applications  or motions  involving  Debtor that may  be pending on the Effective Date;

(9)    to resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the obligations of any Holder or Person incurred in connection with the Plan;

(10)    to consider and approve  any  modification of the Plan  under  § 1127 of the Bankruptcy Code or under Bankruptcy Rule 2019 and/or any modification of the Plan after substantial consummation as defined in § 1101(2) of the Bankruptcy Code;

(11)    to issue injunctions, enter and implement other orders, or take such other action as may be necessary or appropriate to prevent interference by any  entity with consummation or enforcement of the Plan, and any  transaction  related thereto, except as otherwise  provided  in the Plan;

(12)    to hear and determine any other matters that may arise in  connection with or relate to the Plan, the Disclosure  Statement, the confirmation  order or any contract, instrument, release or other agreement or document created in connection with the Plan, Disclosure Statement  or  the Confirmation Order except as otherwise provided in the

33

Plan;

(13)   to adjudicate  all causes of action or claims of Debtor;

(14)   to approve settlements of any cause of action or claim of Debtor;

(15)   to resolve any disputes between Professionals and Debtor in accordance with Section 3.8;

(16)   to hear and determine such matters and make such orders consistent with the Plan as may be necessary or desirable to interpret, enforce and carry out in the provisions thereof; and

(17)   to enter an order closing the Chapter 11 case.

**X.**   **Risk-Analysis.** Because of the numerous risks and inherent uncertainties that will affect the operations of the Reorganized Debtor, the actual results of the Reorganized Debtor may be different from those projected, and such differences may be material and may adversely affect the Reorganized  Debtor and its operations.

## VIII.
## FEASIBILITY

Historically, the Debtor and or Jon Russell have generated sufficient revenue to make the proposed payments under the plan. The principal of Debtor can, and will, supplement cash flow to make payments under the Plan as New Value contributions generated from increased FSA payments made to Jon Russell by his running the farm and/or savings in loan interest payments from Jon Russell signing the ARM loan.

The Plan is feasible.

## IX.
## TAX CONSEQUENCES OF THE PLAN

**A.**   **INTRODUCTION**

THE DEBTOR BELIEVES THAT EACH HOLDER OF A CLAIM SHOULD DISCUSS ANY POTENTIAL INCOME TAX CONSEQUENCES OF THE PLAN WITH COMPETENT TAX COUNSEL IN ORDER TO FULLY UNDERSTAND THE TAX IMPACT OR POTENTIAL IMPACT OF THE PLAN ON SUCH HOLDER OF A CLAIM  OR INTEREST.

**B.**   **FEDERAL TAXES**

34

The Plan may modify or affect the timing of the Federal Income tax treatment of claims.

DEBTOR MAKES NO REPRESENTATION NOR RENDERS ANY OPINION AS TO WHAT THE INCOME TAX CONSEQUENCES WILL BE OR ARE LIKELY TO BE IN THE CASE OF CONFIRMATION OF THE PLAN TO ANY CREDITOR, EACH MEMBER OF EACH CLASS IS SOLELY RESPONSIBLE FOR DETERMINING THE FEDERAL INCOME TAX CONSEQUENCES APPLICABLE TO ITS OWN CIRCUMSTANCES, CREDITORS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS CONCERNING THE INDIVIDUAL TAX CONSEQUENCES OF THE PLAN AS IT AFFECTS THEIR PARTICULAR CLAIM OR INTEREST, INCLUDING THE IMPACT OF STATE AND LOCAL TAXES. NO OPINION OF TAX COUNSEL HAS BEEN SOUGHT OR OBTAINED IN CONNECTION WITH THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED HERE ARE ONLY GENERAL OBSERVATIONS AND ARE NOT TO BE INTERPRETED OR CONSTRUED AS LEGAL ADVICES.

## X.
## CONFIRMATION REQUIREMENTS

At the hearing on the confirmation of the Plan, the Bankruptcy Court will confirm the Plan only if the requirements of the Bankruptcy Code, particularly those set forth in §1129, have been satisfied.

### A.   ACCEPTANCES NECESSARY TO CONFIRM THE PLAN

At the hearing on the confirmation of the Plan, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of allowed claims in each impaired class. Under the Bankruptcy Code, a class of creditors is impaired if their legal, equitable or contractual rights are altered by a proposed plan of reorganization. If a class is not impaired, each creditor in such unimpaired class is conclusively presumed to have accepted the Plan pursuant to §1126(f) of the Bankruptcy Code. Classes three through five are impaired under the Plan and holders of allowed claims in such classes are entitled to vote for or against the Plan by completing and returning the ballots mailed to them with the Disclosure Statement in the manner set forth in the ballots.

Under §1126 of the Bankruptcy Code, an impaired class of creditors and each holder of

a claim in such Class will be deemed to have accepted a plan if the holder of at least two-thirds in amount and more than one-half in number of the Allowed Claims in such impaired Class for which completed ballots have been received have voted for acceptance of the Plan. An impaired Class of Equity Interests and each Holder of an Interest in such Class will be deemed to have accepted a Plan if the Plan has been accepted by at least two-thirds in amount of the interest in such Class who actually vote on the Plan.

If all impaired Classes under the Plan do not accept the Plan, the Debtor intends to request that the Bankruptcy Court confirm the Plan pursuant to §1129(b) of the Bankruptcy Code. To confirm the Plan under §1129(b) of the Bankruptcy code, the Bankruptcy Court must determine, among other things, that the Plan does not discriminate unfairly and that it is fair and equitable with respect to each Class of impaired Allowed Claims that have not voted to accept the Plan.

B.    **BEST INTERESTS OF CREDITORS**

To satisfy one of the requirements necessary for confirmation of the Plan, the Debtor must establish, and the Bankruptcy Court must find that, with respect to each Class of Allowed Claims under the Plan, each Holder of an Allowed Claim in that class either has accepted the Plan or will receive or retain under the Plan on account of such Allowed Claims, property of a value that is at least the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. The section of this Disclosure Statement entitled "Liquidation Analysis" contains the Debtor's analysis of the likely results of a Chapter 7 liquidation of the Debtor. The Bankruptcy Court must compare the value of the distributions to each class under the Plan to determine if the Plan is in the best interest of each class of allowed claims.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF ALL ALLOWED CLAIMS AND PROVIDES VALUE TO ALL OF THEM AT LEAST IN THE AMOUNTS THAT THEY WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION CASE OF THE DEBTOR.

**XI.**

## SUBMISSION

Debtor submits that this Plan meets all requirements of the Bankruptcy Code, is filed in good faith, is in the best interest of creditors and is feasible. Debtor asks that you accept the Plan.


**Dated: January 31, 2019**


**Lakeshore Farms, Inc**

**By: */s/ Jon Russell*_____**
**Jon Russell, Member**



**BERMAN, DeLEVE, KUCHAN & CHAPMAN, LLC**

**By: */s/ Ronald S. Weiss*_____**
Ronald S. Weiss        MO #21215
Joel Pelofsky           MO #17929
2850 City Center Square
1100 Main Street
Kansas City, Missouri 64105
Email:  rweiss@bdkc.com
Email:  jpelofsky@bdkc.com
**ATTORNEYS FOR Lakeshore Farms, Inc**
**DEBTOR AND DEBTOR-IN-POSSESSION**